FILED
2014 Jun-30  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SONNIE WELLINGTON HEREFORD, IV, et al.,** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:63-cv-00109-MHH** |
| | } | |
| **UNITED STATES,** | } | |
| | } | |
| **Intervenor Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | |
| **HUNTSVILLE BOARD OF EDUCATION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

## INTRODUCTION

This school desegregation case has been pending since 1963.  (Doc. 1, p. 1).

"The oft-stated goal of a school desegregation case is to convert promptly from a

*de jure* segregated school system to a system without 'white' schools or 'black'

schools, but just schools."  *Lee v. Autauga County Board of Edu.*, 2004 WL

2359667, *4 (M.D. Ala. Oct. 19, 2004) (citing *Green v. County Sch. Bd. of New

Kent Cnty.,* 391 U.S. 430, 442 (1968)).  "[T]he court's end purpose must be to

remedy the [constitutional] violation and, in addition, to restore [to] state and local

authorities" the control of the public school. *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). Indeed, "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Id.* at 490.

Despite best efforts, and often because of the complexity of the issues that school districts confront when attempting to fulfill their obligations under desegregation orders, resolution of these cases tends not to be prompt, and school districts sometimes prefer judicial oversight to the disruption that may accompany a request for a declaration of unitary status, the final step in a school desegregation action. As one court noted,

> By operating under the status quo, school districts have little burden - mostly just remaining in compliance with previous court orders and filing reports. However, once the school district moves for unitary status, possible negative consequences abound: 1) the rejuvenated litigation may stir up long-dissipated community unrest; 2) closer adversarial and judicial scrutiny may reveal additional areas of inequality, resulting in the need for additional effort and expense from the school district; and 3) the legal proceedings could result in enormous legal and administrative expenses for already cash-strapped school districts.

*Coppedge v. Franklin Cnty. Bd. of Educ.*, 345 F. Supp. 2d 567, 572 (E.D.N.C. 2004). Given the potential costs of stirring the pot, inactivity "is not unusual amongst longstanding school desegregation cases," *id.* at 571; however, inactivity may create problems too. Consequently, "[a]ll parties" involved in a school desegregation case "and the court should be working continuously toward the

ultimate objective – 'restor[ing] state and local authorities to the control of a school system that is operating in compliance with the Constitution.'"  *Id.* at 572 (quoting *Freeman*, 503 U.S. at 489) (emphasis in *Coppedge*).

Lack of activity has taken its toll in this case.  This action was reassigned to the undersigned judicial officer -- the fifth to preside over this litigation -- in February 2014, shortly after the Board filed its motion for approval of its proposed student assignment plan.  (Docs. 281, 282).  When it began examining the 50-year history of the case, the Court encountered named individual plaintiffs who lost their legal interest in the case decades ago, a defendant who for the past 20 years has not filed annual reports mandated by Court order, and a school district that was publicizing in Power Point presentations to the Huntsville community its view that the Majority-to-Minority transfer program that the Court established in 1970 was "substantially reduc[ing] graduation rates" for the district's high schools and "contribut[ing] to flight from majority African-American schools." (Doc. 287-4, p. 8).  The Court also found that years of cooperation among the parties had given way to a standoff concerning the Board's proposal to revise the boundaries of more than 75% of the 40 schools in the district.

As the Court learned more about the case, two things became apparent. First, the Board was interested in more than an isolated order on a discrete student assignment motion.  Instead, the Board was paving the way for an application for a

declaration of unitary status.  Second, periods of dormancy had created cracks in the path toward unitary status.

Consequently, in this memorandum opinion, the Court not only addresses the Board's pending motion for approval of its proposed student assignment plan but also charts a course towards a declaration of unitary status.  The opinion starts at the very beginning and traces the relevant procedural history of this litigation.  It then incorporates findings of fact based on the parties' written evidentiary submissions, the testimony and exhibits that the parties presented during a two-day hearing, and relevant statistical information that the Court has noticed from websites that the State of Alabama, the United States, and Huntsville City Schools maintain.  Next, the Court analyzes the evidence within the framework of the legal principles that govern this litigation.  Finally, the Court evaluates the Board's motion and provides instructions to the parties for the next phases of this school desegregation action.

## PROCEDURAL HISTORY

### 1.    <u>1963-1970</u>

This action began on March 11, 1963, when five Huntsville public school students, Sonnie Wellington Hereford, IV, John Anthony Brewton, James Bearden, Jr., Veronica Terrell Pearson, and David C. Piggie, by and through their parents, filed a motion for preliminary injunction.  The motion incorporated the plaintiffs'

complaint.  In their motion and incorporated complaint, the plaintiffs asserted that,

"[u]nless restrained by this Court," the Board and various individual defendants,

including the chair of the Board and the Superintendent of Education, would

"continue to deny the minor plaintiffs and all other Negro children similarly

situated on account of their race and color the right to be admitted to, enrolled in,

and receive education in the public schools of the city of Huntsville, Alabama on a

non-segregated basis . . . ."  (March 11, 1963, Motion for Preliminary Injunction).[1]

The plaintiffs stated that the defendants' conduct deprived the students "of the

equal protection of the laws secured by the Fourteenth Amendment to the United

States Constitution."   *Id.*   The plaintiffs submitted the affidavit of plaintiffs'

attorney Orzell Billingsley, Jr. in support of their motion for preliminary injunction

and incorporated complaint.  In it, Mr. Billingsley stated that "[i]n every year at

least since 1955," the Board:

> made assignments to schools in its system on the basis of school zones
> which take into account the factor of race.  Negro children are sent to
> Negro schools only and these schools are staffed solely by Negro
> personnel.   Conversely, white children are sent only to schools
> containing white children and are likewise staffed solely by white
> personnel.

---

[1] The pleadings in this matter became automated in 1998.  Many of the Court records that
precede 1998 do not have docket numbers.  The Court refers to those records by the dates on the
manual docket sheets.  The manual docket sheets appear in the electronic record as Doc. 1.

(March 11, 1963, Affidavit in Support of Motion for Preliminary Injunction, at ¶ 5).

On August 12, 1963, the Court entered an order in which it enjoined the Board and the individual defendants:

> from discriminating against the plaintiffs, Sonnie Hereford, IV, John Anthony Brewton, Veronica Terrell Pearson and David C. Piggie because of their race or color in seeking assignment, transfer or admission to the public schools of the City of Huntsville, Alabama, or subjecting them to criteria, requirements, and prerequisites not required of white children seeking assignment transfer, or admission to said schools.

(August 13, 1963 docket order).  The Court also enjoined the Board and the individual defendants "from requiring segregation of the races in any school under their supervision."  (*Id.*).  The Court gave the Board until January 1, 1964 to submit a plan for "an immediate start in the desegregation of schools of the City of Huntsville."  (*Id.*).  On February 15, 1965, the Court entered a final judgment granting the plaintiffs' motion for preliminary injunction and approving the Board's July 28, 1964 plan for desegregation.  (Doc. 1, docket sheet, p. 3).

On April 12, 1965, Nicholas Katzenbach, Attorney General of the United States of America, filed a motion to intervene as plaintiff and a motion to seek supplemental relief.  (Doc. 1, docket sheet, p. 3).  The Court granted the motion to intervene and added the United States as a plaintiff in this action.  (*Id.*).  The

United States then took the laboring oar in the effort to desegregate the Huntsville city schools.[2]

### 2.    The 1970 Desegregation Order

On August 28, 1970, the United States filed a motion for supplemental relief in which it asked the Court to direct the Board to "completely deestablish the dual school system in the City of Huntsville."  (Doc. 1, docket sheet, p. 7).  After hearing the motion, the Court ordered the Board to collaborate with the United States Office of Education, Department of Health, Education and Welfare to prepare "a plan for a unitary school system not based on race which meets the requirements of law."  (Doc. 299-1, p. 2).  The order required the Board to "announce and implement" policies to address: (1) desegregation of faculty and staff; (2) majority to minority transfers; (3) school construction and site selection; (4) interdistrict transfers; (5) services, facilities, activities, and programs, including athletics and other extracurricular activities; and (6) transportation.  (Doc. 299-1, pp. 4-9).

In the desegregation order, the Court elaborated on all of these policies. With respect to Majority-to-Minority or M-to-M transfers, the order states:

> The school district shall permit a student attending a school at which his race is in the majority to choose to attend another school where his

---

[2]  For more detailed information about the role that the United States has played in this litigation over the years, *see* Doc. 329.

race is in the minority.  All such transferring students are to be given priority for space being available.

(Doc. 299-1, p. 7, ¶ B).  The provision concerning school construction provides:

All school construction and site selection . . . in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

(Doc. 299-1, p. 7, ¶ C).  Regarding services and programs, the order requires that:

No student will be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including athletics, or other extracurricular activity), that may be conducted or sponsored by or affiliated with the school in which he is enrolled . . . . All special educational programs conducted by the school system will be conducted without regard to race or color.

(Doc. 299-1, p. 8, ¶ E).

To make certain that the Board complied with the desegregation order, the Court directed the Board to report to the Court "[o]n each October 15th or until the [C]ourt directs otherwise" on a number of topics, including: (1) district and individual school enrollment by race; (2) district and individual school teacher data by race; (3) M-to-M transfer data (including all applications, the action taken by the Board and the reason for the action, the name and race of the students involved, and the school to which and from which the student transferred); and (4) information regarding dismissal or demotion of teachers.  (Doc. 299-1, pp. 9-11).

### 3. __1971 - 1975__

Between 1971 and 1974, the Court considered a number of motions from the parties for permission to change student assignments at some of the schools in the district to address segregation.  (Doc. 1, pp. 8-11).  As early as 1971, the Court noted "a tremendous increase in population" in the City of Huntsville and a significant shift in the racial composition of the district's formerly all-white schools.  (Doc. 299-2, pp. 3-4).  In choosing between alternative student assignment proposals, the Court weighed the practical implications of the proposals and opted for plans that were "sound educationally and []administratively feasible."  (Doc. 299-2, p. 9).

In May 1974, the Board filed a motion in which it asked the Court to approve the Board's proposed revisions to zone lines for and school structures at Cavalry Hill Elementary School and Terry Heights Elementary School.  (Doc. 1, p. 11).  The United States submitted an alternative proposal designed to accelerate integration of the student bodies at the schools.  (Doc. 299-3, p. 6).

In ruling on the Board's motion, the Court made a number of findings of fact.  The Court found, for example, that "[t]he City of Huntsville School system is well integrated" and that it was "a system under a desegregation plan which is working."  (Doc. 299-3, pp. 3, 6).  The Court noted that as of September 1973, "[t]here were no all black schools.  Every school in the system has students of both

races except Monte Sano Elementary School, which is located on top of Monte Sano Mountain near the eastern edge of the city limits which is all white and as to which no issue is tendered or exception taken." (Doc. 299-3, p. 3).

The Court described the challenges that the Board faced as it worked to desegregate the student body at Cavalry Hill:

> The upgrading of the staff and faculty, together with the institution of the Exemplary Career Education oriented program for grades 4 and 5 should also attract the white children in the zone to the school. The deficiencies of the program at Cavalry Hill [have] undoubtedly been [] material factor[s] in white flight to private schools. The school is now desegregated and in view of the changes and improvements indicated should improve its racial balance.
>
> . . .
>
> The attendance zone area for Cavalry Hill School contained in the neighborhood school plan proposed by the United States Office of Education and approved in 1971 includes a large area inhabited by white families. In 1971 if all of the white children zoned to Cavalry Hill School attended it, the white children would have constituted about 33% of the school's attendance. Some of the white families sent their children to Cavalry Hill School, but most of them have sent their children to private schools. None of them are attending public school out of their assigned zone. One of the fathers who did send his children to Cavalry Hill School for two years testified that he withdrew one of them when he reached junior high level because he didn't believe the program offered was broad enough, and withdrew a younger child because the child didn't seem to be learning as well as he thought the child should. The fact that the composition of the student body at Cavalry Hill School is largely black is not for the lack of a good faith effort on the part of the Huntsville Board of Education.

(Doc. 299-3, pp. 4-5).

Ultimately, the Court approved the Board's student assignment proposal. In doing so, the Court noted that since 1971, the Board had "faithfully submitted the reports required by the plan." (Doc. 299-3, p. 6). The Court added, "[w]henever changes have been required in attendance zone boundaries in an attempt to equalize assignment loads at the various schools, [the Board] has petitioned the Court for permission to do so." (*Id.*). The Court concluded:

> In the Huntsville school system, the neighborhood zone is the appropriate basis for determining public school assignments.
>
> No children who live in the Cavalry Hill School attendance zone or in the Terry Heights School zone will be deprived of their constitutional rights by the continuation of a neighborhood school plan. The adoption of one of the Government's suggested pairing or grouping alternatives in order to achieve a more ideal racial balance at the presently integrated Cavalry Hill and Terry Heights Schools could well disrupt the progress already achieved in the desegregation of the system and the schools involved and retard the process rather than advance it. If those students now in the two zones who are not attending the schools in which they are zoned cannot be induced to attend the prospects would appear to be dim to induce those who live in other zones to attend these schools by pairing or grouping.

(Doc. 299-3, pp. 6-7).

The United States appealed. The Fifth Circuit affirmed the Court's order as it pertained to Terry Heights, but it reversed the Court's decision with respect to Cavalry Hill.[3] The Fifth Circuit held:

---

[3] Alabama was part of the old Fifth Circuit until 1981, at which time, the Eleventh Circuit Court of Appeals was established pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96-452, 94 Stat. 1995. *See Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

The facts here indicate that the district court did not err with respect to the Terry Heights school. The racial ratio of the Huntsville school system is 83 per cent white and 17 per cent black. We approved the 1971 plan on the projection that Terry Heights would be 65.5 per cent black. The testimony in the district court here, and made into a finding, was that the Terry Heights school had stabilized from an attendance standpoint. This finding is well supported. The 1973-74 student population of the school was 71.73 per cent black. It was 70.20 per cent black as of September 20, 1974. This is a small variance from the 1971 projection of 65.5 per cent and we find no error in the failure of the district court to require that the plan be modified as to this school.

We have a different view with regard to Cavalry Hill. The 1971 plan projected it to be 67.6 per cent black with 367 white students to attend with 765 black students. The white students have never attended. The maximum number of whites to attend was 55 in the 1971-72 school term. In the 1973-74 term this school was attended by 598 black students and only 25 white students. As of September 1974 there were 368 black students and 15 white students in attendance. The district court should have required that the school board modify the student assignment plan to desegregate the Cavalry Hill school. As in *Ellis v. Orange County*, *supra*, this school has never been desegregated.

*Hereford v. Huntsville Bd. of Educ.*, 504 F.2d 857, 858-59 (5th Cir. 1974).

The Board appealed to the Supreme Court and lost.  (Doc. 299-4, p. 2; *Huntsville Bd. of Educ. v. United States*, 421 U.S. 913 (1975)).  Consequently, the Court directed the Board to develop a plan to desegregate Cavalry Hill.  The Board proposed a plan that blended the Cavalry Hill student body with the student bodies

of three other elementary schools.  The Court approved the plan with some modifications.  (Doc. 299-4, pp. 3-6).[4]

**4.      1975 - 1998**

Between 1975 and 1984, there was little activity in this case with respect to student assignments.  In 1984, the Board began a 15-year process of developing a collection of middle and high school magnet programs.   On June 5, 1984, the Court ordered the Board to incorporate sufficient guarantees into its magnet school proposal so that the plan would not result in the resegregation of the African-American students who were then attending school in the Cavalry Hill-Montview-Highlands-University Place cluster.  (Doc. 299-5, p. 2).

On August 6, 1986, the Court approved the Board's proposal to establish a pilot magnet program for Lee High School and to expand the program if it was

---

[4] The Court modified the Board's plan so that each of the three class sections in the third grade at Cavalry Hill would be assigned to one of each of the Highlands, Montview, and University Place Elementary Schools for the remainder of the 1974-1975 school year.  (Doc. 1, p. 13).  The Court also ordered the parties to cooperate and attempt to resolve legal concerns regarding the Follow Through Program and to report their progress to the Court in five months.  (Doc. 1, p. 13).  The Follow Through Program was a federally funded program operating at Cavalry Hill School. (Doc. 299-4, p. 3).  The program provided economically deprived children in first through third grade a minimal amount of medical, social, and nutritional services.  (*Id.*).  The Board proposed to continue that program but to change the "housing" of the third grade Cavalry Hill students to Montview, Highlands, and University Place.  (*Id.*).  Neither the private plaintiffs nor the United States filed formal objections to the Board's plan; however, both expressed concern over the potential for racially segregated classrooms if the Follow Through Program continued as then operated.  (*Id.* at 4).  The Court concluded that the record did not contain sufficient information regarding the details of the program to enable the Court to evaluate its potentially segregative effects.   Therefore, the Court instructed the parties to attempt to privately resolve disputes concerning the program.  (*Id.* at 4-5).  If unsuccessful, the Court instructed the parties to present specific issues regarding the Follow Through Program to the Court for resolution.  (*Id.* at 5).

successful. (Doc. 299-6). As part of its order, the Court instructed the Board to give preference for admission to the new magnet program to Cavalry Hill students who were not otherwise eligible for the performing arts magnet program at Lee. (Doc. 299-6, p. 2). The Court also ordered the Board to study and plan for development of a magnet program at Johnson High School, either by transferring the engineering program at Lee High School to Johnson or by developing an appropriate alternative plan, which would not be a performing arts program. (Doc. 299-6, p. 3). On September 14, 1987, the Court approved the Board's plan for a magnet program for international education at Johnson High School. (Doc. 299-7, pp. 4, 9). On July 1, 1988, the Court ordered the Board to establish a science and foreign language elementary magnet at the Davis Hills school site to serve as a feeder program to the Space Science and International Program at Johnson High. (Doc. 299-8, p. 2). On July 17, 1998, the Court approved the Board's plan to establish Williams Technology Middle School, a magnet program housed in the same building as Williams Middle School. (Doc. 299-9, pp. 2-3).

It appears that during this period, the Board filed annual reports each year from 1975 through 1986. (Doc. 1, pp. 13-15). The record contains no indication that the Board filed an annual report, per the 1970 desegregation order, after July 1986. (Doc. 1, p. 16; *see also* Doc. 362, pp. 12-14).

5.     **2003-2008**

This case was dormant from 1998 until 2003.  In 2003, the Board filed an unopposed motion for permission to comply with the No Child Left Behind Act. (Doc. 239).  The Board explained that in some instances, transfer opportunities that were available to students under the Act were inconsistent with the Court's desegregation orders.  (Doc. 239, p. 2).  The Court granted the Board's motion. (Doc. 241).

With the exception of one motion in 2005, from 2005 through 2008, counsel for the United States, the Board, and the NAACP advanced the case through negotiations rather than contested proceedings.  On May 2, 2005, the Board filed a motion to increase enrollment at Williams Technology Middle School.  (Doc. 242). In that motion, the Board sought to change the status of Williams Technology Middle School as a "dedicated magnet" to a school that offered a regular middle school curriculum while reserving space for a smaller magnet program within the school.  (*Id.* at 2-3).  Initially, the private party plaintiffs and the United States opposed the plan.  (Docs. 245, 246).  After a hearing and briefing on the motion (Docs. 248, 249, 250, 253), the Court approved a revised plan pursuant to which enrollment at Williams Technology Middle School would increase to 375, with a goal of ensuring that no less than 225 students were enrolled in the technology

magnet program within the school.  (Doc. 252, p. 4).[5]  The Court ordered that the revised plan would remain in place for the 2005-2006 and 2006-2007 school years. (Doc. 252, p. 5).  The Court instructed the parties to file a joint report on June 1 of each year providing details of the student population at the school.  (Doc. 252, pp. 5, 7-8).[6]  The Court added that the parties should include in their June 1, 2007 joint report recommendations regarding the continued operation of Williams Technology Middle School and any proposed modifications to student attendance and assignment.  (Doc. 252, p. 5).

On May 8, 2007, the parties jointly asked the Court to keep its June 28, 2005 order regarding Williams Technology Middle School in effect for at least three additional years.  (Doc. 255, p. 3).  The parties also requested approval for various construction projects affecting other campuses, modification of attendance zones for Farley Elementary School and Chaffee Elementary School, and approval of the sale of the University Place Elementary School property and subsequent consolidation of University Place Elementary School and Terry Heights Elementary School.  (Doc. 255, pp. 4-7).  The Court approved the motion on May 9, 2007.  (Doc. 256).

_____

[5] The Court also ordered that the racial composition at the school would be maintained roughly the same as the system-wide racial composition which was then 42% black and 58% non-black, within plus or minus 10% of those percentages.  (Doc. 252, p. 2).

[6] The parties filed a joint report in May 2007, but there are no other joint reports in the record. (Doc. 254).

On December 8, 2008, the Board filed an unopposed motion requesting permission to consolidate a number of elementary and middle schools and to construct some new buildings to house the consolidated schools. (Doc. 264). The Court granted the motion on December 9, 2008. (Doc. 266).

In the Board's 2007 and 2008 school construction motions, the Board coupled its school construction proposals with a description of the attendance zones for the new schools and often provided a description of the racial composition of the new schools. (*See* Docs. 255, 264). For example, the May 8, 2007 joint motion is titled "Joint Report to Court and Amended Joint Motion of Plaintiffs, Plaintiff-Intervenor and Defendants to Approve *Construction Plans and Student Attendance Zone Line Changes*." (Doc. 255) (emphasis added). The parties asked the Court to approve construction of: (1) a new Lee High School, (2) a new elementary school in the Hampton Cove community; (3) a new K-8 school at Highway 53 (Jordan Lane) and Martin Luther King Drive, contingent upon a Madison County one-half cent county-wide sales tax; and (4) a new middle school building for Williams Technology Middle School on the same campus. (Doc. 255, pp. 4-7).

Simultaneously, the parties requested that the Court approve recommended attendance zone lines for three of the four new campuses. Specifically, the parties indicated that the same student attendance zone lines and magnet programs would

17

continue at the new Lee High School. (Doc. 255, p. 4). The parties proposed specific new attendance zone lines for the new elementary school in the Hampton Cove community. (Doc. 255, pp. 5, 10). The Board informed the Court that it would attempt to enroll no less than 15% black students at both Hampton Cove Elementary and the new elementary school and would encourage No Child Left Behind and Majority-to-Minority transfers to help achieve that goal. (Doc. 255, p. 5). The parties also represented that in addition to serving as a technology magnet middle school, Williams Technology Middle School would serve as the neighborhood middle school for students who lived in the then existing zone for Williams Elementary School and the present Williams Technology Middle School, or on Redstone Arsenal. (Doc. 255, p. 6).

The parties stated that the new K-8 campus would serve as the site of an International Baccalaureate program and as the site for the Academy for Science and Foreign Language, which was then housed at Davis Hills Middle School. (Doc. 255, p. 5). The school would also enroll students who lived in a yet to be defined school attendance zone. Although the parties did not propose specific attendance zone lines for the new K-8 school, the parties suggested they would consult with each other and receive Court approval for a geographic attendance zone for the new campus. (Doc. 255, p. 5).

Moreover, on December 8, 2008, the Board filed an unopposed motion, in which it sought Court approval to: (1) consolidate Terry Heights Elementary School into University Place Elementary School beginning with the 2009-2010 school year and build a new building for the consolidated school; (2) consolidate Lincoln Elementary School and Martin Luther King Elementary School in a new school constructed for those combined student bodies; (3) consolidate East Clinton Elementary School and Blossomwood Elementary School into a new school constructed on Blossomwood's campus; (4) consolidate West Huntsville Elementary School and Morris Elementary School into one school in a renovated Morris or new building on the Morris campus; and (5) consolidate Stone Middle School and Westlawn Middle School into the Westlawn building.  (Doc. 264, ¶¶ 1-5).  For each of these proposals, the Board provided corresponding attendance zones.  (*Id.*).

### 6.    2011-2012

Between December 2008 and July 2011, the case was inactive.  On July 26, 2011, the Board filed an unopposed motion asking for leave to reassign middle school students from Providence School to Williams Technology Middle School.[7]  (Doc. 269).  The Court granted the motion on July 27, 2011.  (Doc. 270).

---

[7] The United States did not oppose the Board's proposal but did express concerns regarding the length of time that Providence students would be on the bus to and from school.  The United

On August 17, 2012, the parties filed a joint motion to modify the method by which the Board would administer school transfers for the 2012-2013 school year. Under the proposed plan, the Board prioritized M-to-M transfers at all grade levels over other transfer applications.  (Doc. 272-1, p. 3).   After acting on M-to-M transfer applications, the Board planned to address applications for transfers under No Child Left Behind.   Finally, the Board proposed to process all remaining transfer applications.  (*Id.* at 3-4).   The Board would not grant any transfer that would move a student from a school in which the student's racial group was in the minority to a school in which the student's racial group would be in the majority. (*Id.* at 4).   The proposed plan did not apply to the following categories of student transfers: (1) senior privilege; (2) school personnel dependents; (3) medical; (4) siblings of special education students; (5) building/moving; or (6) others as approved by the Superintendent, such as "personal" or "guardianship."  (Doc. 272-1, p. 2).   The parties agreed that any transfer, except those excluded from the changes, from Butler or Johnson High School could be recorded as a No Child Left Behind transfer.  (*Id.*).   The Court approved the plan on August 20, 2012.  (Doc. 273).

---

States reserved its right to raise the issue with the parties and, if necessary, with the Court after full implementation of the reassignment plan.  (Doc. 269, ¶ 10).

4.      <u>2013 - present</u>

On May 17, 2013, the Board filed an unopposed motion for approval of its school construction plan.  (Doc. 279).  In the motion, the Board asked the Court to authorize construction of the following facilities:  (1) a new high school at 4090 Pulaski Pike NW for "students in grades 9-12 who would have attended J. O. Johnson High School"; (2) a 7-8 grade school on the high school campus; (3) a high school on Lot 1 of National Subdivision, Third Addition, Huntsville, to replace the existing Grissom High School facility; (4) a 9th Grade Academy on the Huntsville High School campus; (5) a new PK-8 grade school on the existing Whitesburg Elementary and Middle School campus; (6) a replacement school for the consolidated University Place and Terry Heights elementary schools on the campus of the former Terry Heights Elementary School; and (7) a replacement school for Martin Luther King and Lincoln Elementary Schools on the present Martin Luther King campus.  (Doc. 279, ¶¶ 1-8).  The Board also proposed that beginning with the 2014-2015 school year, students zoned for Ed White Middle School would attend Davis Hills Middle School.  Upon completion of the new 7-8 grade school, students in grades 7 and 8 who would have attended Davis Hills Middle School would attend the new school and then would feed into the new 9-12 grade high school.  (Doc. 279, ¶ 9).  Additionally, the Board proposed adjustments to the magnet programs at the Academy for Arts and Academics and the Academy

for Science and Foreign Language.  (Doc. 279, ¶¶ 9-10).  The Board's motion did not mention attendance zones.  It did not mention the Board's plan to close Butler High School or McDonnell Elementary School.  The Court granted the unopposed motion on May 20, 2013. (Doc. 280).

Nearly nine months later, on February 7, 2014, the Board filed its motion for approval of a student assignment plan.  (Doc. 281).  In its student assignment motion, the Board asked the Court to approve its proposal to modify the boundaries of 32 of the district's 40 school zones.  (Doc. 281, pp. 24-63).  The United States opposed the Board's motion and offered the Court two alternative student assignment plans.  (Doc. 287).  The Board and the United States engaged in limited discovery for less than two months.  (Doc. 301).[8]

On May 22-23, 2014, the Court conducted a two day hearing on the Board's motion.  (*See* Doc. 313; Docs. 352, 353).  On June 5, 2014, both parties provided additional evidence in support of their positions regarding the Board's proposed plan.  The Board filed the deposition transcripts of two teachers in the Huntsville public school system.  (Docs. 342, 342-1, 342-2).  The United States submitted a

---

[8] Counsel for the NAACP did not participate in discovery, but he filed two briefs in support of the Board's motion.  (Docs. 297, 325).  As the Court reviewed the parties' briefs and the record in this case, the Court questioned, *sua sponte*, whether any of the original private plaintiffs had a viable claim.  The Court determined that the original plaintiffs' legally cognizable interest in the litigation expired years ago, so that their claims are moot.  No current students have filed a motion to intervene.  Therefore, the Court found that the United States is the only remaining plaintiff in this public action.  (Doc. 329, pp. 2-3).

supplemental declaration from a deputy assistant secretary for the United States Department of Education. (Docs. 343, 343-1). On June 6, 2014, the Court ordered the parties to provide additional evidence for its review. (Doc. 345). The parties complied with the Court's request. (Docs. 348, 349, 350, 351, 354, 358, 359).[9]

On this record, the Court considers the Board's motion for approval of its proposed student assignment plan.

## FINDINGS OF FACT

### Structure of the City of Huntsville's Public School System

1.     Currently, there are 40 schools in the City of Huntsville's public school system:  seven high schools, five P-8 grade schools; seven middle schools and twenty-one elementary schools. (Doc. 281, p. 21; Doc. 352, p. 35). Those schools serve just under 24,000 students. (Doc. 352, p. 35). Approximately 40% of the student population is African-American. (Doc. 352, p. 35).

2.     Alabama Code § 16-11-1, *et seq.* charges the Huntsville Board of Education with responsibility for the general administration and supervision of the public schools in the city of Huntsville and with all the powers necessary or proper for the administration and management of the free public schools within the city. The Board has five elected members.  The Board appoints the superintendent of

---

[9] In addition to the evidence submitted by the parties, the Court has received numerous letters from non-parties, some in favor of the Board's plan and others in opposition to the plan. (Docs. 302, 306-312, 315-317, 322, 331, 339).  The Court permitted 22 members of the public to speak at the conclusion of the hearing on May 23, 2014.

public schools for the City of Huntsville.  (Doc. 352, p. 34).  By Alabama statute, the superintendent is the chief executive officer of the public school system for the City of Huntsville.  (Doc. 352, pp. 34-35; Ala. Code § 16-1-3-(a)(2)).

3.     In 2011, the Board selected Dr. Casey Wardynski to serve as school superintendent.  Dr. Wardynski assumed his duties as superintendent of the public school system for the City of Huntsville on July 1, 2011.  (Doc. 326-1, p. 4; Doc. 352, p. 34).  From his first day as superintendent, Dr. Wardynski began the work necessary to "put the [d]istrict in a good position to be a unitary system."  (Doc. 326-1, p. 4).

Early Challenges

4.     When Dr. Wardynski became superintendent of the district in 2011, he encountered a number of challenges.  Dr. Wardynski testified that the district "was in bankruptcy," and the State Department of Education was examining the schools in the district.  (Doc. 352, p. 66).[10]  The State had proposed closing a number of schools including Davis Hills, Westlawn, Ed White, Whitesburg, Monte Sano, Chaffee, and perhaps Mountain Gap.  (Doc. 352, p. 66).

---

[10] In a June 5, 2014 telephone conference, the Board's counsel explained that when Dr. Wardynski became superintendent, the school system was operating at a $36 million deficit. (Doc. 362, pp. 15-17).  The Board's counsel clarified the school system did not file for bankruptcy protection, but the district had more debts than assets.  (*Id.*).

5.     In addition to financial challenges, a number of the schools in the district were, by objective measures, performing poorly.  In 2011, Butler High School, a school that was 70% African-American, 13% white, and 17% other, had a 31% graduation rate.  (Doc. 352, p. 57; Def. Ex. 4, p. 1).  Only a little over 20% of the students at Butler were reading at or above grade level.  (Def. Ex. 4, p. 2).  Dr. Wardynski testified, "[m]y feeling about Butler was it was barely a school." (Doc. 352, p. 61).

6.     Johnson High School, a school with a predominantly African-American student body, had a 62% graduation rate in 2011, and a little over 20% of the students at Johnson were reading at or above grade level.  (Doc. 352, p. 60; Def. Ex. 4, pp. 1-2).

7.     Johnson High School had five different principals between 2008 and 2013.  (Doc. 353, pp. 8-9).

<u>Early Accomplishments</u>

8.     During his first three years as superintendent, Dr. Wardynski spearheaded a number of innovative programs in the district.  In 2012, the district adopted a 1:1 Digital Initiative.  (Doc. 299-13, pp. 13, 14).  Through this initiative, Huntsville supplies laptop computers to all students in grades 3-12.  (Doc. 352, pp. 45, 47).  Every school is equipped with wi-fi; so too are school buses that travel distances long enough to allow students to open their laptops and do homework en

route to or from school.  (Doc. 352, pp. 47-48).  The program offers a number of benefits.  For example, students have materials for their classes that are current; they do not use outdated textbooks.  (Doc. 299-13, p. 14; Doc. 352, p. 46). Students also have access to online tutors.  (Doc. 299-13, p. 15; Doc. 352, p 45). Teachers may monitor students' work and personalize instruction.  (Doc. 352, p. 45; Doc. 342-1, p. 6).  The digital initiative is helping the district to expand access to materials and curricula across the district.  (Doc. 342-1, pp. 5-6).  In addition to laptop computers, the district provides iPads for students in Pre-K, kindergarten, first grade and second grade.  (Doc. 352, p. 47).[11]

9.     In 2011, the district began the first Universal Free Breakfast in the Classroom program in Alabama.   The program supplies free breakfast to all students in high-poverty schools.  (Doc. 299-13, p. 15).  The students eat breakfast with their teachers each morning, giving the teachers an opportunity to interact casually with their students.  The program has reduced tardy rates and behavioral problems linked to inadequate nutrition.  (Doc. 299-13, p. 16; Doc. 352, p. 55).  In

---

[11] The district is in the process of working through some logistical issues regarding the laptop program. For instance, when students bring their computers home to do homework, some families do not have access to the internet.  (Doc. 352, pp. 48-49).  The district is trying to improve internet accessibility by teaming with the Huntsville Housing Authority to provide internet access to students who live in public housing.  (Doc. 299-13, pp. 14-15; Doc. 352, pp. 48-49).  Mayor Battle has had all city facilities such as government buildings and libraries equipped with wi-fi.  (Doc. 352, pp. 48-49).

2013, the district expanded the nutritional program to include lunch and dinner during the months of June and July.  (Doc. 299-13, p. 16; Doc. 352, p. 56).[12]

10.    In 2012, Dr. Wardynski and his staff began developing a pre-kindergarten program that, to date, has added 42 Pre-K classrooms to elementary schools in the district.  (Doc. 299-13, p. 13; Doc. 352, p. 40).  The district gives students from families with limited resources first priority when filling Pre-K classes.  Currently, there are only nine students waiting for placement in a Pre-K classroom.  (Doc. 352, pp. 40-41).

11.    Dr. Wardynski also revised some of the administrative procedures within the district.  First, he examined the leadership at each school in the district to make certain that the school had a strong principal.  (Doc. 352, p. 37).  Then, he changed the way in which teachers are selected, moving from a local, school-specific hiring system to a central hiring and placement system managed on a district level.  (Doc. 352, pp. 37-38).  He also adopted the Star Enterprise System, a standardized assessment tool that enables the district to measure the performance of all students and all schools using the same assessment criteria.  (Doc. 352, p.

---

[12] According to the Huntsville City Schools website, this summer, the district is providing breakfast and lunch at Chapman Elementary, Providence Elementary, Williams Elementary, Ridgecrest Elementary, Johnson High, and Dawson Elementary.  The district is serving breakfast and dinner at Martin Luther King, Jr. Elementary and Westlawn Middle. All students are eligible to participate in the summer feeding program. (http://www.huntsvillecityschools.org/?PN=Pages&SubP=Level1Page&L=2&DivisionID=1114 1&DepartmentID=11317&PageID=19412&ToggleSideNav) (last visited June 27, 2014)).

39).[13]  Finally, he instituted professional development programs.  Teachers have 30 days of professional development during each 180-day school year.  (Doc. 352, p. 43).

Planning for New Schools and School Rezoning

12.    Early in his tenure as superintendent, Dr. Wardynski addressed not only programs and personnel but also school facilities. Under the superintendent's leadership, in August 2011, the district began discussing the possibility of building a number of new schools.  (Doc. 326-1, p. 8).  The district's plans for school construction and student assignment unfolded at the same time.  (Doc. 326-1, pp. 7-8; Doc. 352, p. 79-80).  In the words of the district's director of strategy and innovation, "designing our student assignment plan around our capital plan, our capital plan around supporting education, it's all intermarried, and it's all woven together."  (Doc. 352, p. 293).  The district's demographer, Tracy Richter, put it this way:  planning for school assignment and school construction "has to be in conjunction . . . There's almost no way to do one first and then the other because they have to work together . . . there is no way to separate the two."  (Doc. 353, pp. 94-95).

---

[13] The district also uses School Net, a program that helps schools assess in real time whether their curriculum and teaching methodology are producing results that align with Common Core standards.  The district is employing a number of year-end assessment tools as well.  (Doc. 352, p. 64).

13.    In the spring of 2012, the district retained DeJong-Richter to help the district develop its school construction and student assignment plans.  DeJong-Richter is an educational facility planning firm that consults with school districts as districts examine long-range facility planning.   DeJong-Richter provides demographic analysis, facility analysis, program analysis, and boundary analysis. (Doc. 326-1, pp. 9, 14; Doc. 352, pp. 68-69; Doc. 353, pp. 37-39).

14.    At the outset, Dr. Wardynski identified potential funding sources that would enable the district to undertake "a fairly rigorous construction campaign" to replace old schools.  (Doc. 352, p. 69-70).  By August 2012, plans for funding the construction of new schools were well underway.  (Doc. 297-4).

15.    Dr. Wardynski convened a team of attorneys, directors of education and athletics, construction managers and administrators to participate in the process of planning school construction and student assignment.  (Doc. 352, p. 96). Using Geographical Information Systems (or GIS) programs that display data on interactive maps, DeJong-Richter enabled the district's planning team to visualize and understand the impact of different configurations of students on capacity, desegregation, and transportation.  (Doc. 326-1, p. 15; Doc. 352, pp. 150-151; Doc. 353, pp. 38-39, 41).[14]

---

[14] The district made no effort to memorialize the work accomplished in each of the planning meetings.  There are no minutes or electronic records of any kind from the meetings.  As the planning team considered different school assignment alternatives using DeJong-Richter's

16.     A number of core considerations guided the planning team's work. First, schools in the district should be safe.  (Doc. 352, p. 86).  The district wanted to maximize safety both in terms of transportation and in terms of physical facilities (e.g. storm shelters and security from would-be attackers).  (Doc. 281, pp. 12-14; Doc. 326, pp. 7, 17, 26; Doc. 352, pp. 86-87).

17.     The district also wanted to offer students "21st century learning facilities" and to maintain local communities by building strong feeder patterns so that students would remain in the same school cluster from pre-kindergarten through high school.  (Doc. 326-1, p. 7; Doc. 352, pp. 84-85).  Dr. Wardynski explained that even for students who move from their live-in school cluster to another cluster of schools via one of the district's transfer policies, "it benefits children to be in a continuum of educational experience.  Their buddies are there; parents are in the PTA.  So children who have already transferred, they'll be allowed to complete [their elementary and secondary education] through high school" in their transfer zone.  (Doc. 326-1, p. 19).[15]

18.     The planning team specifically addressed Huntsville's Shady Grove community, a neighborhood of "high mobility students" whose live-in school zone

---

modeling tools, the team saved none of its work.  (Doc. 352, pp. 151-152; Doc. 353, pp. 43-44).  Mr. Richter, Chief Executive Officer of DeJong-Richter, testified that it would not be practical to save each of the school assignment scenarios that the planning team considered.  (Doc. 353, p. 44).

[15] The district's various transfer policies appear in Doc. 287-4, pp. 3-5.

currently is McDonnell Elementary. (Doc. 352, p. 182-84; Def. Ex. 2, p. 4; Doc. 353, p. 149). The team decided to transport the Shady Grove students to Monte Sano, a school that the superintendent described as the district's "strongest elementary school." When asked why the team made that decision, Dr. Wardynski explained that Monte Sano would provide "a more stable environment" for those students, an environment in which the Monte Sano community may engage with the Shady Grove community. (Doc. 326-1, pp. 20-21). He also testified that the educational programs are stronger at Monte Sano than at Ridgecrest, an elementary school closer to the Shady Grove area. (Doc. 352, p. 183). Travelling to and from Monte Sano Elementary School, students from the Shady Grove area will pass other elementary schools. (Doc. 353, p. 81).

19.     The team also considered diversity. (Doc. 352, p. 84). The 1970 desegregation order in this case states that "[a]ll school construction and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." (Doc. 299-1, p. 7). Following the district's initial effort to comply with the 1970 desegregation order, the district instituted a number of magnet programs to further desegregate its public schools. *See* pp. 13-14, *supra*. Students of any race could apply to attend a magnet program outside of their live-in school zone. In developing its proposal for school

construction and rezoning, the district remained committed to "vibrant magnets." (Doc. 352, p. 100; *see also* Doc. 352, p. 242-244).[16]

20.     The superintendent testified that in formulating the school assignment plan, the district tried to "zone[] in as much" racial diversity "as was feasible" so that the district would not have to rely on student transfers to accomplish desegregation.   (Doc. 326-1, p. 18; *see also* Doc. 352, p. 100; 156-57).   For purposes of evaluating the capacity of each school, the planning team did not include in the students' live-in zones magnet students who attended the three dedicated magnet schools ASFL, AAA, and Century Technology; however, the team did include Majority-to-Minority transfer students in their live-in zones.

---

[16] The Lee High School campus houses two magnet programs, an arts program which is part of Lee High School and The New Century Technology High School which is housed in a building on the campus of Lee High School.  (Doc. 352, p. 110).  Currently, 322 students are enrolled in the arts program, 20.8% of whom are non-black; 346 students are enrolled in the technology magnet, 52.3% of whom are non-black.  The traditional high school program on the Lee campus currently is home to 511 students, 20% of whom are non-black.  (Def. Ex. 2, p. 4).  In short, the Lee campus is a predominantly black campus at which the technology magnet enhances the non-black student population.  The district plans to add approximately 25 students per year for the next four years to each of the magnet programs on the Lee High School campus.  (Doc. 281, p. 68; Doc. 352, p. 88).  In addition to these two high school magnet programs, the district currently offers the following magnet options:  the Johnson Law Academy at J.O. Johnson High School; the Academy for Science and Foreign Language or ASFL, which operates in a portion of the Davis Hills facility; the Academy for Academics and Arts or AAA, which is currently housed at the former Cavalry Hill campus; and a technology magnet housed at Williams Middle School.  (Doc. 281, p. 15; Doc. 352, p. 52, 58, 74, 244-270).  The district is evaluating the technology program at Williams Middle School to determine whether that magnet offering should be modified in light of the fact that the district is in the process of launching an international baccalaureate program at Williams.  (Doc. 281, p. 68).  The district's magnet program has increased diversity at designated magnet schools and at schools that include magnet programs. For example, in 2012-2013, the student population at AAA was 44.5% black and 55.5% non-black.  That same year, the student population at ASFL was 53.4% black and 46.6% non-black. Similarly, the student population at New Century in 2012-2013 was 47.7% black and 52.3% non-black.  (Def. Ex. 2, p. 4).

(Doc. 326-1, p. 41; Doc. 352, pp. 89-90, Doc. 353, pp. 61-62; 89-92).[17]  The team did not treat M-to-M transfer students in the same way that it handled magnet students because the magnet programs are "going to continue to run" and will be "permanent," but M-to-M transfer students only "will be out there [i.e. out of their live-in zone] while they're grandfathered" because the M-to-M program "is a transition that's changing over time."  (Doc. 326-1, p. 42; *see also* Doc. 353, pp. 61-62).

21.    As discussed at pp. 7-8, *supra*, in its 1970 desegregation order, the Court required the district to adopt a Majority-to-Minority transfer policy.  The order states:  "[t]he school district shall permit a student attending a school at which his race is in the majority to choose to attend another school where his race is in the minority.  All such transferring students are to be given priority for space being available."  (Doc. 299-1, p. 7).[18]  In 1984, the Court added the following requirement for M-to-M transfers:  "the Board's majority to minority transfer

---

[17] A live-in zone is the school zone in which a student resides.  The boundary of each school zone is defined by the streets that surround the zone.  Students may attend a school outside of the zone in which they live if they are accepted to a magnet program in another zone, if they are accepted into an IB program in another zone, or if they transfer from their live-in zone to another zone in the district via one of the district's transfer policies.  (*See* Def. Ex. 9; Gov't. Ex. 11).

[18] The order also provides that on each October 15th, the Board must supply to the Court, with service on all parties, a list of all M-to-M applications, a description of the action that the Board took on each application and the reasons for the action, and the names of the schools involved in the transfer.  (Doc. 299-1, pp. 9-10).  It is undisputed that the Board has not filed an M-to-M report since 1986.

provision must be amended so as to provide appropriate, convenient transportation to all students who choose to transfer under this provision."  (Doc. 299-5, p. 2).

22.    The Board's M-to-M policy generally operates as follows:  "a student in grades K-12 attending a school whose race is in in majority" may transfer to "another school where the student's race is in the minority."  (Doc. 287-4).  The M-to-M program achieves its purpose of integrating public schools.  For example, for the 2012-2013 school year, the live-in African-American population for Blossomwood Elementary was 9% black, but because of M-to-M transfers, African-American students actually comprised 12.9% of the student body.  (Doc. 352, p. 111; Def. Ex. 2, p. 4).  In 2012-2013, Grissom High School, which has a live-in African-American population of 7.6%, added 31 black students through M-to-M transfers, which raised the black population of the school to 10.3%.  (Doc. 326-8, p. 5; Doc. 351-40, pp. 5-6; Doc. 358, p. 15).  In the same year, Huntsville High School, which has a live-in African-American population of 10%, added 42 black students through M-to-M transfers, which raised the black population of the school to 18.3%.  (*Id.*).  In the same year, Challenger Middle School, which has a live-in African-American population of 11.3%, added 15 black students through M-to-M transfers, which raised the black population of the school to 17.4%.  (*Id.*).

23.    The district will not grant an application for an M-to-M transfer if a school to which a student asks to transfer is filled to capacity with students from

the school's live-in zone; transfers are available only to schools where actual student enrollment is below student capacity.  (Doc. 287-4; Doc. 352, pp. 91-92). DeJong-Richter advised the planning team that for purposes of long-term planning, "schools need to remain in a hundred percent utilization of [program utilization] or lower.  Preferably lower for changes and its cohorts."  (Doc. 353, p. 48; *see also* Doc. 326-5, pp. 15-16; Doc. 353, pp. 85-86).  Nevertheless, in the end, six schools have an estimated enrollment that is over capacity under the Board's proposed plan.  Those schools are Chaffee Elementary (108.5% capacity), Martin Luther King, Jr. Elementary (100.7%), Providence Elementary (102.2%), Chapman P8 (101.9%); Columbia High School (104.7%) and Grissom High School (110.3%). (Doc. 353, pp. 74-75; Def. Ex. 2, p. 4).

The Board's School Construction Plan

24.    Based on the planning team's evaluation, the Board decided to construct six new school facilities.  (Doc. 281, pp. 12-15; Doc. 287-3, p. 9).  In north Huntsville, the district chose to build a new facility to replace Johnson High School because the existing building is too big for the current student enrollment, and the air, electrical, and plumbing systems are nearing the end of their lifespans. (Doc. 352, pp. 71-72).  The planning team designed a 7th and 8th grade feeder school for the high school that would replace Johnson.  The district also opted to fulfill its earlier proposal, which the Court approved in 2008, to build one new

school to house the merged Terry Heights and University Place elementary schools and a second new school to house the merged Lincoln and Martin Luther King elementary schools.  (Doc. 352, pp. 72-73).  Finally, the district proposed to relocate the AAA magnet program, currently situated in the Cavalry Hill community, to renovated space on the Ed White campus.  (Doc. 287, pp. 11-12).

25.    The district also proposed a number of new buildings in south Huntsville.  The district chose to construct a new facility for Grissom High School to replace the current 45-year old school building.  (Doc. 281, pp. 12-13; Doc. 352, p. 76).  In addition, the district planned to build a new school to house Whitesburg PK-8, replacing a 50-year old building, and to add a ninth grade academy to Huntsville High School to house 500 ninth grade students.  (Doc. 281, p. 13; Doc. 287-3, pp. 3-6, 9; Doc. 352, pp. 76-78).

26.    Four schools will close under the district's plan:  Butler High School, McDonnell Elementary School, Ed White Middle School, and Davis Hills Middle School.  (Doc. 281, p. 5; Doc. 287, p. 11).

27.    Forty-seven percent of the capital expenditures that the Board has committed to new construction will be for schools with majority African-American populations.  (Doc. 299-13, p. 11).

28.    On May 17, 2013, the district presented an unopposed motion for approval of its school construction plan to the Court.  (Doc. 279; Doc. 352, pp. 78-

79).  The motion did not mention attendance zones.  The Court granted the motion

on May 20, 2013.  (Doc. 280; Doc. 352, p. 78).

### The Board's Student Assignment Plan

29.    Nearly six weeks before the Board submitted its school construction

motion to the Court, on March 29, 2013, the district presented to the United States

a comprehensive proposal for school construction, school closures, and student

assignment.  (Doc. 281, p. 4; Doc. 287, p. 4; Doc. 352, pp. 100-101).[19]  The district

provided its proposal to launch a conversation with the United States about *Green*

factors.  (Doc. 352, p. 101).[20]

30.    A few weeks later in April 2013, DeJong-Richter produced a

document entitled:  "Facility Plan and Enrollment Report."  (Doc. 326-2, pp. 10-

31).    According to that document, the purpose of the report was "to create

documentation that will allow Huntsville City Schools to achieve Unitary Status.

It will outline the process, reasoning and conclusion as to how to reach this goal."

(Doc. 326-2, p. 12).  The document contained maps and statistics that illustrate the

---

[19] The timing of the district's unveiling of its proposed student assignment plan is not entirely clear from the record.  Dates vary between March 2013 and April 2013.  (*See*, *e.g.*, Doc. 352, p. 148; Doc. 332, p. 7).  The difference is insignificant for purposes of the Court's analysis.

[20] As discussed below at p. 91, in *Green v. County School Bd. of New Kent Cnty., Va.*, 391 U.S. 430 (1968), the United States Supreme Court provided a non-exhaustive list of factors that a district court should examine when a formerly segregated public school district files a motion for a declaration of unitary status.

Board's student assignment plan.   The district provided that document to the United States.  (Doc. 352, pp. 148-149, 154; Doc. 326-6, pp. 16-17).

31.   Between April 2013 and September 2013, the district revised its proposed student assignment plan and provided information to the United States concerning the plan.  The parties met in Washington D.C. and in New York and participated in telephone conferences and email exchanges as they discussed the district's proposal.  In September 2013, the district updated its proposal for revised school attendance zones.  (Doc. 281, p. 4; Doc. 287, p. 5; Doc. 326-7, pp. 12-15).[21] The September 2013 report is entitled "Unitary Status Process:  Five Year Facility Plan," and it bears the DeJong-Richter logo.  (Doc. 326-7, pp. 16-24).[22]

32.   The district's student assignment plan is unusual because it encompasses the entire district, affecting the boundaries of more than 75% of the district's school zones.  (Doc. 353, p. 57).  At the hearing on the Board's motion,

---

[21] Counsel for the original plaintiffs participated in these discussions between the district and the United States.  His description of the parties' negotiations is consistent with the documents in the record that memorialize the parties' negotiations between April 2013 and January 2014.  (Doc. 297, pp. 3-9).  At the hearing on the Board's motion, the superintendent tried to create the impression that the United States was non-communicative from April 2013 through December 2013.  (Doc. 352, p. 101) ("We went looking for feedback.  We got no feedback in April, no feedback in May, no feedback in June, no feedback in July, no feedback in August. We met again in September. There, we looked for many more feedback, and we got none.  In October, the U.S. government went on hiatus. Finally, on November, we said we've got to do something. If we're going to do anything with regard to telling parents about where their kids are going to go and we are going to plan for construction and allocate resources, we've got to begin knowing what we're doing. They said we would get you something in December, and I saw it on December 31st.").  The superintendent's testimony on this point is not credible when compared to the record.

[22] Mr. Richter testified that he did not create the September 2013 document, and he does not know "who put it together."  (Doc. 326-5, p. 50).

witnesses testified that district-wide rezoning is rare and that it has the potential to be disruptive.  (Doc. 352, pp. 292-293).  According to the Facility Plan and Enrollment Report that the Board's demographer prepared in April 2013, the zone changes are designed "to improve diversity and align the feeder patterns to ensure smoother transitions for the students between grade levels" to "allow students to remain in a consistent feeder allowing students to remain together throughout their academic career."  (Doc. 326-6, p.11).

33.    Under the Board's proposed plan, the live-in population for some of the district's predominantly white schools becomes better integrated.  For example, Blossomwood will increase its live-in African American population by 18 percentage points (9% to 27%); Chaffee by five (14% to 19%); Jones Valley by 14 (5% to 19%); and Whitesburg by six (27% to 33%).  (*See* Doc. 324, pp.17-18 (citing Doc. 281, p. 21)).  Conversely, the live-in populations for most of the district's predominantly African-American schools have become more black.  For instance, most students from the Butler attendance zone will move from a school that is 66.7 percent black to Jemison, which will be 90.3 percent black. Under the Board's plan, Lakewood will increase its African-American enrollment by an estimated 3.2 percentage points (81.9% to 85.1%); University Place by 4.5 (67.3% to 71.8%); Montview by 0.6 (82.8% to 88.8%); and Dawson by 0.7 (86.6% to 87.3%).  (Def. Ex. 2, p. 4).  The largest increase in non-black enrollment in a

predominantly black school in the Jemison feeder pattern is an increase of 2.2 percentage points (8.9% to 11.1%) at Highlands Elementary. (*Id.*).

The United States's Proposed Plans

34.     After its initial discussions with the district relating to student assignment, the United States retained its own demographer, Matthew Cropper, to examine the Board's "current (2012-13) and proposed student assignment plans, and their impact on demographics." (Doc. 326-13, p. 61).  The United States also asked Mr. Cropper "to provide any suggestions as it relates to alternatives to [the Board's] plan that could/would further the desegregation in the Huntsville City School district by providing a more diverse environment at the schools." (Doc. 326-13, p. 61).

35.     On December 31, 2013, the United States proposed an alternative student assignment plan to the district.   The superintendent stated that the government's plan "looked nothing like anything" he had seen and contained "at least 19 splits" and "destroyed feeder patterns." (Doc. 281, p. 4; Doc. 352, pp. 99, 101).

36.     Mr. Cropper then proposed two alternative options to the Board's plan that he believes "better address the demographic imbalances amongst schools." (Doc. 326-14, p. 11).  Mr. Cropper left the majority of the Board's proposed plan intact.   (Doc. 326-14, p. 11).   He attempted "to maintain the details of [the

Board's] plan if possible while furthering desegregation and adher[ing] to the same parameters they have provided regarding grade configurations and feeder patterns." (Doc. 326-14, p. 17). Specifically, Mr. Cropper "recommended changes in the northeast and eastern part of the district where there is a majority black population adjacent to a majority white population." (Doc. 326-14, p. 11).

37.    The United States's proposed Option 1 alters the Board's proposed plan as follows:  (1) converts Blossomwood, Monte Sano, and Jones Valley from PK-5 grade schools to PK-6 grade schools; (2) feeds University Place Elementary School (Sonnie Hereford) into Huntsville Middle School and Huntsville High School; and (3) feeds all Westlawn Middle School students into Columbia High School.  (Doc. 326-14, p. 11).  According to Mr. Cropper, Option 1 better utilizes the additional space at Huntsville High while freeing space at Jemison, which in his opinion, would enable more students to attend the magnet at Jemison or transfer in out of boundary, which in turn would create more demographic diversity at Jemison.  (Doc. 352, p. 134).

38.    The United States's proposed Option 2 is "nearly identical" to Option 1, except: (1) Monte Sano would remain a PK-5 grade school and feed into Chapman for grades 6-8 and Lee High School for grade 9-12; and (2) Montview

Elementary would convert to a PK-6 grade school and feed into Huntsville Middle and Huntsville High.[23]  (Doc. 326-14, p. 12).

39.    The United States's proposed student assignment plans have not been presented to parents of students who attend Huntsville public schools.  (Doc. 326-13, p. 13; Doc. 353, pp. 144-146).

<u>Presentation of the Board's Proposed Student Assignment Plan to the Board and the Huntsville Community</u>

40.    On January 16, 2014, the superintendent presented the district's student assignment plan to the Board during an open, public Board meeting.  (Doc. 299-13, p. 7; Doc. 352, p. 103).

41.    In his January 2014 public remarks regarding the district's plan, Dr. Wardynski commented that hundreds of students have transferred from Butler and Johnson high schools to Grissom and Huntsville High, and the students' movement from their live-in zones to alternative zones has depressed graduation rates at Butler and Johnson.  (Doc. 352, pp. 159-160).  In Dr. Wardynski's words,

> We have seen hundreds of students move from Butler and Johnson High Schools to Grissom and Huntsville High Schools.  As they left those high schools, what happens is students are highly engaged and parents are highly engaged are migrating across our city and then as time unfolds we see stories in the Huntsville Times: scores went down at Johnson; enrollment went down at Johnson this year; graduation rate went down at Johnson this year.

---

[23] Based upon his travels on May 1, 2014, Mr. Cropper concluded that "feeding Monte Sano Elementary to Chapman Middle and Lee High School is feasible, and route times and distances are not prohibitive when compared to routes travelled to the current schools that Monte Sano Elementary School is assigned to (i.e., Huntsville Middle/High).  (Doc. 326-14, p. 39).

And, what do parents think? It's clear what parents think.  It's clear what I would think. Something is wrong.  I got one chance for my child. I need to move my child somewhere.  That's not the problem.  The problem is the kids are fine but they are moving. . . . If we combine the students in a new school called Jemison that had moved to Huntsville and Grissom their graduation rate instantly would be nine points higher at a school called Jemison. . . . If we actually had a school called Jemison with the kids from the Jemison zone its graduation rate would be 78% if we were a unitary system and we would be building strong communities instead of hurting our communities by seeing kids move across town.

(Gov't. Ex. 38).  In support of his remarks, the superintendent used a Power Point slide which states that "M-to-M Transfers Substantially Reduce Graduation Rates and Contribute to Flight from Majority African-American Schools."  (Doc. 287-4, p. 8; Doc. 352, pp. 159-160).  Although the slide does not identify the statistics used to produce the graphic, the chart suggests that the graduation rates at Butler and Johnson would be higher if transfer students who are zoned for those schools returned to Butler and Johnson from their transfer schools, and the graduation rates for Grissom and Huntsville High also would rise if M-to-M transfer students returned to their home school zones.  (Doc. 287-4).

42.   The district published the superintendent's January 16, 2014 presentation to the Board on the district's website.  In addition, the district posted a Power Point presentation entitled "Unitary Status Background" dated January 17, 2014.  The presentation consists of seven slides that describe the history of the *Hereford* case, general legal concepts pertaining to school desegregation, and self-reports regarding the Board's efforts to obtain unitary status. (Huntsville City

Schools, Unitary Status Background, http://www.huntsvillecityschools.org/Download.asp?L=3&LMID=720089&PN=D ocumentUploads&DivisionID=11142&DepartmentID=11319&SubDepartmentID= 8057&SubP=&Act=Download&T=1&I=329185 (last visited June 19, 2014)).[24] For example, the fourth slide states, "[i]n 2011, the Board began implementing comprehensive measures to earn unitary status. Faculty assignments are within the case law. Court approved construction is underway to address facility equity, student assignment, and quality of education." (*Id.*). The slide adds, "[t]o further desegregation and the sustainability of desegregation measures, the Board now seeks court approval for attendance zone areas that will significantly expand diversity within attendance zones." (*Id.*).

43. Between January 30, 2014 and February 5, 2014, the Board hosted a series of six community meetings to introduce the Student Assignment Plan to Huntsville residents. The meetings took place at the high schools in the district. (Doc. 299-13; Doc. 352, pp. 103-104, 154). The district made no changes to its proposed student assignment plan as a result of the community meetings. (Doc. 326-2, p. 2; Doc. 352, pp. 153-154). In addition to the six community meetings, the Board presented the student assignment plan to the Huntsville Chamber of

---

[24] The Court has taken judicial notice of certain facts provided on the district's website pursuant to Fed. R. Evid. 201(b)(2).

Commerce, the Huntsville PTA, the Whitesburg Civic Association, the Committee 100 (a group of business leaders), and a group of community leaders from the north side of Huntsville.   (Doc. 326-2, p. 1; Doc. 352, p. 103).   The district participated in a total of 12 meetings.  (Doc. 352, p. 103).

44.     In conjunction with its submission of its proposed student assignment plan to the Board for a vote, the district posted a Power Point presentation entitled "Status of Student Assignment Plan" dated February 6, 2014.  The presentation announced the Board's plan to file its motion for approval of its proposed student assignment plan on February 7, 2014 and highlighted differences between the Board's proposed plan and a student assignment plan that the United States proposed during negotiations with the Board.  (Huntsville City Schools, Status of Student                                    Assignment                                    Plan, http://www.huntsvillecityschools.org/Download.asp?L=3&LMID=720089&PN=D ocumentUploads&DivisionID=11142&DepartmentID=11319&SubDepartmentID= 8057&SubP=&Act=Download&T=1&I=332015 (last visited June 19, 2014)).  As of the date of publication of this opinion, the slide show also contains an assertion that the United States's proposed plan contains "twenty" feeder splits and a graphic that implicates a complex feeder pattern under the government's proposal. *Id.*  The proposed student assignment plans that the United States presented to the Board in

February 2014 and to the Court in April 2014 contain no feeder splits. (Doc. 287-5, pp. 3, 6; Doc. 326-14, pp. 13, 15).

45.     The Board approved the student assignment plan at a public meeting on February 7, 2014. (Doc. 299-13, p. 8; Doc. 352, p. 104).

Presentation of the Board's Proposed School Construction and Student Assignment Plans to the Court

46.     The Board first presented its student assignment plan to the Court in February 2014. (Doc. 281). The plan that the Board presented to the Court consists of a collection of boundary maps, charts, written descriptions of the proposed boundaries for all 40 schools in the district, a transportation agreement, a chart comparing current and proposed enrollment demographics, and a document labeled "Equitable Access to Course Offerings and Magnet Programs" that contains information regarding various education programs that the district offers. (Doc. 281, pp. 18-71).

Educational Programs in the district

47.     In support of its effort to increase racial diversity in Huntsville's public elementary and secondary schools through alternative zoning proposals, the United States has presented data to illustrate the disparity between predominantly African-American schools and predominantly non-African-American schools in the district. The Court has conducted a preliminary assessment of the differences among the schools based on limited samples of evidence. That evidence gathered

46

to date demonstrates that there are significant differences between predominantly African-American schools and predominantly non-African-American schools both at the elementary and secondary levels.

48.     At the secondary level, the Court has compared data regarding Butler and Johnson, the two identifiably black high schools that the district proposes to combine to create Jemison High School, to data relating to Grissom and Huntsville High, two predominantly white high schools.  Butler and Johnson are the two lowest-performing high schools in the district.  (Doc. 352, p.148).

49.     During the 2010-2011 school year, approximately 71% of the students at Butler were African-American; 95% of Johnson's students were African-American; 8% of the students at Grissom were African-American; 20% of Huntsville High's students were African-American. (Doc. 358, pp. 11-12).

50.     As noted previously, in 2011, Butler had a 31% graduation rate, and Johnson had a 62% graduation rate.  (Doc. 352, pp. 57, 60; Doc. 351-10).  For the same year, Grissom had an 88% graduation rate, and Huntsville High had an 81% graduation rate.  (Doc. 351-10).[25]

---

[25] In the spring of 2011, the Alabama State Department of Education changed the equation that high schools across the state must use to calculate graduation rates.  (Doc. 351-12, pp. 4-5).  The graduation rates for all of the high schools in the district fell when the district began using the new equation.  Butler's graduation rate fell the most, dropping from 79% in 2010 to 31% in 2011.  At the other end of the spectrum, New Technology's graduation fell only slightly, dropping from 98% in 2010 to 96% in 2011.  (Doc. 351-10).

51.     During the 2012-13 school year, Butler was approximately 66% African-American; Johnson was 93% African-American; Grissom was 10% African-American; Huntsville High was 18% African-American.   (Doc. 358, p. 15).   In 2013, Butler had a 49% graduation rate, and Johnson had a 78% rate. (Doc. 351-10; Doc. 352, p. 145).   For the same year, Grissom had an 89% graduation rate, and Huntsville High had a 90% graduation rate.   (Doc. 351-10).

52.     Students at Butler and at Johnson perform below their counterparts at predominantly white high schools on all standardized tests.   For example, approximately 21% of Johnson students read at or above grade level in 2011; 22% of Butler's students read at or above grade level during the same year.   In contrast, at Grissom and Huntsville High in 2011, 78% and 64% of students, respectively, read at or above grade level.   (Def. Ex. 4, p. 2).   Tests scores at all four schools improved in 2014, but the scores of Grissom and Huntsville High students still significantly outpaced the scores of Butler and Johnson students.   In 2014, 33% of Johnson students and 50% of Butler students read at or above grade level.   By comparison, 84% of Huntsville High students and 88% of Grissom students read at or above grade level.   (*Id.*).[26]

---

[26] Similar disparities exist in math scores on standardized tests.   In 2014, 28% of Johnson students and 28% of Butler students were at or above grade level.   By comparison, 75% of Huntsville High students and 78% of Grissom students were at or above grade level.   (Def. Ex. 4, p. 2).

53.     Reading test results at the high school level correlate with elementary school reading test results.  As the following data illustrate, students at high schools at which few students read at or above grade level in the fall of 2011 had low reading test scores when they were in third grade in 2004.  For example, students at elementary schools that feed into Butler scored, on average, in the 28th percentile in reading on the Stanford Achievement Test. (http://www03.alsde.edu/Accountability/Accountability.asp).[27]   By comparison, students at high schools at which significantly greater numbers of students read at or above grade level in 2011 had higher reading test scores when they were in third grade.  For example, third-grade students at elementary schools that feed into Grissom scored, on average, in the 63rd percentile in reading on the Stanford Achievement Test.  (http://www03.alsde.edu/Accountability/Accountability.asp).[28]

54.     More recent SAT reading test results for third graders show little change from reading test results for third graders during the 2004-2005 school year.  The reading test score percentiles for third graders in the current feeder schools for Butler for the 2010-2011 school year were as follows:

---

[27] The Court has taken judicial notice of certain facts provided on the Alabama State Department of Education's website.  Fed. R. Evid. 201(b)(2).

[28]  Details regarding elementary school standardized test results appear in Appendix C.  To make the charts that appear in Appendix C, the Court determined that a student who was in tenth grade in the spring of 2011 would have been in third grade during the 2004-2005 school year.  This data is just a sample.  For purposes of this opinion, the Court did not attempt to track elementary test scores for all students who attended an HCS high school during the 2010-2011 school year.

| School | All | Black | White[29] |
|---|---|---|---|
| McDonnell | 40 | 44 | * |
| Montview | 30 | 30 | * |
| Morris | 36 | 34 | 47 |
| Ridgecrest | 43 | 46 | 49 |
| University Place | 26 | 25 | * |

(Doc. 351-38; http://www03.alsde.edu/Accountability/Accountability.asp).[30]   The reading test score percentiles for third graders in the current feeder schools for Johnson for the 2010-11 school year are as follows:

| School | All | Black | White |
|---|---|---|---|
| Dawson | 27 | 23 | * |
| Highlands | 38 | 36 | * |
| Lakewood | 28 | 25 | * |
| Rolling Hills | 45 | 45 | * |

(Doc. 351-39; http://www03.alsde.edu/Accountability/Accountability.asp). The reading test score percentiles for third graders in the current feeder schools for Grissom for the 2010-2011 school year are as follows:

---

[29] The symbol * indicates that fewer than 10 students of a particular group tested.

[30]  The most recent scores available on the Alabama State Department of Education's website are from the 2010-2011 school year.

| School | All | Black | White |
|--------|-----|-------|-------|
| Chaffee | 71 | * | 83 |
| Whitesburg | 65 | 48 | 77 |
| Challenger | 73 | * | 77 |
| Farley | 64 | * | 66 |
| Weatherly | 74 | * | 77 |
| Mountain Gap | 81 | * | 80 |

(http://www03.alsde.edu/Accountability/Accountability.asp).   The   reading   test

score percentiles for third graders in the current feeder schools for Huntsville High

for the 2010-2011 school year are as follows:

| School | All | Black | White |
|--------|-----|-------|-------|
| Ridgecrest | 43 | 46 | 49 |
| Hampton Cove | 77 | * | 80 |
| Blossomwood | 70 | 41 | 79 |
| Monte Sano | 78 | * | 84 |
| Jones Valley | 82 | 54 | 85 |
| Mountain Gap | 81 | * | 80 |

(http://www03.alsde.edu/Accountability/Accountability.asp).

55.     Advanced Placement or AP courses are college-level courses that

high schools offer primarily to juniors and seniors.  (Doc. 352, p. 216).  During the

2013-2014 school year, students at Butler participated in six AP courses; students

51

at Johnson participated in five AP courses; students at Grissom participated in 22 AP courses; and students at Huntsville High participated in 14 AP courses. (Doc. 352, p. 249).[31]

During the 2012-2013 school year, students at Butler took AP exams in three courses: 16 students took the AP English Language exam; 10 students took the AP English Literature exam, and one student took the AP Statistics exam. AP exams are scored on a scale of 1 to 5. No student at Butler scored above a 1 on AP English Literature and AP Statistics, and no student scored above a 2 on any of these exams. (Sealed Doc. 354-1, p. 1). During the same year, students at Johnson took AP exams in four courses: 11 students took the AP English Language exam; 11 students took the AP English Literature exam, six students took the AP Calculus AB exam, and eight students took the AP Biology exam. With the exception of one student who scored a 4 on the AP English Language exam, no student scored above a 2 on these AP exams. (Sealed Doc. 354-4, p. 83).

_____

[31] A+ College Ready is a non-profit organization that provides the district with resources, including professional development for teachers, teacher and student incentives for qualifying AP scores, and Saturday study sessions for students preparing for AP examination. (*Id.* at ¶ 10). In the 2009-2010 school year, Columbia, Lee, Huntsville, Butler, and Johnson High Schools qualified for the A+ College Ready Program. (Doc. 299-14, ¶ 11). Grissom High School began participating in the program in 2011. (*Id.*). Butler and Johnson exited the program in 2010. (*Id.* at ¶ 11; Doc. 352, p. 50). A+ College Ready officials recently reviewed Butler and Johnson and added the schools back to the program for the 2013-2014 school year. (Doc. 352, pp. 50-51). The record does not indicate why Butler and Johnson did not participate in the A+ College Ready Program for a number of years. Dr. Wardynski testified that the district "worked very hard to get Johnson High back in the partnership with A-Plus College Ready. The partnership with A-Plus College Ready, we feel, is critical to growing the AP program. And I believe the AP program needs to grow not only at Johnson High School but at every school." (Doc. 352, p. 208).

During the 2012-2013 school year, 424 Grissom students took a total of 1,097 AP exams covering 23 subjects.  (Sealed Doc. 354-1, pp. 79-127).[32]  The average test score for the eight students who took the AP English Language exam was a 4; the average test score for the 108 students who took the AP English Literature exam was a 3.3.  (*Id.*).  In 2013, 494 Huntsville High students took a total of 1,108 exams in 20 subjects.  (Sealed Doc. 354-3, pp. 35-63).[33]  The average test score for the three students who took the AP English Language exam was a 2.7; the average test score for the 144 students who took the AP English Literature exam was a 2.9.  (*Id.*).[34]

56.    The district has stated that fewer AP courses are taught at Butler and Johnson for a number of reasons.  First, according to the district, the smaller student bodies Butler and Johnson cannot support the breadth of AP courses taught at Huntsville High and Grissom.  (Doc. 299-14, ¶ 18; Doc. 352, pp. 234-235).  A

---

[32]    Those 23 subjects are  Studio Art Drawing, English Language, English Literature, Comparative Government and Politics, European History, Macro Economics, Micro Economics, Psychology, U.S. Government and Politics, U.S. History, Calculus AB, Calculus BC, Computer Science A, Biology, Physics C: Mechanics, Physics C: Electricity and Magnetism, Physics B, Chemistry, Statistics, Environmental Science, Spanish Language, German Language, and French Language.  (Sealed Doc. 354-1, pp. 79-127).

[33]  Those 20 subjects are Art History, English Language, English Literature, European History, Macro Economics, Psychology, U.S. Government and Politics, U.S. History, Calculus AB, Calculus BC, Biology, Physics B, Physics C: Mechanics, Computer Science A, Statistics, Chemistry, Environmental Science, Latin, French Language, and Spanish Language.  (Sealed Doc. 354-3, pp. 35-90).

[34] Grissom and Huntsville High taught multiple sections of some AP courses.  (Doc. 352, p. 261).

cursory glance at enrollment statistics supports this assertion.  During the 2012-2013 school year, 1,818 students were enrolled at Grissom, and Grissom had 1,087 AP enrollments.  During the same year, 1,729 students were enrolled in Huntsville High School, and Huntsville had 1,084 AP enrollments.  (Def. Ex. 2, p. 4; Doc. 351-2).  In contrast, 673 students were enrolled in Butler and 580 students were enrolled at Johnson, with 28 AP enrollments and 40 AP enrollments in those schools respectively.  (*Id.*).  These numbers do not tell the whole story.  The record demonstrates that the during the 2012-13 school year, enrollment at Columbia High School and at Butler High School was almost identical.  So was the racial composition of the two schools.  (Def. Ex. 2, p. 4).[35]  Nonetheless, during the 2012-13 school year, 138 students at Columbia took a total of 273 AP exams in 12 courses[36], while 27 students at Butler took a total of 27 AP exams in three courses.  (Sealed Doc. 354-1, pp. 1, 10-19).[37]  In addition, Butler had nearly two times as many students as New Century High School.  (Def. Ex. 2, p. 4).[38]  Nevertheless, 82

---

[35] Butler had 673 students enrolled, 66.6% of whom were black, and Columbia had 676 students enrolled, 67% of whom were black.  (Def. Ex. 2, p. 4, Current Enrollment).

[36] Those 12 subjects are English Language, English Literature, World History, Macro Economics, U.S. Government and Politics, U.S. History, Calculus AB, Biology, Statistics, Chemistry, Environmental Science, and French Language. (Sealed Doc. 354-1, pp. 10-19).

[37] Students from across the district may apply for admission to the Columbia's IB program, even if they are not in the live-in zone for Columbia High School.  (Doc. 352, pp. 213-214).

[38] Butler had 673 students enrolled, 66.6% of whom were black, and New Century had 346 students enrolled, 47.7% of whom were black.  (Def. Ex. 2, p. 4, Current Enrollment).

students at New Century took a total of 212 AP exams in 12 courses[39] as compared to Butler's 27 AP exams in three courses.  (Sealed Doc. 354-5, pp. 69-75).

57.     In addition to asserting that class size influences AP enrollment, the district explains that student demand dictates the number of AP courses that are taught in the district's high schools.  (Doc. 352, p.250).  The district states that it offers all of its AP courses to students at every high school, including Butler and Johnson, but students at Butler and Johnson do not ask to take the AP courses that students at Grissom and Huntsville take.  (*Id.* at 250-51; Doc. 299-14, ¶ 9).  If the schools do not teach certain courses, it is because students do not request the courses.  (*Id.* at 139-42).

58.     Honors courses are preparatory courses for AP courses.  They are accelerated courses that have more rigorous content and assignments than ordinary courses.  (Doc. 352, p. 214).  A witness for the district testified that "honors programs are vital" because they "build the pipeline for AP."  (*Id*. at 227).  Moreover, for the district "to have students ready for AP, we have to accelerate all the way down to elementary" school.  (*Id*.).  The district has just begun to offer honors courses at Butler and at Johnson and to encourage students to get into the AP pipeline.  (Doc. 299-14, ¶ 9; Doc. 352, pp. 288, 297-298).

---

[39] Those 12 subjects are English Language, English Literature, Micro Economics, U.S. Government and Politics, U.S. History, Calculus AB, Computer Science, Biology, Statistics, Chemistry, Environmental Science, and Physics B.  (Sealed Doc. 354-5, pp. 69-75).

Transfer data

59.    A significant number of African-American students in the current attendance zones for Butler and Johnson have left those schools.  For the 2013-2014 school year during which 627 students were enrolled at Butler, 31 students from the Butler attendance zone transferred to other schools using M-to-M transfers, 25 students attended a private school, and 125 students attended magnet programs.  (Doc. 287-1, p. 11; Doc. 351-34, p. 1; Doc. 351-40, p. 1).  For the same year during which 599 students were enrolled at Johnson, 30 students from the Johnson attendance zone transferred to other schools using M-to-M transfers, 20 students attended a private school, and 204 students attended magnet programs.  (Doc. 287-1, p. 11; Doc. 351-34, p. 1; Doc. 351-40, p. 1).  In addition, the district denied the M-to-M transfer applications for 85 Johnson students and 87 Butler students for the 2013-2014 school year.  (Sealed Doc. 359-1, pp. 2-12).

60.    As the chart below demonstrates, over the past seven years, black students in the feeder schools for Butler and Johnson also have moved to other schools using M-to-M transfers.

| School | 2013-2014 | 2012-2013 | 2011-2012 | 2010-2011 | 2009-2010 | 2008-2009 | 2007-2008 |
|---|---|---|---|---|---|---|---|
| McDonnell Elementary | 3 | 1 | n/a | 1 | 5 | 4 | 15 |
| Montview Elementary | 21 | 9 | 2 | 9 | 16 | 11 | 7 |
| Morris Elementary | 23 | 11 | 6 | 6 | 12 | 2 | * |
| Ridgecrest Elementary | 3 | * | 6 | 6 | 1 | 11 | 1 |
| University Place Elementary | 25 | 21 | 10 | 15 | 25 | 14 | 11 |
| Dawson Elementary (West Mastin Lake) | 53 | 11 | 10 | 12 | 29 | 18 | 28 |
| Highlands Elementary | 18 | 2 | 7 | 18 | 21 | 13 | 6 |
| Lakewood Elementary | 32 | 9 | 6 | 21 | 27 | 26 | 23 |
| Rolling Hills Elementary | 53 | 12 | 12 | 30 | 46 | 39 | 44 |
| Davis Hills Middle | 53 | 36 | 15 | 4 | 42 | 26 | 27 |
| Ed White Middle | 54 | 25 | 13 | 25 | 33 | 34 | 30 |
| **Total number of M-to-M transfers** | **338** | **137** | **87** | **147** | **257** | **198** | **291**[40] |

(Doc. 351-38; Doc. 351-39; Doc. 351-40).

<u>Recent Changes to the district's Majority-to-Minority Transfer Policy</u>

61.     Prior to the spring of 2014, students who moved from their live-in zone to a school in another zone via an M-to-M transfer could remain in the cluster of schools to which the transferee school belonged until they graduated from high school.  (Doc. 287-4, p. 3).  For example, African-American third grade students

---

[40] The symbol * indicates that the Board did not provide any transfer information for that school for the year indicated.

who transferred from University Place Elementary School to Blossomwood Elementary School could remain in the Blossomwood feeder pattern until they graduated from Huntsville High School.  (Doc. 352, p. 91).  In developing the proposed student assignment plan, the district "grandfathered the children that are already under Majority-to-Minority" so that students who already have been approved for an M-to-M transfer may remain "in their feeder pattern as long as they wish up to graduation."  (Doc. 352, pp. 89-92).  The district's demographer opined that students would not abandon the schools to which they transferred simply because the district built a new school building in their live-in district. (Doc. 353, pp. 51-52, 67).

62.    To curb intra-district transfers, beginning with the 2014-2015 school year, students who change schools using an M-to-M transfer are assured of a place in the school to which they transfer only through the highest grade at that school. (Doc. 287-4, p. 3).  For example, African-American third-grade students who transfer from University Place Elementary School to Blossomwood Elementary School may remain in Blossomwood through the fifth grade, but they are not guaranteed a place at Huntsville Middle School or at Huntsville High School. Those transfer students will have to apply separately for an M-to-M transfer to

Huntsville Middle School and Huntsville High School.  (Doc. 287-4, p. 3; Doc. 352, p. 95).[41]

63.    At the end of the 2013-2014 school year, the district also changed the timeline for requests for M-to-M transfers.  Until this past school year, parents could request an M-to-M transfer at any time over the course of a year.  (*See generally* Doc. 351-13, p. 24, Doc. 351-15, p. 24; Doc. 351-17, p. 27; Doc. 351-20, p. 32; Doc. 351-22, p. 49; Doc. 351-25, p. 34).  In late March or early April 2014, the district revised the M-to-M policy and limited the time for applying for M-to-M transfers to the month of May.  (Doc. 352, pp. 162-163).  The district notified parents of the change through the school website and through the district's television station.  (Doc. 352, p. 163).

64.    In addition, until the spring of 2014, the M-to-M program contained a "percentage" provision.  Under that provision, the district permitted African-American students to transfer to another school provided that the percentage of African-American students was greater at the student's current school than it was at the school to which the student sought to transfer.  (Doc. 287-4, p. 4).  Although it has eliminated percentage transfers, the district has grandfathered students who

---

[41] Additional details regarding the most recent version of the Board's M-to-M program are available for review at Doc. 287-4, p. 3.  The Board offers five other types of specialized transfers to its public school students.

already have transferred to schools outside of their live-in zone until those students graduate. (Doc. 352, pp. 89-92).

65.    In 2011-2012, the Board denied 463 M-to-M transfer requests.   In 2012-2013, the Board denied 402 M-to-M transfer requests.   In 2013-2014, the Board denied 326 M-to-M transfer requests.   (Sealed Doc. 359-1, pp. 2-53; Sealed Doc. 359-2, pp. 2-6).

### Title I and Rezoning

66.    At the hearing on the Board's proposed student assignment plan, Dr. Wardynski testified for the first time that the biggest downside to the United States's zoning proposal, the one that would "[b]e bad forever more," would be the impact of the government's proposal on federal funding under Title I.  (Doc. 352, p. 130-137).  Under Title I, the federal government provides supplemental funding for public school children who live in poverty.  In Huntsville, the funding amounts to approximately $650.00 per child.  (Doc. 343-1, pp. 10-11; Doc. 352, pp. 130, 133).  According to Dr. Wardynski, students who leave Title I schools to attend schools such as Huntsville Middle School and Huntsville High School, schools that do not receive Title I funds, would lose that financial support.  (Doc. 352, pp. 131-133; *see also* Doc. 352, pp. 176, 199-200).  Dr. Wardynski stated that "the 650 dollars per student that would go to the school where [the students] would attend if it was a Title I school will not follow them to the non-Title I school."  (Doc. 352,

p. 133).  He added that once the funding was lost, "[t]here would be nothing [he] could do about it."  (Doc. 352, p. 130).  Over the years, Dr. Wardynski asserted, the present value of the Title I funding that Huntsville's public schools would lose would be $50 million.  (Doc. 352, pp. 133-134).

67.    The United States provided a declaration from Scott Sargrad, the Deputy Assistant Secretary for Policy and Strategic Initiatives in the Office of Elementary and Secondary Education at the United States Department of Education.  (Doc. 343-1).  Mr. Sargrad explained that a local school district, like Huntsville, will not lose any Title I funds if a certain school's Title I eligibility changes.  (Doc. 343-1, p. 2).  According to Mr. Sargrad, if a particular school within a district loses Title I eligibility, those funds can be used at other eligible schools in the district.  (Doc. 343-1, p. 2).  Therefore, Mr. Sargrad states that "to preserve maximum funding, it is not necessary to group students by poverty, or to try to maintain concentrations of poverty at certain schools."  (Doc. 343-1, p. 2). In other words, according to Mr. Sargrad, a local school district's Title I allocation is based upon "statutory formulas and does not depend on the schools in which students are assigned.  Reassignment of students within [a local district] does not affect the [district's] Title I allocation."  (Doc. 343-1, p. 3).  Mr. Sargrad also explained that local districts under court desegregation orders may apply to the

Department of Education Secretary for waivers from standard eligibility criteria. (Doc. 343-1, p. 5).

68.   All but one of the schools in the district that currently receive Title I funding have significant African-American student populations.   (Doc. 352, p. 178).  Those schools are Johnson High (93% black); Butler High (67% black); Ed White Middle (89% black); Davis Hills Middle (91% black); Westlawn Middle (55% black); Chapman P-8 (53% black); University Place Elementary (67% black); Morris Elementary (57% black); Martin Luther King, Jr. Elementary (76% black); McDonnell Elementary[42] (26% black); Rolling Hills Elementary (90% black); Lakewood Elementary (82.5% black); Dawson Elementary (87% black); Highlands Elementary  (91% black); Montview Elementary  (88% black); and Ridgecrest Elementary  (90% black).  (Doc. 343-1, p. 11; Doc. 352, pp. 177-178).

69.   The Board's demographer testified that it is best to avoid high density poverty in schools whenever possible and to expose students to socio-economic diversity.  (Doc. 353, pp. 82-83).

Initial Steps toward Equity

70.   The record indicates that the district recognizes the existing inequities between predominantly African-American schools and schools whose

---

[42] McDonnell would close under the Board's proposed plan.

student bodies are not predominantly African-American.  Recently, the district has taken some initial steps to diminish those inequities.

71.    The district recruited a new leadership team for Johnson.  The school's current principal has received national recognition for the results that he was able to achieve at another high school.  (Doc. 352, p. 206).  Butler also has new leadership.  (Doc. 352, p. 209).

72.    In 2013, the district increased bus service for Butler students to try to reduce absenteeism and tardiness caused by factors beyond the students' control.  (Doc. 299-13, p. 17; Doc. 326-1, p. 18).  Under Board's proposed student assignment plan, the district will "provid[e] transportation to high school students assigned to Jemison who live in areas of relative poverty more than 2 miles from the Jemison campus."  (Doc. 281, p. 71).

73.    With the assistance of a consultant, the district is studying the law magnet at Johnson.  "By July 1, 2014, based on the review and assessment, the district [] will develop a plan for improving or strengthening the Law Academy or for implementing a new magnet program."  (Doc. 281, p. 67).

74.    Minority enrollment in AP courses has increased since 2011.  (Doc. 352, p. 50-51).  The district is beginning to recruit students for AP courses.  (Doc. 352, p. 254).  To make sure that parents are better-informed about AP options, every AP course that the district offers now will be listed on class registration

forms that parents must sign.  (Doc. 352, p. 290).[43]  The district plans to add Honors Algebra II and Honors Pre-Calculus to the curricula at Butler and Johnson over the next two years to prepare those students to take AP Calculus during their senior year.  (Doc. 299-14, p. 5, 7-8; Doc. 352, p. 297).

**DISCUSSION:**

## I.   THE ABC'S OF PUBLIC SCHOOL DESEGREGATION IN THE 21st CENTURY

Sixty years ago, the United States Supreme Court wrote, "in these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."  *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954) (*Brown I*).  That observation resonates today.  So does the Supreme Court's holding in *Brown*:  "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."  *Id.* at

---

[43] Following the hearing on the Board's motion during which Ms. Pickens testified about the registration forms (which she called "cheat sheets"), the Court asked the district to produce high school class registration forms for the past seven years for Johnson High, Butler High, Grissom High, and Huntsville High.  (Doc. 354, p. 2). The district was able to produce only the following documents:  Johnson "cheat sheets" for 2012-2013 and 2013-2014 (Doc. 351-29, pp. 3-4); Butler "cheat sheets" for 2012-2013 and 2013-2014 (Doc. 351-31, p. 3); Grissom "cheat sheets" for 2012-2013 and 2013-2014 (Doc. 351-26, p. 3; Doc. 351-27, p. 1); Huntsville "cheat sheets" for 2011-2012, 2012-2013, and 2013-2014 (Doc. 351-30, pp. 3-5).  The district explained that it searched for other registration forms responsive to the Court's request but was unable to locate them either because of personnel changes, lost computer backup, or school document retention policies pursuant to which outdated registration forms were destroyed.  (Doc. 351-32).  The registration forms that the Court received reveal that no AP courses were listed on the registration form for Butler for the 2012-13 school year or 2013-14 school year.  (Doc. 351-31, p. 3).

493. Simply put, "racial discrimination in public education is unconstitutional." *Brown v. Bd. of Educ.*, 349 U.S. 294, 298 (1955) (*Brown II*).

In *Green v. County School Bd. of New Kent Cnty., Va.*, the United States Supreme Court acknowledged that its immediate concern in *Brown* was to make a place in white schools for black students who sought admission; however, "that immediate goal was only the first step." 391 U.S. 430, 436 (1968). "The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." *Id.* That "'constitutionally required end'" demands "'the abolition of the system of segregation *and its effects*'" so that racial discrimination in public education is eliminated "root and branch." *Id.* at 438, 440 (quoting *Bowman v. Cnty. School Bd. of Charles City Cnty.*, 382 F.2d 326, 333 (4th Cir. 1967) (Sobeloff, J., concurring)) (emphasis added). "Until a school system achieves unitary status, it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct." *Harris by Harris v. Crenshaw Cnty. Bd. of Educ.*, 968 F.2d 1090, 1094-95 (11th Cir. 1992).

Neither the Supreme Court nor the school systems and district courts charged with carrying out the Supreme Court's mandate doubted that "the 'complexities arising from the transition to a system of public education freed of racial discrimination'" would be great, and all "recognized the task would necessarily involve solution of 'varied local school problems.'" *Green*, 391 U.S. at

436 (quoting *Brown II*, 349 U.S. at 300).  The Supreme Court assigned school authorities "primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." *Brown II*, 349 U.S. at 300.

Some problems are beyond both the control of school authorities and the constitutional reach of the federal courts.  For example, a "school district is under no duty to remedy [racial] imbalance that is caused by demographic factors," and a district court has no power to fashion a remedy "where racial imbalance is not traceable, in a proximate way, to constitutional violations." *Freeman v. Pitts*, 503 U.S. 467, 491, 494 (1992).  Other problems though, such as disparities in the quality of education in racially identifiable schools, are well-suited to resolution by school authorities, so that a school district "must take all steps necessary to eliminate" inequities which are "vestiges of the [district's] unconstitutional *de jure* system." *Freeman*, 503 U.S. at 485; *see also Missouri v. Jenkins*, 515 U.S. 70 (1995).

Both types of problems seem to intersect in the Board's motion for approval of its proposed student assignment plan.  It is undisputed that although black students make up 41% of the district's total enrollment, almost all of the 40 public schools in the Huntsville City School district are racially identifiable.  The Board's

66

proposed student assignment plan revises the boundaries of almost all of the district's schools.   The plan increases the black live-in population for seven predominantly non-black schools and decreases the black live-in population for three schools, one of which is predominantly black.  (Doc. 281, pp. 25-64; Doc. 298, p. 33).  Even with these changes, most of the schools in the district remain racially identifiable under the Board's proposed plan.[44]  More importantly, under that plan, the black live-in population for almost all of the predominantly black schools in the district remains constant or increases, consolidating black students in schools with poor standardized test results and graduation rates and educational programs that are bare-boned compared to the abundant course options at the district's predominantly white schools.  The Board argues that demographic shifts are to blame and that the district has no obligation to correct racial imbalances in student population that stem from residential patterns generated by private choice. (Doc. 298, pp. 21-26; Doc. 324, pp. 7-1).

---

[44] Courts have approved use of plus/minus 15 percent variance from district-wide proportions for assessing student assignment.  *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 319 (4th Cir. 2001).  According to enrollment data supplied by the Board, in 2012-2013, the Court calculates that 41.2% of the district's school children were African-American.  (Doc. 358, pp. 15-16). Applying the plus/minus 15 percent variance (plus 15% equals 56.2%; minus 15% equals 26.2%), the Court finds that all but nine schools are racially identifiable.  (*See* Def. Ex. 2, p. 4).  According to the United States's calculations, in 2012-2013, 41.4% of the district's student body was African American, and all but three of the schools were racially identifiable. (Doc. 287, p. 8; Doc. 287-1, pp. 3-4).  Whether all but nine or all but three of the district's 40 schools are considered racially identifiable is not material to the Court's analysis.

The United States counters that the situation is substantially more complex. The government states that the Board's proposed plan "cements the boundaries between many of the district's identifiable black and white schools, along with corresponding barriers to equal educational opportunities." (Doc. 287, pp. 1-2). The United States acknowledges that the Board's plan furthers desegregation in a few schools; however, the government points out that the plan increases racial segregation of the student bodies at a number of schools, especially Butler High School.   At the same time, the United States argues, the Board already has eliminated or is in the process of curtailing transfer programs that have helped integrate the district's schools for many years, and the Board has not addressed adequately the gulf between the educational opportunities in predominantly white schools and predominantly black schools. (Doc. 287, pp. 7-9, 17-18; Doc. 327, p. 30-36).  The United States proposes two alternative student assignment plans that increase integration of some schools.  Most significantly, the government's plan places an elementary school with a large black student population into the feeder system for one of the district's predominantly white high schools that offers substantially more educational opportunities than the predominantly black high school that these students would attend under the Board's plan. (Doc. 287, pp. 20-24).

The juncture between failing educational programs and segregated student bodies is one that the Court has met before in this case. As the Court noted 40 years ago when it considered alternative proposals from the district and from the United States for the integration of Cavalry Hill Elementary School, "[t]he deficiencies of the program at Cavalry Hill has undoubtedly been a material factor in white flight to private schools." (Doc. 299-3, p. 4) (Order dated August 14, 1974). This Court credited the district with its efforts to alter the racial composition of the student bodies of schools across the district generally and found that "[t]he fact that the composition of the student body at Cavalry Hill School is largely black is not for the lack of a good faith effort on the part of the Huntsville Board of Education." (Doc. 299-3, p. 5). The Court concluded, "[i]n the Huntsville school system, the neighborhood zone is the appropriate basis for determining public school assignments. No children who live in the Cavalry Hill School attendance zone . . . will be deprived of their constitutional rights by the continuation of a neighborhood school plan." (Doc. 299-3, p. 6). The Fifth Circuit Court of Appeals disagreed, finding that Cavalry Hill had never been desegregated. The appellate court ordered this Court to take action, and the Court complied with the mandate. *Hereford v. Huntsville Bd. of Educ.*, 504 F.2d 857 (5th Cir. 1974); Doc. 299-4. Against this backdrop, the Court considers the Board's arguments in

favor of its student assignment plan and the district's path toward a declaration of unitary status.

## A is for Attendance Zones

Attendance zones are the physical boundary lines that dictate the public school to which a particular student is assigned.  These boundary lines often play a major role in shaping the racial composition of the student bodies at public schools.  Consequently, when a school district that is under court supervision pursuant to a desegregation order wishes to re-draw the boundary lines of its attendance zones, the district must obtain court approval of its student assignment plan.  The school district bears the burden of establishing that its proposed plan neither perpetuates nor reestablishes a dual school system and that the plan "further[s] desegregation and help[s] to eliminate the effects of the previous dual school system."  *Harris*, 968 F.2d at 1095; *see also N.A.A.C.P., Jacksonville Branch v. Duval Cnty. School*, 273 F.3d 960, 966 (11th Cir. 2001) (where a district formerly operated *de jure* segregated schools, "there is a presumption that any current racial disparities [in the areas of (1) student assignments; (2) facilities; (3) faculty; (4) staff; (5) transportation; and (6) extracurricular activities] are the result of [the district's] past unlawful conduct.  *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208-09 (1973).  The Board 'bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior

violation.' *Freeman,* 503 U.S. at 493; *see also Lockett II*, 111 F.3d at 843 (district court must presume that substantially disproportionate racial compositions within the schools is constitutionally violative.).") (some citations omitted).

### 1. On the current record, the Court cannot determine whether the Board operates a dual system.

In support of its motion for court approval of its proposed student assignment plan, the Board argues: "First and foremost, it is beyond dispute that Huntsville does not currently operate a dual system" because Huntsville "effectively desegregated its schools at an earlier point in time." (Doc. 324, p. 17) (citing Doc. 298, pp. 7-27). The record in this case is not as clear as the Board suggests, and the fact that the district integrated the student bodies of many of its schools in the early 1970s does not automatically lead to the conclusion that the district does not currently operate a dual system.

With respect to the record, the Board bases its argument on the Court's 1974 Cavalry Hill student attendance order. In that 1974 order, this Court stated that "'[t]he City of Huntsville school system is well integrated.'" (Doc. 298, p. 8) (quoting Doc. 299-3, p. 3) (emphasis in Board's brief omitted). As noted above, the Court of Appeals found that at least one school, Cavalry Hill, was not well integrated, and the Court of Appeals directed this Court to take steps to desegregate the school. The appellate decision does not address this Court's

71

statement regarding the district's other efforts at desegregation throughout the district.

The details of the record aside, the Board's argument that the Court's 1974 order established for all time that the Board does not operate a dual system is a bridge too far.  In *Freeman*, the Supreme Court held:

> the term 'unitary' is not a precise concept:  '[I]t is a mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution' . . . [W]e must be cautious not to attribute to the term a utility it does not have.

*Freeman*, 503 U.S. at 487 (quoting *Bd. of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 245-46 (1991)).  The fact that a school district has integrated the population of the student bodies of its schools does not establish that the district operates a "nonracial system of public education" that has eliminated the effects of the former segregated system.  *Green*, 391 U.S. at 436.  On the record before it, the Court cannot find conclusively that the Board does not operate a dual system.

This much is certain.  Currently, approximately 40% of the district's student population is African-American, but few of the district's schools reflect the overall racial composition of the district.  Most of the schools in the district are either predominantly African-American or predominantly white.  This too is certain:  the district has experienced significant demographic shifts that have caused schools that previously were integrated and majority non-black to become, for the most

72

part, predominantly black.  (*See* Doc. 298, p. 9).  The Board submits that shifts in the racial composition of the live-in zones of its 40 schools are the product of private choices and that the district has done everything practicable to address the resulting re-segregation of its public schools.  (Doc. 298, pp. 11-14; Doc. 324, pp. 7-9, 18-19).  There is nothing in the record that suggests that "either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the [district's] schools."  *Freeman*, 503 U.S. at 494.

While private choices seem to have precipitated the existing racial polarization of the district's schools, it is not clear on the record before the Court that the district has not contributed to the situation.  There is significant disparity between the educational programs in the district's predominantly African-American secondary schools and the educational programs in the district's predominantly white secondary schools.  *See* pp. 51-55, *supra*.  Although the Court does not have information about the educational programs in the district's primary schools, there are substantial differences in standardized tests results from predominantly African-American elementary schools and test results from predominantly white elementary schools.  *See* pp. 49-51, *supra* and Appendices B and C.  The Board has full control over and responsibility for the educational programs that its schools provide, and as this Court observed in its 1974 order

regarding Cavalry Hill, deficiencies in a school's educational program can be a "material factor" that causes white flight.  (Doc. 299-3, p. 4).

In its 1974 order, the Court cited testimony from a white parent who sent his two children two Cavalry Hill.  The father "testified that he withdrew one of them when he reached junior high level because he didn't believe the program offered was broad enough, and withdrew a younger child because the child didn't seem to be learning as well as he thought the child should."  (Doc. 299-3, p. 5).  The record in this case contains similar testimony with respect to Butler High School.  A white parent who testified at the hearing on the Board's motion explained that she withdrew her daughter from Butler and moved her to Huntsville High during the 2013-2014 school year.  The witness stated that she had concerns about Butler before the school year began because when she registered her daughter for school, she noticed that Butler offered fewer classes than another high school in the district.  The witness's concerns rose when her daughter brought home her first progress report, and it provided no grade for math.  (Doc. 353, p. 180).  When the witness investigated, she learned that Butler had not had a permanent teacher for her daughter's class since the beginning of the school year.  (Doc. 353, pp. 180-181).[45]

---

[45]   As discussed in the findings of facts, African-American students also have left Butler and other predominantly black schools through transfers or through acceptance to a magnet school or an IB program.  *See* pp. 56-57, *supra*.

The statistics that the Court set forth in its findings of fact bolster this anecdotal evidence and demonstrate the disparity between the educational programs at the district's predominantly white high schools and its predominantly black high schools. At the hearing on the Board's student assignment motion, the district tried to blame the students at Butler and Johnson for the absence of accelerated courses in those schools. The district administrator who determines which courses will be taught at the district's schools each year testified that all of the courses listed in the district's course catalogue, including all of the 27 AP courses, are *offered* to all of the students at all of the high schools in the district, but the district only teaches a handful of AP courses at Butler and Johnson because students at those schools have not requested other AP courses. (Doc. 352, pp. 234-235; Doc. 251-48; *see also* Doc. 352, pp. 140, 296). When pressed, the witness conceded that the district only recently has begun encouraging students at Butler and Johnson to take AP courses, and the district is in the process of instituting at those schools the pre-AP courses already available at predominantly white schools – courses that create the pipeline for AP classes. (Doc. 352, pp. 288-289, 297-298; Doc. 351-26 th. 351-31). The uncomfortable truth is that in a high school in which only 33% of the students read at or above grade level (Doc. 352, p. 148; Def. Ex. 4, p. 2), many students probably are not prepared for the rigor of college level AP

courses.  Students who do not read at grade level need not only encouragement but also remedial help to take an AP course.

Reading skills are developed in elementary school, not in high school.  At the hearing on the Board's motion, an African-American grandmother whose children attended district schools and who formerly taught in the district testified about the role that she played in selecting an elementary school for her two grandchildren.  Under the district's current attendance zones, the children are assigned to Lakewood Elementary School.  (Doc. 353, p. 21).  Explaining the decision to send the children to a private elementary school, the witness stated:  "I was very influential in [the decision] because I am an educator.  And one of the things I discussed with [my daughter] is if your children don't have the foundation at the very beginning, then they're going to be lost."  (Doc. 353, p. 22).  The witness added that she did not encourage her daughter to apply for M-to-M transfers for the students "because at the time Huntsville City Schools was not allowing a lot of Majority-to-Minority transfers, and I didn't want to take that chance with my grandkids."  (Doc. 353, p. 23).[46]  When the Court asked the

---

[46] In response to this testimony, counsel for the Board asked, "[a]re you aware, Ms. Watkins, that last year, say for example, '12, I guess, '13, '14, that the Huntsville City Schools did not deny any request at the elementary level for a Majority-to-Minority transfer?"  (Doc. 353, p. 23).  The evidence that the Board submitted after the hearing demonstrates that premise of counsel's question is false.  For the 2013-2014 school year, the district denied 66 applications for elementary school transfers.  (Sealed Doc. 359-1, pp. 2-12).  More generally, in 2013-2014, the district received 708 M-to-M transfer requests from elementary, middle and high school students and denied 335 of them.  In 2012-2013, the district received 681 applications for M-to-M

witness why she did not believe that her grandsons would receive a good foundation at Lakewood, she replied, "the test scores were down pretty low." (Doc. 353, p. 34). Standardized test score reports bear out this testimony. *See* pp. 49-51, *supra* and Appendix B.

Among the schools for which the Court currently has some data, Butler High School's program and its outcomes are the poorest. Between the fall of 2007 and the spring of 2014, Butler's student population was, on average, 69% African-American, 14% White, and 17% other. (Doc. 358).[47] With regard to programs, by way of example, for the 2012-2013 and 2013-2014 school years, when Butler students registered for classes, they were given the option of taking three foreign language classes:  Spanish I, Spanish II, and French I. (Doc. 351-31, p. 3). In contrast, during the 2013-2014 school year, when students at Grissom registered, they were given 16 foreign language options: French I, II, III, IV (AP); German I, II, III, IV (AP); Latin I, II, III, IV (AP); and Spanish I, II, III, IV (AP). (Doc. 351-26, p. 3). Grissom gave its students four more foreign language options during the

transfers and denied 413 of them. Similarly, in 2011-2012, the district received 609 applications for M-to- M transfers and denied 476 of them. The materials that the district provided to the Court do not explain why the Board denied these M-to-M applications. (Sealed Doc. 359-1, pp. 2-53; Doc. 359-2, pp. 2-6).

[47] Unlike many of the predominantly black schools in the district, since 2007, Butler's black population has gradually decreased. Butler was 73.7% black in 2007-2008, 76.1% in 2008-2009, 71% in 2009-2010, 70.7% in 2010-2011, 70% in 2011-2012, 66.2% in 2012-2013, and 65% in 2013-2014. (Doc. 358). Under the Board's plan, most of the African-American students who currently attend Butler will move to Jemison, a school whose estimated enrollment is 90.9% black. (Def. Ex. 2, p. 4).

2012-2013 school year because it offered Pre-AP classes in all four languages to juniors. (Doc. 351-27). During the 2013-2014 school year, Butler offered three business class options; Grissom offered 14. Butler offered one class in Family and Consumer Science; Grissom offered seven. (Doc. 351-26, p. 3; Doc. 351-31, p. 3).[48] With respect to outcomes, in the spring of 2011, only 31% of Butler's seniors graduated after four years of high school. In the spring of 2012, 45% of Butler's seniors graduated after four years of high school. (Doc. 351-10, p. 1; *see also* pp. 25, 47, *supra*).[49]

All of this data demonstrates a strong correlation between race and the relative strength of the educational programs throughout the district and suggests that educational opportunities in the district may not have not been "made available to all on equal terms"[50]; however, on the current record, the Court cannot determine when the disparities in educational programs, test results, and graduation rates arose or whether the disparities "have a causal link to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496. The Court must presume that the

---

[48] This data comes from the "cheat sheets" that advisors at each high school give their students when students register for courses. (Doc. 352, pp. 257-58).

[49] When Johnson students registered for classes for 2013-2014, they were also provided only 10 foreign language options: French I, II, and III; German I, II, and III; and Spanish I, II, III, and IV (AP). (Doc. 351-29, p 3). Johnson students were provided three more business classes than the Butler students but still eight fewer than the Grissom students. (*Id.*). Unlike the "cheat sheets" provided to Butler students, the Johnson 2013-2014 "cheat sheet" directs students to the 2013-2014 Course Description Guide for more courses. (*Id.*). Graduation rates at Johnson have increased at Johnson from 62% in 2011, to 68% in 2012, to 78% in 2014. (Doc. 351-10).

[50] *Brown I*, 347 U.S. at 493.

disparities are the result of the district's past unlawful conduct, but the Court also must give the Board an opportunity to overcome the presumption. *Duval Cnty. School*, 273 F.3d at 966. Until the Court is able to answer these outstanding questions, it cannot determine as a matter of law whether the district operates a dual system or whether the inequities in the district's educational programs are the consequence of other factors.[51] Even if the disparities are not causally linked to the *de jure* violation that produced the segregation order in this case, the district "of course remains subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment," and the Court may evaluate the district's educational programs "under appropriate equal protection principles." *Bd. of Edu. v. Dowell*, 498 U.S. 237, 250-51 (1991).

---

[51] The Board included proposals regarding a number of its educational programs in its motion for approval of its student assignment plan. (Doc. 281, pp. 6-7, 65-69). It is appropriate for the Court to consider those programs and other programs within the system as it reviews the Board's proposed zoning plan. As the Supreme Court held in *Freeman*:

> It was an appropriate exercise of its discretion for the District Court to address the elements of a unitary system discussed in *Green*, to inquire whether other elements ought to be identified, and to determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree. Both parties agreed that quality of education was a legitimate inquiry in determining DCSS' compliance with the desegregation decree, and the trial court found it workable to consider the point in connection with its findings on resource allocation.

*Freeman*, 503 U.S. at 492.

**2. Many of the arguments that the Board makes in favor of its student assignment plan are unpersuasive.**

Although the Court currently cannot determine whether the Board operates a dual system, the Court can address the Board's argument that "[t]he record does not support the conclusion that Huntsville's actions reestablish a dual system for three reasons." (Doc. 324, p. 17). The Board posits first that its proposed student assignment plan increases the black live-in population at seven predominantly white schools and decreases the black live-in population at three schools, Morris Elementary, Westlawn Middle, and Jemison High School. (Doc. 324, pp. 17-18). The point is well-taken with respect to the seven predominantly white schools that the Board identifies, but the Board's argument regarding the black schools is lacking.

The live-in populations for Morris Elementary and Westlawn Middle already are nearly racially balanced, and neither school is in the Johnson/Butler/Jemison feeder pattern. (Doc. 281, pp. 21-22; Def. Ex. 2, p. 4). Consequently, the changes that the Board proposes to make to the student bodies at those schools do not get to the root of the racial disparities in the district's racially identifiable schools. Moreover, the Board's argument overlooks the fact that its plan increases the black live-in population for four of the six feeder schools for Jemison. Students who currently attend University Place will experience the most resegregation. University Place currently has a live-in population that is 66.5% black and 33.5%

non-black. Under the Board's plan, the live-in population for Sonnie Hereford, the school that will replace University Place, will be 71.8% black and 28.2% non-black. The black live-in populations at Dawson Elementary, Highlands Elementary, and Lakewood Elementary will grow slightly, with Lakewood experiencing the most growth of the three. The black live-in populations for Rolling Hills Elementary and McNair 7-8 will decrease slightly. (Doc. 281, p. 21; Def. Ex. 2, p. 4; Appendix A).

With respect to Jemison, the Board argues that students at the school will experience a reduction in the black live-in population because Johnson, the new Jemison, will go from 93% black to 91% black. (Doc. 324, p. 18). The Board omits Butler from the equation. Under the Board's proposed plan, the majority of Butler's black live-in population (367 students to be exact) will be zoned for Jemison while most its non-black population will be zoned for Lee, Columbia, Hunstville, and Grissom. (Doc. 287-1, p. 9; Doc. 326-14, p. 11). During the 2012-13 school year, Butler had a live-in (plus magnet) population that is 66.1% African-American. The students from Butler who are zoned for Jemison under the Board's plan will enter a school that has a 90.9% black live-in population. Thus, the Board's argument overstates the extent to which it decreases segregation and ignores the schools at which the plan increases segregation.

The Board's plan increases the African-American live-in population at the schools that bear the greatest burden of the inequities in the district's educational programs. *See Harris*, 968 F.2d at 1097 ("To comply with constitutional mandates, the burden of desegregation must be distributed equitably; the burden may not be placed on one racial group.").  The superintendent testified that it is important for the Court to approve the Board's design for the feeder schools to Jemison because "when a child goes to McNair and Jemison from Hereford, they will benefit from a federal [funding] program called Title I," but if a Hereford student goes "to Huntsville Middle and Huntsville High, those schools do not earn any Title I money.  So the Hereford children, if they go in that direction would be denied those resources, and yet they need them."  (Doc. 352, pp. 130, 132).[52]  The United States has demonstrated that the superintendent's argument concerning Title I funding is inaccurate, eliminating that facially non-racial argument for the Board's proposed rezoning.  *See* pp. 60-62, *supra* (citing Doc. 343-1).

Beyond live-in population assignments, the Board argues that its plan demonstrates its commitment "to continuing to strengthen its magnet programs district wide."  (Doc. 324, p. 18).  The Court agrees with one caveat.  To date, the district's commitment to the Johnson magnet (which, under the Board's plan, will

---

[52]  As noted at p. 62, *supra*, all but one of the schools in the district that currently receive Title I funding have predominantly African-American student bodies.

become the Jemison magnet) seems to have been lukewarm. The success of a magnet depends, in part, on the school's ability to offer specialized classes that are not available elsewhere in a district. A number of the classes that the district offers through its magnet program at Johnson are available in similar formats at other high schools, removing the incentive for non-black parents to send their children to the Johnson magnet. (*See* Doc. 287-2).[53] In addition, "[m]agnet schools have the advantage of encouraging voluntary movement of students within a school district in a pattern that aids desegregation on a voluntary basis, without requiring extensive busing and redrawing of district boundary lines," *Missouri*, 515 U.S. at 92; however, a magnet program planted in a school with, relatively speaking, few educational offerings outside of the magnet program is unlikely to draw students who have available to them in their live-in district a wealth of sophisticated elective classes and a breadth of advanced programs that the magnet school does not currently offer. That being said, overall, the record supports the Board's commitment to "vibrant magnets." (Doc. 352, p. 100; *see also* Doc. 352, pp. 242-44).[54]

---

[53] The teacher for Johnson's law magnet classes has a law degree. The teachers for similar classes at other high schools do not have a law degree. (Doc. 352, pp. 245, 270).

[54] As reflected in the Court's finding of fact, the Board projects adding 100 students over four years to the art magnet at Lee and the New Century magnet. (Doc. 281, p. 68). The district also has hired a magnet coordinator. (Doc. 281, p. 66; Doc. 352, pp. 88, 243). Finally, the district has engaged a consultant to review its magnet programs. (Doc. 281, p. 65; Doc. 352, pp. 243, 273).

Finally, the Board argues that its M-to-M transfer policy helps ensure that its proposed student assignment plan will not reestabish a dual system.  In theory, the argument is sound, but the record demonstrates a course of conduct that diminishes that ability of the transfer policy to mitigate the impact of the Board's proposed plan on schools burdened by the district's inequitable educational programs.  The record reveals the district's aversion to M-to-M transfers.  The superintendent has criticized M-to-M transfers publicly.  When he presented the district's proposed student assignment plan to the Board, Dr. Wardynski stated that highly engaged students from Butler and Johnson have moved to Grissom and Huntsville High, impacting high school graduation rates in the district.  (Gov't. Ex. 38).  He used a Power Point slide labeled "Today, M-to-M Transfers Substantially Reduce Graduation Rates and Contribute to Flight From Majority African-American Schools" to illustrate his point.  (Doc. 287-4, p. 8; Doc. 352, pp. 159-60).[55]  At the hearing on the Board's motion, the superintendent testified that students' movement from Butler and Johnson is one of the factors contributing to depressed

---

[55]  The M-to-M transfer data that the Board supplied to the Court following the May 22, 2014 hearing does not seem to support the superintendent's argument.  The district's transfer records reveal that for the 2013-14 school year, only four Butler seniors and one Johnson senior transferred to other schools under the district's M-to-M policy.  (Sealed Doc. 359-1, pp. 2-23).  These students might improve the graduation rates at Butler and Johnson, the precursor schools to Jemison, but the change probably would be marginal.  Last year, seven Butler juniors and thirteen Johnson juniors transferred to other high schools under the district's M-to-M policy.  (Sealed Doc. 359-1, pp. 2-23).  Those students might have a bigger impact on graduation rates if they returned to Butler and Johnson for the 2014-15 school year, but probably not to the degree that the superintendent suggests.  Moreover, if those students returned to Johnson and Butler, they would be deprived of the richer curricula at the schools to which they transferred.

graduation rates for schools and, if those students returned to their home attendance zone, graduation rates would go up. (Doc. 352, pp. 159-160).

Backing up the superintendent's remarks with action, the district has begun chiseling away at the M-to-M transfer policy that the district followed for years. For the 2014-2015 school year, the district instituted the following changes to its M-to-M transfer policy: (1) prior to 2014-2015, students granted transfers could remain in their school feeder pattern through their senior year; now, students may remain at the school to which they transferred only through the highest grade offered at that school; and (2) upon completion of the highest grade at a school, a student may apply for a M-to-M transfer to attend the school or school serving the next grade level; these students will have priority for receiving a transfer if the school to which the student seeks a transfer does not have space available for all students seeking M-to-M transfers. (Doc. 287-4, p. 3; Doc. 352, pp. 161-163). In addition, in 2014, the Board required families to submit applications for M-to-M transfers during the month of May. (Doc. 352, pp. 162-163). In the past, families could ask for an M-to-M transfer throughout the year. (Doc. 352, pp. 162-163). The Board announced the May application deadline in late March or early April 2014, giving little notice to parents. (Doc. 352, p. 163). Finally, the Board's proposed plan increases program utilization at a number of the district's strongest schools, making those schools unavailable for M-to-M transfers. (Doc. 352, pp.

91-92; *see also* pp. 34-35, *supra*).  The Court infers from this evidence that the district will continue to look for ways to limit M-to-M transfers as much as possible while the district is under court supervision.

Moreover, the evidence supports the inference that the Board will end M-to-M transfers once the district obtains a declaration of unitary status.  The Board recently eliminated its minority transfer policy, a policy that operated much like the M-to-M policy.[56]  (Doc. 287-4, p. 3).  The Board had full authority to make the change because the minority transfer policy was not court-ordered like the M-to-M policy; however, the district's decision to discontinue this transfer option strengthens the inference that the Board will cancel M-to-M transfers when the Board obtains unitary status.  So does the fact that the district did not include M-to-M transfers in its student assignment plan calculus.  The district posits that it was logical to exclude these students from its planning because the number of transfers fluctuates each year, but the superintendent has testified that the M-to-M policy

---

[56] Before the Board deleted it from its transfer options in the spring of 2014, the percentage transfer policy provided:

> To enhance desegregation, the school district may permit a Black student to transfer to another school provided that the percentage of Black students is greater at the school to which the student is assigned than it is at the school to which the student seeks to transfer.  Also, the school district may permit any other student to transfer to another school provided that the percentage of Black students is less at the school to which the student is assigned than it is as the school to which the student seeks to transfer.  The transferee must provide transportation. . . .

(Doc. 287-4, p. 4).

will be "changing over time."   (Doc. 326-1, p. 42; Doc. 353, pp. 61-62).   It is entirely plausible, given the superintendent's vocal criticism of M-to-M transfers, that the district will end those transfers when it is free to do so.   In short, the evidence dilutes the Board's argument that M-to-M transfers minimize the ability of the Board's student assignment plan to reestablish a dual system.

### 3. The United States's proposed student assignment plans further desegregation and mitigate the effects of the current inequities in the district's educational programs, but the plans pose risks to public school enrollment.

The student assignment plans that the United States has proposed have much to offer.  In particular, the government's plan moves Hereford Elementary School, a predominantly African-American school, into the feeder system for Huntsville High.  (Doc. 287, p. 22).   Under the government's plan, the Hereford students would attend Huntsville Middle School and Huntsville High School.  (Doc. 287, p. 22; Doc. 287-5, pp. 3, 5).  The educational programs at Huntsville High currently exceed the educational programs at Johnson and Butler, the precursor schools to Jemison.  *See* pp. 51-55, *supra*.

 The Board posits that the government's proposed reassignment plans are "infeasible;"[57] however, the Board's criticisms of the government's proposals boil down to a simple preference for the district's policy choices.  For example, the

---

[57] *See* Doc. 352, p. 125; Doc. 353, p. 74.

Board argues that under the government's first proposal, the projected 106.9% program utilization rate for Blossomwood Elementary would make the school significantly overcrowded. (Doc. 352, p. 126). The superintendent stated that overutilization of Blossomwood would "go[] against all of the educational approaches we are taking. We are designing our buildings. We're programming our buildings with educational space to fit the students. And here we have a school where we're going to go over that by quite a bit." (Doc. 352, p. 127). The Board cannot argue credibly that boundaries that give rise to utilization rates in excess of 100% are fundamentally flawed because the Board's proposal creates six boundaries that produce program utilization rates that exceed 100%. The schools affected include Chaffee Elementary which has a 108.5% utilization rate under the Board's plan and Grissom that has a 110% utilization rate under the Board's plan. (Def. Ex. 2, p. 4). The Chaffee and Grissom utilization rates, like the government's utilization rate for Blossomwood, do not include students who will attend Chaffee and Grissom because they are grandfathered into the schools under the district's former M-to-M policy. (*See* Doc. 324, p. 25; Def. Ex. 2, p. 4).[58] The United States's proposal also changes Blossomwood from a PK-5 configuration to a PK-6 configuration, a school structure that the superintendent prefers. (Doc.

---

[58] At the hearing on the Board's motion, the Board's demographer acknowledged that some of his calculations concerning program utilization at Blossomwood were incorrect, rendering part of the Board's argument concerning the United States's proposal inaccurate. (Doc. 326-6, p. 8; Doc. 353, p. 79). The Court is grateful for Mr. Richter's candor.

287-5, pp. 3, 5; Doc. 352, pp. 136, 157).[59]  Urging the Court to approve the district's policy choices rather than the government's, the Board argues that under Eleventh Circuit precedent, proposals like the ones that the United States offers, "even if they lead to increased desegregation, impermissibly intrude on a school district's educational policymaking powers if that school district has acted in good faith to desegregate its schools."  (Doc. 324, p. 23) (citing *Lee v. Anniston City School Sys.*, 737 F.2d 952, 956 (11th Cir. 1984)).  The Court will turn to the issue of good faith shortly.

The Court's concerns regarding the zoning proposals that the United States offers are pragmatic.  First, the government's demographer had to develop his plans fairly quickly.  He did not have as much time as the Board's demographer to examine the subtleties of the district, and he did not have access to the same information that the Board's demographer had.  That makes the government's plans susceptible to criticism.  Second, the district has published inaccurate information about the government's proposals.  The district included in a Power

---

[59] The Board takes issue with the government's second proposal because it would cause some middle school students to have to drive past one of the district's middle schools to reach the students' assigned school (Doc. 326-6, p. 1; Doc. 353, pp. 54-56), but the Board's proposed plan creates a similar transportation issue for some elementary students.  (Doc. 353, p. 81) (acknowledging that under the Board's plan, students from the Shady Grove area will ride past one or more elementary schools to reach Monte Sano, the students' assigned school).  In addition, the Board states that by bringing University Place (Hereford) into the Huntsville pattern and out of the Jemison pattern, those students will not benefit from the increased security and safety measures the district is implementing on the McNair and Jemison campuses.  (Doc. 352, pp. 128-129).  Finally, the Board adds that the United States's proposals will make McNair and Jemison less diverse because University Place (Hereford) is the most diverse elementary school in the Jemison feeder pattern.  (Doc. 352, p. 129).

Point presentation about its plan a diagram that illustrates a maze of feeder patterns that the district attributes to the United States's proposal.  (Huntsville City Schools, Status of Student Assignment Plan, February 6, 2014, slides 5-6, http://www.huntsvillecityschools.org/Download.asp?L=3&LMID=720089&PN=DocumentUploads&DivisionID=11142&DepartmentID=11319&SubDepartmentID=8057&SubP=&Act=Download&T=1&I=332015 (last visited June 27, 2014)).[60] Those feeder patterns were part of the parties' confidential negotiations; the published illustration of the government's proposal bears no resemblance to the plans that the United States submitted to the Court.  Misunderstandings about the United States's proposals may create instability in the district, including flight to private schools, if the Court adopts one of the government's plans.  That has happened before in the years since the Court issued its desegregation order, and it is a possibility that the Court must consider as it evaluates the parties' proposals. *See*, *e.g.*, *Missouri*, 515 U.S. at 76 (noting that district court refused to order some student assignments that the court feared would "increase the instability" of the district and "reduce the potential for desegregation").

---

[60] At the May 22 2014, hearing, the superintendent stated that the government's plan "looked nothing like anything" he had seen and contained "at least 19 splits" and "destroyed feeder patterns." (Doc. 352, pp. 99, 101).

**B is for building a unitary system.**

Because the Board is operating under a desegregation order, the Board has an ongoing duty "to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, 391 U.S. at 437-38.  In a unitary system there "is no *de jure* racial segregation, and the vestiges of former *de jure* segregation have been eliminated to the extent practicable."  *Duval Cnty. Sch.*, 273 F.3d at 965-66 ("If the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance, that condition must be remedied.") (citing *Freeman*, 503 U.S. at 494).  Until the Board achieves this goal and demonstrates that it has complied in good faith with the desegregation decree, the Court must continue to supervise the Board's efforts.  *See id.*

In *Green*, the Supreme Court identified six areas that the Court must examine to evaluate whether the Board has fulfilled its obligation to eliminate the vestiges of *de jure* segregation:  (1) student assignments; (2) facilities; (3) faculty; (4) staff; (5) transportation; and (6) extracurricular activities.  391 U.S. at 435.  "[T]he *Green* factors need not be a rigid framework." *Freeman*, 503 U.S. at 493. district courts must "inquire whether other elements ought to be identified, and [] determine whether minority students [a]re being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree." *Id*. at 492-93.

Although the Court's primary objective in this case is to oversee the Board until the Board eliminates the effects of a dual school system, the Court's other important objective is to restore Huntsville's schools to local control.  After 50 years of litigation, it is time for the district to move toward a declaration of unitary status.  To accomplish that end, the parties must analyze and review the programs and practices in each of the areas identified in *Green* as well as any other factors that the Court finds are relevant to the unitary status inquiry.  The parties may identify areas in which they believe the school system has achieved unitary status, and the Board may ask for release from Court oversight in those areas.  *See Freeman*, 503 U.S. at 493 ("By withdrawing control over areas where judicial supervision is no longer needed, a district court can concentrate both its own resources and those of the school district on the areas where the effects of *de jure* discrimination have not been eliminated. . . .").  The parties also should identify areas that still bear vestiges of prior *de jure* segregation and develop a procedure by which the school system may achieve unitary status in those areas.  This procedure should set forth in detail the areas to be addressed and the specific actions that, if successfully undertaken by the Board, will eliminate to the extent practical vestiges of the prior dual system and ensure that the school system operates on a nondiscriminatory basis.  In other words, the parties should develop

"a roadmap to the end of judicial supervision." *Duval Cnty. School*, 273 F.3d at 963.

This process must be deliberate.  The Court will appoint Chief Magistrate Judge Ott to serve as a mediator to assist the parties in this endeavor.  The Court anticipates that at the end of negotiations, the parties will present for Court approval a proposal that details the areas of operation, if any, in which the district will petition immediately for a declaration of unitary status and those in which further action is necessary.  If the Court is satisfied that the proposal defines the specific goals the Board must meet, a timeline by which the Board must act, and a set of reliable, routine reporting requirements, then the Court will enter and enforce the plan.  With respect to the areas that the parties agree have achieved unitary status, the Court will consider:

> whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman*, 503 U.S. at 491.

**C is for Conduct that Demonstrates Good Faith.**

"To be entitled to the end of federal court supervision, a formerly dual school system must be able to prove that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable." *Duval Cnty. School*, 273 F.3d at 966 (citations omitted). "The good-faith component has two parts. A school district must show not only past good-faith compliance, but also a good-faith commitment to the future operation of the school system through 'specific policies, decisions, and courses of action that extend into the future.'" *Lee*, 2004 WL 2359667, at *4 (quoting *Dowell v. Bd. of Educ. of the Oklahoma City Public Schools*, 8 F.3d 1501, 1513 (10th Cir.1993)) (citations omitted).

The Board submits that the district's conduct over the past 50 years demonstrates good faith. (Doc. 298, pp. 6-17; Doc. 324, p. 9). The Court agrees in certain respects. As discussed above, the district has established a number of successful magnet programs. Those programs have promoted desegregation within the district. Some of the other steps that the Board has taken to increase white enrollment in predominantly black schools have not succeeded completely, but the Court has credited the Board's efforts.

Recent events, though, have hurt the Board's record. For starters, the Court's desegregation order contains several reporting requirements. The order

states that the Board must provide the following information to the Court "each October 15 or until the court directs otherwise:"

- district-wide and individual school enrollment by race;

- Racial demographics of the district's teachers;

- All transfer applications (majority to minority and attendance outside system) made, the action taken by the Board and the reasons for granting or denying the application, the names, addresses, and races of students involved, and the school to which and from which a transfer was requested; and,

- Detailed information regarding promotion and demotion of personnel.

(Doc. 299-1, pp. 9-11).  The Court has not changed these reporting requirements, yet the Board has not filed a report in more than 20 years.  (Doc. 362, pp. 15-17). Had these reports been available, the Court would have had a good deal of the information that it has had to request from the district over the past month.

The district's failure to file annual reports diminishes the Board's ability to demonstrate good faith; however, given the age of this case and the fact that the case has been dormant for years at a time, if the district simply had failed to file some reports, the Court would be inclined to give the Board some leeway.[61]

---

[61]  In fairness, it appears that neither the United States nor the Court has reminded the Board of its reporting requirements in the past 20 years.  Still, the reports are the Board's responsibility, and the reports are one of the Board's strongest tools for demonstrating good faith compliance

Unfortunately, the district did not simply fail to file reports. Instead, the district represented that certain M-to-M transfer data was missing.  At the hearing on the Board's motion, counsel asked Dr. Wardynski: "Is it the case that the school system in prior years [] did not have perfect records, shall we say, with regard to the students who were M-to-M transfers?"  (Doc. 352, p. 116).  Dr. Wardynski replied: "Recordkeeping was through a paper process and very difficult to reconstruct.  We've implemented digital recordkeeping and digital application." (Doc. 352, p. 116).  Yet, following the hearing, after the Court reminded counsel of the Board's reporting obligations under the 1970 desegregation order, the district was able to submit spreadsheets to the Court containing information about M-to-M transfers for the past seven school years.  (Doc. 348; Doc. 354-7).  Days later, the district asked the Court for permission to file 20 years' worth of M-to-M reports that the district says it has just located.[62]  (Doc. 355).

The district's shifting story regarding M-to-M data is not an isolated incident.  Over the past few months, when asked for information, the district frequently has offered incomplete answers.  The construction of Jemison is a case in point.  At the hearing on the Board's motion, when the United States pointed out

_____

with the Court's desegregation order.  In other words, the reporting requirement is for the Board's benefit.

[62] The Board has filed a motion to submit those reports to the Court.  The Court will set a hearing on the motion shortly.

to the superintendent that African-American students at Butler who would be assigned to Jemison under the Board's plan would move to a more segregated environment, the superintendent responded, "I have to do that because the Court has ordered me to do that." (Doc. 352, p. 170). The superintendent's answer is not accurate. The Court has not ordered the Board to do anything with respect to Butler. In the Board's unopposed motion to build a new high school to replace Johnson, the Board did not mention Butler. (Doc. 279, p. 2).[63] To date, the Board has not asked for permission to close Butler. The superintendent seems to have been suggesting that Jemison will have a high concentration of African-American students because Hereford is in the Jemison feeder pattern. The order to which the superintendent refers is the 2008 order granting the Board's unopposed motion for permission to build Hereford. (Doc. 264). In other words, the Board asked to build Hereford; the Court did not instruct the district to build the school. When the Court asked the superintendent whether the district would like relief from the 2008 order that granted the Board's request to build Hereford, the superintendent declined. (Doc. 352, pp. 170, 196-197). As the Court advised the superintendent, the Court's orders are designed to enable the Board to address the vestiges of segregation and to promote diversity. If the Board believes that one of the Court's

---

[63] The Board's school construction motion also did not mention McDonnell Elementary (*see* Doc. 279), a school that the district intends to close as the Board's student reassignment motion (*see* Doc. 281, p. 3).

orders hampers the district's ability to carry out its obligations under the 1970 desegregation order, then the Board may file a motion for reconsideration of the order that causes the Board's concern.  (Doc. 352, p. 196).

The district also stated in its unitary status Power Point presentation on its website that it has satisfied the *Green* factor regarding faculty assignments (Huntsville City Schools, Unitary Status Background, slide 4, http://www.huntsvillecityschools.org/Download.asp?L=3&LMID=720089&PN=DocumentUploads&DivisionID=11142&DepartmentID=11319&SubDepartmentID=8057&SubP=&Act=Download&T=1&I=329185 (last visited June 27, 2014)) ("Faculty assignments are within the case law"); however, the Board has not requested much less received a declaration of unitary status concerning faculty assignments.  The Court must decide whether faculty assignments are within the case law.  Until it does, the district's premature announcement is risky and prone to generate confusion.

The district has employed a similar tactic with respect to M-to-M transfers. The district criticized the Court's M-to-M transfer requirement in public hearings and in a Power Point slide posted on the district's website that states that M-to-M transfers lower graduation rates at the district's high schools.  (Doc. 287-4, p. 8). The Board did not present its concerns to the Court.  Had the Board filed a motion for relief from the M-to-M transfer requirement in the desegregation order, the

United States and the Court would have had a chance to reconsider the M-to-M requirement and revise or eliminate it if the district were able to present evidence to substantiate its allegation that transfers do more harm than good. The Board did not give the Court an opportunity to address the issue before the district launched a public presentation that disparages the Court's desegregation order.

Additionally, the district first introduced its proposed student assignment plan to the public at a January 16, 2014 Board meeting. Less than three weeks later, the Board approved the plan, and on February 7, 2014, the Board filed its motion for approval of the plan. The Board hosted six "community conversations" at the district's high schools between January 30, 2014 and February 5, 2014. (*See* Huntsville City Schools, Community Conversation Open House Meetings Schedule, http://www.huntsvillecityschools.org/Download.asp?L=0&LMID=458429&PN=D DocumentUpload&DivisionID=&DepartmentID=&SubDepartmentID=&SubP=& AAc=Download&T=1&I=326612 (last visited June 26, 2014)). The final community conversation occurred just two days before the Board filed its motion. The superintendent acknowledged that no changes were made to the Board's proposed plan following these meetings. One witness testified that at the meeting she attended, individuals who had questions were told to write the questions on index cards. Open discussion at the meeting she attended was limited. (Doc. 353,

p. 29).   Thus, the Board provided little opportunity for meaningful community feedback after it announced its school assignment plan.  *Compare Lee v. Anniston Cnty Sch. Sys.*, 737 F.2d 952, 957 (11th Cir. 1984) ("The Board's plan was adopted after several years of public debate and careful consideration of the available options.").

These are examples of conduct that undermines the Board's argument that it is acting in good faith.[64]  To be in a position to find that the Board has made a good faith commitment to future operations that will not lead to the reestablishment of a dual system, the Court must be confident that programs that the district has instituted, like the recent nutritional and Pre-K programs, are not short-term measures that the district will abandon when it is free from Court supervision.  The district can build that confidence by providing complete and objectively accurate answers to the Court's questions, by complying consistently with the Court's orders (including orders that require the routine submission of reports that pave the way to unitary status), and by proceeding in a respectful manner if the Board wishes to request relief from one of the Court's orders.[65]

---

[64] The Court previously has discussed testimony that was inconsistent with data that the Board has supplied.

[65]   Speaking of conduct, the government's conduct bears mention here.  From the record, it appears that years of relative calm and inactivity have lulled the government into a habit of checking in only when the district proposes actions that require the government's review.  The government should be more proactive.  Based on the current record, the Court does not know when inequities in educational programs arose in the district; however, standardized test scores

The Court does not underestimate the complexities involved in making decisions about student assignment, particularly when the boundaries of 40 schools are at play.  The Court strongly suspects that the district has chosen not to share many of the reasons for the choices that it made as it shaped its student assignment plan.  The Court got a glimpse into the superintendent's thinking when the United States's cross-examined him about his objections to the government's rezoning proposals.   When asked whether Hereford students would not benefit from attending Huntsville High, the superintendent, in an unguarded moment, replied "[t]hey [would] be going into schools that are not accustomed to dealing with students who are below grade level."  (Doc. 352, p. 177).  Test scores that the Court has reviewed lend credence to the superintendent's concern:   African-American students who attend predominantly white schools tend to score below their white classmates on standardized tests.  *See* Appendix B.

For now, the Court's impression that the district has provided partial explanations for its policy choices is speculation.  The Court can work only with the explanations that the Board provides for its decisions, and the Court must judge credibility on the extent to which those explanations align with the underlying data.  So far, it is hard to square the two.

from 10 years ago demonstrate disparate results among racially identifiable schools.  Had the government been keeping an eye on that sort of information, it could have brought it to the Court's attention more quickly and enabled the Court and the district to address the issue in a timely fashion.

## II. THE PATH FORWARD

Where does this leave the Court?  The Court cannot make a final decision regarding the student assignment plans that the parties have proposed until the Court has more information about inequities in the district's educational programs. If those inequities trace their roots to the original *de jure* segregation that generated this litigation, then the Court may fashion a remedy for the constitutional violation, and that remedy potentially may include adjustments to the Board's proposed student assignment plan.  If the record indicates that those inequities are not an effect of *de jure* racial segregation and do not otherwise violate applicable equal protection principles, then the Court is without power to address them in this litigation. *Missouri*, 515 U.S. at 102 ("Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the [school district] will be able to operate on its own . . . [a] remedial quality education program should be tailored to remedy the injuries suffered by the victims of prior *de jure* segregation.").  To resolve the issue, the Court will need to gather more information from the district, and the Court will give the parties an opportunity to brief the issue.  After the Court consults with the parties, the Court will appoint a special master to help collect relevant information.  The Court also appoints Magistrate Judge Harwell Davis to work with the undersigned to oversee the data gathering exercise.

While the parties try to reach agreement about a plan for seeking a declaration of unitary status in their mediation with Judge Ott, the Court directs the parties to discuss with Judge Ott potential revisions to their student assignment plans, including concrete proposals for improving the educational programs in the predominantly African-American schools in the district.  If the parties are able to reach agreement on a student assignment plan that includes a meaningful expansion of the Board's current proposal regarding educational programs, the parties may be able to advance more quickly toward an order approving a district-wide student assignment plan.

Because time is of the essence, with the parties' cooperation, by the end of the calendar year, the Court will endeavor to enter orders resolving the issue of school assignment and setting a unitary status timeline.  The Board may proceed with its construction plans.[66]

## III. OBSERVATIONS FROM THE BENCH

This opinion tells only part of the story.  Ordinarily, the Court would not issue an opinion until after it collected and evaluated all of the data relevant to the

---

[66] When the Board filed its school construction motion in May 2013, it did not explain that the construction plan was part of a larger plan to revise the boundaries of school zones throughout the district.  The Board knew that the two plans were inextricably linked and that district-wide rezoning is a rare and potentially disruptive exercise, but the Board seems to have believed that it would gain a strategic advantage by staggering its presentation of its plan to the Court.  In fact, it has placed itself between a rock and a hard place with respect to construction schedules, and it has complicated the Court's job.  The Court shares the Board's clear belief that it is important to settle the school assignment issue as quickly as possible.  The Court gladly would have begun working with the parties on this issue in May 2013 if the Board had given the Court the chance.

issues before it; however, the district asked for an answer to its student assignment motion by the end of June, so the Court has provided an analysis of information that currently is available.  Though it might be expedient to simply pick one of the zoning plans that the parties have proposed, the more prudent course is to address district-wide adjustments to school zones after the Court has complete answers to the questions that have arisen in this matter.

Having recognized the challenges that confront the district, the Court would be remiss if it did not also acknowledge the many reasons to believe that the future is bright.  First and foremost, there are the award-winning teachers who have testified in this matter.  There is so much to hope for in them and in the many teachers like them in the district.  These teachers have demonstrated unbounded enthusiasm for their work and sincere dedication to their students, their schools, and the district.

Then there are the hundreds of people who either attended the hearing on the Board's motion or signed letters to the Court.  These citizens are engaged, and they want the best for their community.  They are parents, grandparents, teachers, elected officials, and even a former superintendent of the district.  Who better to provide support to students who may need extra help or a simple word of encouragement?

Last but not least, there is Lincoln Elementary, a school that beat the odds – a school that proves that the past is not necessarily a predictor of the future.  The racial composition and socioeconomic status of Lincoln's student body mirrored that of many of the predominantly African-American schools in the district.  In 2008-2009, fifth grade students at Lincoln performed just like their neighbors in predominantly white schools on standardized tests:

Reading 2008-2009

| Group | Percent Tested (1) | Percentile (2) | Percent in Group (3) |
|---|---|---|---|
| All Students (2008-2009) | 100.00 | 73 | 100.00 |
| Black (2008-2009) | 100.00 | 75 | 50.00 |
| Hispanic (2008-2009) | No Data | * | N/A |
| White (2008-2009) | 100.00 | 71 | 50.00 |
| Free Lunch (2008-2009) | 100.00 | 72 | 90.00 |
| Reduced Lunch (2008-2009) | No Data | * | N/A |
| Non Poverty (2008-2009) | 100.00 | * | 10.00 |
| Poverty (2008-2009) | 100.00 | 72 | 90.00 |

Math 2008-2009

| Group | Percent Tested (1) | Percentile (2) | Percent in Group (3) |
|---|---|---|---|
| All Students (2008-2009) | 100.00 | 79 | 100.00 |
| Black (2008-2009) | 100.00 | 80 | 50.00 |
| Hispanic (2008-2009) | No Data | * | N/A |
| White (2008-2009) | 100.00 | 79 | 50.00 |
| Free Lunch (2008-2009) | 100.00 | 78 | 90.00 |
| Reduced Lunch (2008-2009) | No Data | * | N/A |
| Non Poverty (2008-2009) | 100.00 | * | 10.00 |
| Poverty (2008-2009) | 100.00 | 78 | 90.00[67] |

Lincoln closed years ago, but it may provide a model for future success stories in the district. The children in the district are counting on it. They have no control over where they live now, but giving them a strong education is the surest way to ensure that they will have choices about where they will live and what they will do when they become adults. The Court ends where it began: "in these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown I*, 347 U.S. at 493. There are many reasons to believe that the district will meet the challenges that it currently faces and will expand educational opportunities for all of its children. As Dr.

---

[67] *See* http://www03.alsde.edu/Accountability/Accountability.asp.

Wardynski remarked, the district "has the potential to be the best school system in the United States."  (Doc. 352, pp. 35-36).  The Court couldn't agree more.

**DONE** and **ORDERED** this 30th day of June, 2014.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE