Comments:  HCS Proposed Consent Order
Submitted by Dr. Richard Showers, Sr.
Page 1 of 4

1. Overall, not much changed regarding the Student Assignment Plan.  It seems the District was successful in pleading their case that it was in the best interest of the schools in North Huntsville to remain as they are and continue the same "feeder" pattern.  Failing schools feeding into failing schools.  After several months of negotiations between the District and the United States, there still remains predominantly black schools in North Huntsville and predominately white school in South Huntsville.  This consent order does not alleviate that fact.

2. For every instance in this consent order that requires the District to implement, to develop, to review, to revise some program or action, a specific timeline should be associated with it.  Without a timeline, there may not be a priority associated with the action.

3. This consent order, in many cases, states the District will "hire" administrators/personnel to oversee various programs or to supplement where there is a deficiency.  Are funds available to support these hires without eliminating and/or combining current jobs or job functions?  Each Magnet School and Academy has its own administrator to oversee the operations of the magnet school/academy with the exception of the College Academy at Jemison High School.  In this instance, the Principal at Jemison will be serving a dual role, that's not the case at the other Academies.  Why?

4. **Page 1:**  What is the cause for this section to be intentionally left blank?  I would suggest before this order goes to the judge that an introduction be provided.

5. **Page 4, Section (II)(B)(3)**:  Section should be updated with a project timeline (i.e., at the beginning of school year "X").  Updating will be consistent with other school construction/renovation project timelines.  At the moment, this criterion is not "measurable" without an adequate timeline associated with it.

6. **Page 13, Section (II)(D)(7):**  Section should be updated with an action times (i.e., no later than school year "X").  At the moment, this criterion (develop and implement a plan) is not "measurable".  Without a timeline, the goal will not be given "priority" status.  Also, is it correct to assume the 15% desired enrollment of African American students can only be achieved via the M-to-M transfers?  If this is the case, then it would seem difficult to meet this goal when the barrier will always be "if space is available".

7. **Page 17, Section (II)(E)(4)(a):**  It is not clear what would trigger the District to supplement the common magnet program application.  Will the procedures identified in this consent order supersede the current application process or will the current process remain in place as is and if the District decides to supplement it, the process will change to what's in the consent order.  As written, that distinction is not clear.

8. **Page 19, Section (II)(E)(4)(c)(2)(b), Page 20, Section (II)(E)(4)(d)(2), Page 21, Section (II)(E)(4)(e)(4):**  What does "data and information" about the student entail.  Would this only include the information associated with "selection criteria" or will other information be used to either admit or deny?

Comments:  HCS Proposed Consent Order
Submitted by Dr. Richard Showers, Sr.
Page 2 of 4

9. **Page 23, Section (II)(E)(6):**  The District has a responsibility to take the appropriate steps to ensure the plan(s) developed for students who are not succeeding in the magnet program, for whatever reason, is consistent across the board.  It would be unfair for a student to be dismissed at one school for a similar problem experienced at another school and the student was not dismissed.

10. **Page 25, Section (II)(E)(7)(b), Page 26, Section (II)(E)(e)(1), Page 27, Section (II)(E)(f)(3):**  Students should be warranted the opportunity to have certified teachers available at all times in specialized curricula.  A qualified teacher is great, but a certified arts-minded teacher is what's deserved.

11. **Page 26, Section (II)(E)(7)(d)(4):**  What were the criteria used to identify Providence, Williams Elementary, and Williams Technology Middle School as potential candidate schools to expand the IB program.  Where other schools considered?

12. **Page 26, Section (II)(E)(e)(3):**  What is the advantage to "take away" programs from district schools (i.e., dance) to ensure success at magnet schools (Lee).  Talent is not always reserved for individuals attending the magnet school (that's based on choice and admission based on criteria)…other schools should not have to limit their extracurricular programs and take a back seat to magnet schools.  The magnet schools have ample resources and plenty of dedicated time to the performing arts, the district schools do not, but based on this section, it's ok to punish the district schools for their extra effort.

13. **Pages 28-31, Section (II)(E)(8)(a) – (II)E(8)(i):**  Will students be allowed to apply for the College Academy without being nominated by the District through the application process or will both a nomination and an application be required for admission?  Who within the District can nominate?  How many students will be allowed to participate in the College Academy?  What marketing activities will be developed to support the college academy? What plans does the District have to recruit white students (from South Huntsville) to participate in the Academy?  The marketing plan and strategy will be challenging at best. Being that the majority of schools in North Huntsville are failing, how are you to convince parents in South Huntsville to encourage their children to give the College Academy a fair chance?  Has the institution of higher learning been identified?  If not, what is the status of developing that partnership?

14. **Page 25, Section (III)(A):**  What is considered a "cabinet-level administrator"…would this person have to have specific credentials (i.e., PhD)?

15. **Page 37, Section (III)(C)(2):**  Using "measurement tools" such as student surveys, student achievement data, student discipline data, seems a bit subjective.  To hold teachers responsible for "bitter/angry" students or even "parents" seems a bit open for interpretation.

16. **Page 39, Section (III)(E)(3)(c):**  Why is the District seeking exemption from the state recommended gifted matrix for identification, it is biased?

17. **Page 42, Section (III)(F):**  There is little information provided regarding the District's responsibility to its special education/special needs students.  This section needs to be expanded.  The District's process is basically geared only to identifying the student, not servicing the student.

18. **Page 43, Section (III)(G):**  This is a rigorous avenue to take… "certified" teachers at all levels are should be prepared to ensure success.

19. **Page 45-46, Section (III)(I)(1)(a) and (III)(I)(2)(a):**  How will the District handle the correlation between offering a certain number of AP classes if the enrollment criterion is not met by the student(s)?  Criteria should not create barriers for any student, not just African American students.

20. **Page 48, Section (III)(L)(1)(b):**  Does the District currently use the "direct certification process" or will there be a process put in place by the State of Alabama (successor process) that will be used for eligibility?  What was used to determine the District would only support "30" students?

21. **Page 51, Section (III)(L)(5):**  Community and industry support should be strengthened at all schools, regardless of location and alliances.

22. **Page 53, Section (III)(M), Page 55 III(N), Page 63, Section (V)(D):**  All reports associated with this Consent Order should be made public as a good-faith effort to show transparency.

23. **Page 70, Section (VII)(A)(3):**  Does this section imply that all schools will have a uniform policy, right now, some schools have to wear uniforms and others don't.

24. **Page 71, Section (VII)(A)(8):**  Is the "racially-diverse committee" the same as the Desegregation Advisory Committee?  It would be in the interest of the process to limit supplemental policies to the student code of conduct as much as possible.  Walking down that road would open up policies that may possibly differ from the processes used at other schools.

25. **Page 75, Section (VII)(D)(3):**  With the new positive enforcement mechanisms in place, expulsions should be a last resort.  Why would an expulsion take place if it is/was found that interventions or supports were not implemented?  If that is/will be the case, then protocols were not followed by the District.

26. **Page 76, Section (VII)(F)(1):**  Section VIII refers to transportation.  What relevance is that to this section?

27. **Page 80, Section (IX)(B):**  How will the "adult" members of the DAC be selected?  Will the District submit names and then the Parties agree/disagree on said names?  How will this process be such that it is independent and transparent?  It will serve no purpose to have "rubber stamped" members of this committee to serve as "watch dogs" over the

implementation of this consent order.  Huntsville has had enough of that and we definitely don't need it in this process.

28. **Page 82, Section (IX)(L):**  It is imperative that this committee be transparent.  The District, by many, cannot be trusted.  The committee should not be in anyway bullied by the District to do its bidding.  They should be allowed, without burden, the opportunity to come to their own independent conclusions without pressure from the District to do otherwise.

29. **Page 83, Section (IX)(P):**  Will the Annual Report provided by the committee be made public?

30. **Page 84, Section XII:**  What is the definition of "partial" unitary status and "reasonable" period of time?  The definitions of both should be identified before approval of this consent order.

31. **Page D-1, Appendix D:**  The methodology presented in the section was difficult to understand without the definitions associated with the various classroom types.

32. Overall, very little has changed.  Through this consent order, it is apparent the District has convinced the United States that it's feasible to continue to operate two independent school systems, one in North Huntsville (predominately black) and one in South Huntsville (predominantly white).  This consent order does not address nor alleviate this fact.  Based on the proposed feeder pattern, students from the majority of failing schools will have no relief but to attend a failing school at the next level, but only in North Huntsville.  Butler High School is a failing high school, to the west about three miles is Huntsville High School.  The District is recommending these students will attend Jemison High School, a black school about 12 miles to the north.  This District is determined to keep a black school district in the north and a white school district in the south, this District is determined to not correct this over 40 year problem.  Huntsville has been bound by a desegregation order for more than 40 years.  Are we closer in unity now after 40 years, no; Huntsville is still divided.  As long as there are two school districts, one black and the other white, Huntsville does not deserve unitary status.