

Fighting Hate
Teaching Tolerance
Seeking Justice

Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
334.956.8200
www.splcenter.org

March 10, 2015

The Honorable Madeline H. Haikala
United States District Court
   for the Northern District of Alabama
101 Holmes Avenue
Huntsville, AL 35801

              Re: Proposed Order, *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-cv-00109-MHH

Dear Judge Haikala,

      We write on behalf of young people currently or previously enrolled in public middle schools and high schools in Huntsville City Schools who have been subjected to unjust and overly punitive disciplinary policies and procedures without proper attention to their rights. For the last year, the Southern Poverty Law Center ("SPLC") has worked with dozens of current and former Huntsville City Schools ("HCS") students[1] and their families who have deep and significant concerns with the school system's discipline procedures and practices.[2] The picture that has emerged shows that HCS's practices around school discipline and school-based policing have resulted in serious violations of students' rights. While we commend the efforts of the Department of Justice and the Huntsville Board of Education (collectively "the Parties") to address some of the most glaring issues facing Huntsville's students, the Proposed Order does not comprehensively address many of the issues with HCS discipline procedures and practices, nor has the Court been fully apprised of the issues during this litigation. We write to propose revisions to the Proposed Consent Order ("Proposed Order") that we believe would better protect the rights of HCS students, including our clients, than the draft presently before the Court.[3]

---

[1] These students' names have been changed to protect their privacy.
[2] SPLC's work in Huntsville is part of our longstanding commitment to fighting hate and bigotry and to seeking justice for the most vulnerable members of our society. Since 1971, SPLC has been committed to ensuring that Alabama youth receive equal access to high quality education.
[3] On January 24, 2015, the United States and Huntsville City Schools submitted a Proposed Order in *Hereford v. Huntsville Board of Education*, Case No. 5:63-cv-00109-MHH. The Proposed Order includes ten pages on discipline that raise substantive concerns. Regarding the other sections of the Proposed Order, SPLC has been fighting for desegregation throughout Alabama and the South for more than four decades and we are concerned that Huntsville has not yet made sufficient progress towards unitary status. We believe that the Proposed Order does not adequately address the reforms and safeguards needed to bring Huntsville into compliance with the desegregation order. While

1

SPLC is prepared to offer our assistance and expertise to the Court and the Parties as Huntsville moves towards revising its current discipline and school-based policing practices.

School discipline and school-based policing in Huntsville are in desperate need of overhaul. Huntsville's discipline system and practices of its School Resource Officers ("SROs") lead to some of the highest levels of school-based arrests and expulsions in the State. According to data reported to the federal Department of Education ("DOE"), Huntsville arrested more students in school-related actions than any other jurisdiction in Alabama in both absolute numbers (101 school-related arrests in 2011-2012) and percentage (0.4% of the student body was arrested in a school-related arrest in 2011-2012).[4][5] Huntsville's school discipline statistics are equally troubling. In 2011-2012, Huntsville expelled more students than any other school district in Alabama and a higher percentage than any of the fourteen largest school districts in the State.[6] Media reports even higher numbers in 2013-2014, when HCS expelled 305 students—238 (78 percent) of whom were African American, despite that the fact that African-American students make up only 40 percent of the total student population.[7] HCS also suspends an alarmingly high rate of students: In 2011-2012, approximately five percent of Huntsville's student body received one out of school suspension, while more than eight percent of the African-American students received one such suspension. Even more troubling, African-American students were almost twice as likely to receive more than one out of school suspension as the general student body.[8]

Huntsville's Code of Conduct is also troubling. It permits, and even encourages, harsh consequences for minor, disruptive conduct, including "acting in defiance, horse playing, dress code violations, or talking too much in class."[9] One of the most extreme manifestations of this punitive system is the Students Against Fear ("SAFe") program, though which HCS identifies off-campus (and unrelated to school) photos. Schools then punish the students depicted in those photos under Code of Conduct provisions that appear to target on-campus activity, frequently possession of a weapon. During the 2013-2014 academic year alone, HCS reported that the

---

this comment focuses exclusively on the provisions related to school discipline, we join the comments submitted by the NAACP Legal Defense and Education Fund regarding student assignment, faculty, and transportation.

[4] *Civil Rights Data Collection*, Department of Education, http://ocrdata.ed.gov/ (last visited March 10, 2015) (concerning school-related arrests of students without disabilities).

[5] "Jackie" is one such student. In middle school, she was arrested for fighting. After being pushed to the ground and straddled by a SRO, Jackie was placed in handcuffs, escorted to the principal's office, and ultimately taken to a juvenile detention center where she waited four hours until her mother came.

[6] *Civil Rights Data Collection*, Department of Education, http://ocrdata.ed.gov/ (last visited March 10, 2015).

[7] Challen Stephens, *Huntsville schools paid $157,000 for former FBI agent, social media monitoring led to 14 expulsions*, AL.com (Nov. 1, 2014), available at http://www.al.com/news/huntsville/index.ssf/2014/11/huntsville_schools_paid_157100.html (information obtained from HCS in an open records request).

[8] Students without disabilities received more than one out of school suspension at a rate of 5.6% while African American students received a similar number of suspensions at a rate of 10.1%. *Civil Rights Data Collection*, Department of Education, http://ocrdata.ed.gov/ (last visited August 1, 2014).

[9] For instance, "Noah" was frequently dismissed in the middle of the day—and charged with an unexcused absence—for speaking out of turn, falling asleep, or talking back to a teacher. Alexis has been similarly punished and once overheard the principal tell a teacher "[i]f [Alexis] drops a pencil, just let me know and I'll write her up."

program led to the expulsion of 14 students, 86% of whom were African American.[10] The SAFe program results in loss of instruction time and violations of students' due process and First Amendment rights.

Beyond formal suspensions and expulsions, administrators frequently place students on "probation" for minor, disruptive conduct. The administrator may then expel that student for violating conditions of probation imposed at the administrator's sole discretion. The Code of Conduct does not clarify how many referrals lead to probation or how a student may be removed from probation, and SPLC's clients do not fully understand the basis of their probation.

Further, even students who are not formally excluded—through expulsion, suspension, or probation—from all educational opportunities are still denied the benefits of a public education. Although HCS provides certain expelled students with the opportunity to attend alternative school, those students spend their days working alone, on computer-generated education programs, and are severely punished for minor activities such as talking, laughing, or sleeping.[11]

Finally, the exclusionary disciplinary system does not provide sufficient procedural protections when imposing suspension, expulsion, or alternative placement. For example, HCS administrators initiate charges against students for violating the Code of Conduct without giving students the opportunity to refute the charge or providing them with the background evidence.[12] Relatedly, families are frequently not given timely or sufficient notice of student disciplinary hearings. Further, these same families are often not aware that they are entitled to bring a lawyer or advocate, and even if they are aware, they rarely have the resources to find someone to speak on the student's behalf.[13] At the hearings themselves, students are often prevented from addressing the panel or presenting evidence. The expulsion panel frequently dismisses without consideration questions or explanations from students or their families.[14] After the hearing, families are routinely unaware of the right to appeal an unfavorable decision, and the final letter containing the decision frequently omits this information.[15]

---

[10] *Civil Rights Data Collection*, Department of Education, http://ocrdata.ed.gov/ (last visited Mar. 10, 2015).
[11] "Matthew" was dismissed for exhibiting "defiant" behavior—laughing out loud—during the Pinnacle Alternative School orientation. According to the Code of Conduct, if an-alternative school student like Matthew commits a Class II or Class III offense, that student may be expelled in proceedings commenced two days after the charge is issued without any written notice of the charge or the hearing date and without any opportunity to appeal.
[12] In middle school, "Jackie" was approached by the middle school principal, who accused her of having gang affiliations based on a social media photo. Rather than letting Jackie explain the photo, the principal and an SRO repeatedly told her "[b]e quiet or you will be suspended" and "[w]e can take you to jail for this. Be quiet."
[13] "Noah," "Nicole," and "Larry" all received hearing notices that did not advise them of the option to bring an advocate. The Proposed Order's failure to provide more robust notice requirements for discipline proceedings is contrasted by other provisions that require the District to provide notice to parents regarding non-disciplinary processes and procedures in HCS. *See, e.g.*, Secs. II(D)(2)(a); II(E)(5)(c).
[14] When "Alexis" was shown a photo where she appeared holding a gun, she offered that the alleged gun was a toy. The panel dismissed her explanation, saying "[w]ell, we don't know that. We can't tell if it's real or not."
[15] While the Code of Conduct includes a reference to the right to appeal, suspension or expulsion notices and disciplinary decision letters often—as in the case Noah—forgo any mention of the appeal.

The Proposed Order does not provide HCS students with adequate relief from the problems described above and the Court has not had the opportunity to evaluate the deficiencies in HCS discipline procedures and practices during the course of this matter.

## I. While the Proposed Order Would Provide Much-Needed Relief to Huntsville Students, Additional Protections Are Needed to Fully Address Serious Deficiencies in Huntsville's School Discipline System

The Parties' proposed revisions to Huntsville's current school discipline scheme are commendable, to be sure; the Proposed Order appropriately identifies many of the most glaring deficiencies in the Huntsville system. Despite the positive components of the Proposed Order, however, and based on our extensive work with HCS students and families over the last year, we believe additional protections are needed to fully address the serious deficiencies in HCS's discipline system. Specifically, the agreement is not sufficiently detailed to allow this Court to provide meaningful oversight; it does not incorporate adequate procedural mechanisms to protect the rights of Huntsville students; it does not include sufficient accountability measures; and the time frames laid out in the agreement prolong necessary overhaul of the system beyond a reasonable time frame. We urge this Court to instruct the Parties to incorporate these revisions and volunteer our time and experience if we can provide assistance.

### A. The School Discipline Provisions Do Not Provide Meaningful Guidance for the Court, the School District, or the Community

While the Proposed Order purports to address the full school discipline scheme, it does so only in vague and overbroad terms that create uncertainty for the Parties and the community. Further, because the provisions lack specificity, this Court would be left without the necessary tools to enforce the Proposed Order when its provisions come before the Court in the future.

Admirably, the Proposed Order seeks to limit the use of exclusionary discipline for low-level offenses. *See* Secs. VII(A)(1)(a); VII(A)(1)(b); VII(A)(2)(d). SPLC and our Huntsville clients fully support this goal and the use of Problem Solving Teams ("PSTs"), conflict resolution, restorative justice, and evidence-based practices as tactics to reduce the use of exclusionary discipline. *See* Secs. VII(A)(2)(e); VII(B); VII(C). However, the Proposed Order does not fully, or sometimes even partially, define these techniques. Nor does it outline how and when they should be used or how they interact with other disciplinary options. For example, discussions of evidence-based practices for improving school climate are so vague—"[t]he District will expand and implement a District-wide program incorporating evidence-based practices to improve school climate"—that they are ineffective in offering appropriate parameters for action by the District. *See* Sec. VII(B)(1).

4

The Proposed Order provides exceptions to the disciplinary scheme that allow conduct that would ordinarily be prohibited and, therefore, limit the impact of the revised scheme. For example, one provision requires the District to discipline students "only for conduct occurring on school property or at school activities" but provides an exception "where there is an identifiable serious threat of physical harm to the District, District student(s) or District employee(s)." Sec. VII(A)(1)(c). As has been broadly reported in the media,[16] HCS routinely punishes students for posting or accessing photos of themselves or other students holding weapons, even if the possession of a weapon actually occurred off campus. Although on its face the new provision seems to limit such disciplinary measures, it would still arguably be permissible to punish students whose only "conduct" is accessing the photos on social media while on campus, such as "Nina" who was punished for weapons possession although the school admitted that she never possessed a weapon on campus. Further, the language of the exception includes ambiguous and undefined terms. In the current system, the District regularly relies on the ambiguity of "serious" and "threat" to punish students for off-campus conduct. Eight of our clients were punished for off-campus conduct that the District alleged had posed a threat to the school community although there was no evidence of any threat, let alone one targeted towards the District or other students.

In addition, the Proposed Order does not appropriately limit the use of other disciplinary tactics, specifically Principal and Superintendent Probation and Alternative Schools. *See* Secs. VII(A)(2)(f), VII(D). Without such guidance, the Court will not be able to meaningfully assess the District's progress at meeting its obligations under the Proposed Order or to evaluate whether the programs are meeting their stated goals. For example, while the section on alternative schools includes certain limitations, it does not address the basis or duration of alternative school placements or other relevant factors concerning alternative schools. Sec. VII(D). Similarly, other than requiring that the two probation programs be renamed, the Proposed Order's only limitation on Principal and Superintendent Probation is requiring that the District "incorporate[]a problem solving approach to supports and expectations." Sec. VII(A)(2)(f). This provision does not address when probation is appropriate, how it should be imposed, what the long-term consequences (if any) of probation should be, or include an actual definition of the programs. Many of our clients have been placed on probation based on accumulations of disciplinary referrals for minor offenses such as "acting in defiance," "horse play," "dress code violations," or "talking too much in class." Under the current system, it is not clear how many referrals lead to a probation placement or how our clients can exit probation, and the Proposed Order provisions do nothing to clarify this ambiguity.

The Proposed Order also relies on vague, undefined terms when describing a complex paradigm for school discipline. Although the Proposed Order instructs the District to incorporate "detailed behavior-oriented definitions of prohibited conduct" and "disciplinary consequences that are consistent, age-appropriate and correspond to the severity of the student's behavior," it

---

[16] *See, e.g.,* Challen Stephens, *supra* note 7.

does not define any of the terms or explain how the District should incorporate those measures. Secs. VII(A)(2)(a), VII(A)(2)(c).

The Proposed Order's provisions concerning school discipline afford substantial discretion to the District without ensuring that the District properly implements the provisions in the spirit of the agreement. Many provisions seeking to limit the disciplinary consequences for particular offenses include substantial discretion without providing any parameters on how that discretion should be used. For instance, while the Proposed Order would obligate the District to "[r]eview class two and three offenses and reclassify offenses as lower level offenses, where possible, and/or eliminate the use of out-of-school suspension for these offenses," the provision does not clarify how the District should determine whether it is possible to reclassify the offenses, when it would be appropriate to eliminate out-of-school suspension for these offenses, or what else the District should consider in its review. Sec. VII(A)(1)(b). Without additional guidance, it will be impossible for this Court to ensure that the District is properly exercising its discretion within the spirit and intent of the Proposed Order when deciding whether to reclassify these offenses.

Similarly, although the Proposed Order allows the District and teachers to use non-exclusionary disciplinary tactics, those tactics are not defined and their use is left to the discretion of individual school personnel.[17] Although the Proposed Order purports to impose a disciplinary scheme that provides the opportunity for "teachers and staff to document prior intervention strategies utilized," the Proposed Order neither requires nor encourages the teachers to actually take those actions. Sec. VII(A)(6).

The broad discretion also creates concerns with regard to the role of School Resource Officers ("SROs") in Huntsville schools. Although the Proposed Order properly recognizes that policies regarding SROs require revisions, it does not lay out a process for evaluating and revising the role of SROs or narrowing their discretion or involvement in school-based misconduct. Sec. VII(F). The Proposed Order does not contemplate a process that includes feedback from either the Huntsville City Police Department or the broader community. Rather, it appears to vest all responsibility for SROs, including training and determining their roles, with the District without any regard for the involvement of the Huntsville Police Department.

Finally, despite provisions that incorporate input from the Department of Justice ("DOJ") into the process, the Proposed Order relies exclusively on the District's discretion to make final determinations about the validity or success of programs without specifying the standards for such success. Sec. VII(B)(5). Without providing specific benchmarks, neither the Court nor DOJ can properly evaluate the program's success.

---

[17] This ambiguity is in stark contrast to provisions in other sections of the Proposed Order that provide a detailed outline of each programmatic change. See, e.g., Sec. II(D); Sec. II(E)(3)-(4), (7); Sec. III(C)(1); Sec. III(H)(1).

### B. The Proposed Order Does Not Provide Adequate Due Process Protections and Procedural Safeguards

Although the Proposed Order adopts certain positive measures, it fails to bolster due process and procedural protections in a meaningful way. For example, the Order does not address due process protections with regard to suspensions or referrals to alternative programs. And while it briefly addresses expulsion proceedings in Section VII(E), this provision is insufficient to ensure adequate due process safeguards regarding expulsion hearings. For instance, while the Proposed Order properly requires a notice informing the student that he may have a guardian or an advocate present at a hearing, the Proposed Order does not specify that the advocate may be a lawyer, does not require the District to provide information regarding pro bono legal services, and does not require that the District permit the advocate or lawyer to present or cross examine witnesses. Sec. VII(E). In fact, we have learned anecdotally that at certain expulsion hearings only students, not their lawyers, are permitted to present evidence, cross examine witnesses, or challenge the discipline imposed. Further, the Proposed Order does not address the process or timing by which the District must provide notice of an expulsion charge. In fact, the District has provided notice by telling students about an upcoming hearing, waiting until the family contacts the school to ask about a hearing, or sending a letter by certified mail that no one is available to sign for. Unless the Proposed Order imposes specific due process guidelines, there will be no way to ensure that the District is appropriately safeguarding students' due process rights.

In addition, as discussed above, the provision addressing Principal and Superintendent Probation is inadequate, not only because it is vague but also because it does not incorporate any additional due process or other procedural protections that could have long-lasting effects. Sec. VII(A)(2)(f). The provisions regarding alternative schools contain many of the same problems. For example, the Proposed Order does not require the District to disclose to parents whether or not behavioral interventions or supports were utilized before a student was expelled or placed in an alternative school, or provide other documentation regarding the decision to recommend an alternative school placement. Sec. VII(D)(3). In fact, under the current system, the District regularly fails to contact parents of students until after discipline has already been imposed. Without additional safeguards, these problems will continue and neither the community nor the Court will be able to monitor the District's compliance with the letter or spirit of the agreement.

Further, the Proposed Order appropriately requires schools to "document and review" removals but does not describe or define that process in any way that would allow the Court to ensure that those reviews are conducted in a fashion that protects the rights of the individual students. Sec. VII(A)(4). It does not impose any requirements on the District regarding the information that must be documented or the individuals and processes for conducting reviews. Without such information, the Court is deprived of a metric to use when evaluating the District's compliance with the Proposed Order.

Similarly, while the Proposed Order appropriately requires that "[t]he District [] apply its dress code policies . . . fairly and consistently across all schools and classrooms," the provision does not provide adequate guidance regarding the substance of the policy itself or that the dress code policy is applied with respect for due process. *See* Sec. VII(A)(3). Under the current regime, students have been disciplined based on inconsistent readings of the dress code policy. The provisions of the Proposed Order in no way address whether such penalties are appropriate or how the District should balance a comprehensive dress code with students' rights.

### C. *The Proposed Order Does Not Establish Proper Accountability Measures to Allow the Court and the Huntsville Community to Remain Informed About the District's Progress Towards Compliance with the Proposed Order*

Despite numerous positive steps in the Proposed Order, including those discussed above, the agreement does not include sufficient accountability measures to ensure that the progress the Proposed Order seeks to achieve is actually accomplished. Many of the school discipline provisions lay out a plan without incorporating any accountability measures to ensure community involvement or input from DOJ. *See* Secs. VII(A)(9), VII(A)(3). The new, and potentially transformative, programs that are proposed do not properly incorporate opportunities for public feedback and community accountability. For example, the Proposed Order takes positive steps to ensure that the District monitors, reviews, and evaluates its programs but does not incorporate DOJ or members of the community into the monitoring or evaluation process. *See* Secs. VII(B)(5), VII(D)(5). Similarly, mechanisms that aim to incorporate community input or the perspectives of the Desegregation Advisory Committee do not provide sufficient guidance for how those perspectives should be weighed in adopting final recommendations. Sec. VII(A)(5). Even more concerning, provisions that address substantive changes to the Code of Conduct do not allow any opportunity for community comment or input. Sec. VII(A)(8). Unless these types of exchanges are built into the ongoing monitoring and review process, it will not be possible for the Court or DOJ to ensure that the District is, in fact, considering community input or reviewing the District's process for evaluating its own programs.

The data collection, review, and reporting process is also troubling as it is neither comprehensive nor does it incorporate proper accountability mechanisms to ensure that relevant information is captured and there is a proper understanding of the impact of discipline on the school community. For example, the discipline provisions require the District to collect and review a range of data, and based on that data, to develop proper strategies to address identified areas for improvement. Sec. VII (G), VII(H). Yet the Proposed Order does not impose any independent obligation to release that data to the community, or to this Court, to help inform the basic changes to the school discipline process. Further, even where the Proposed Order appropriately requires the District to release certain data, that data is not necessarily comprehensive. For instance, the Proposed Order only requires the District to release "complaint forms involving alleged discriminatory student discipline." Sec. VII(G)(4). This narrow requirement allows the District to interpret the basis of every complaint and exclude those that

8

allege violations of due process or other student rights without specifically alleging discrimination. Without incorporating broader requirements into the Proposed Order itself, neither the Court nor the community will be able to properly ensure that the District in fact conducts a comprehensive evaluation.

### D. The Proposed Order Does Not Outline Sufficient and Adequate Timelines for Implementation of the Provisions of the Proposed Order

As described above, the problems with HCS's discipline policies and the ongoing violations of students' rights in HCS are frequent and result in far-reaching consequences on the lives of students, their families, and the Huntsville community. Against this backdrop, the prolonged and often open-ended time frames contained in the Proposed Order to adopt and implement school discipline reforms are insufficient to protect HCS students' rights now. For example, most of the revisions for the Code of Conduct are not set to be imposed until the 2016-2017 school year—giving the District a very generous year-and-a-half year to review and make the required changes to the current Code of Conduct. Sec. VII(A)(2). Likewise, important provisions relating to alternative school programming and discipline policies will not be put into place until the 2016-2017 school year (Sec. VII(D)(1)-(2)) and implementation of the Positive School Climate Program will not be complete until the 2018-2019 school year. Sec. VII(B)(3). In the meantime, students like the ones discussed above will continue to experience major violations of their rights in the context of school discipline.

Additionally, several particular sections of the Proposed Order fail to set any time frames for the implementation of specific provisions or reforms. To illustrate, the Proposed Order does not give a date for the implementation of currently missing expulsion hearing protections set forth in Section VII(E) or the provisions restricting placement in alternative schools to certain grade levels in Section VII(D)(3). Similarly, the Proposed Order does not provide a timeframe for hiring the alternative school transition coordinator (Sec. VII(D)(4)) or the Coordinator for Behavioral Learning (Sec. VII(B)(2)). And finally, in many cases, there is language requiring the District to begin doing something, but the Proposed Order gives no start date. For example, in Section VII(A)(4), the Order instructs schools to "document and review as incidents of discipline all removals from regularly-assigned classroom for disciplinary purposes," yet gives no indication of when schools must begin doing this.

## II. The Court Should Not Be Asked to Assess a Comprehensive School Discipline Scheme Based on Incomplete Evidence of School Discipline Issues in Huntsville

School discipline, including the presence of police in schools, is one of the most pressing issues facing public schools and children around the country. In the 50-plus years since this case was filed, school discipline issues have been litigated extensively throughout the country. *See, e.g., Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295 (11th Cir. 2006); *C.B. v. City of Sonora*, 769 F.3d 1005 (9th Cir. 2014); *Hawker v. Sandy City Corp.*, 774 F.3d 1243 (10th Cir. 2014);

9

*Nixon v. Hardin Cnty. Bd. of Educ.*, 988 F. Supp. 2d 826 (W.D. Tenn. 2013); *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128 (D. Minn. 2012); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698 (W.D. Pa. 2003). Yet school discipline has never been a central issue throughout the long history of this case, and this Court has only been presented with minimal, incomplete evidence regarding school discipline in HCS. As this Court recognized as recently as June 2014 when considering student assignment plans, the current state of Huntsville's school system is a complex issue that requires the Court to "gather more information from the district, and . . . give the parties an opportunity to brief the issue." Doc. 364, p. 102. School discipline and school-based policing are no different, and the Parties should not ask this Court to consider the validity of the Proposed Order's discipline section based on an incomplete record. Rather, we respectfully ask that SPLC be engaged in crafting a comprehensive discipline section that will provide meaningful overhaul based on our experience with discipline and school-based policing in Huntsville and throughout the State.

### III. Conclusion

The Proposed Order undeniably highlights some of the most significant discipline and school-based policing problems currently affecting Huntsville students. Unfortunately, the revisions that the Parties proposed will not effectively remedy the problems that it highlights. Without additional guidance and detail, the Proposed Order risks the danger of being simply a temporary fix for a systemic problem, or worse, actually exacerbating an already troubling situation. By contrast, if the Proposed Order is revised to provide meaningful judicial oversight, robust accountability measures, significant due process protections, and an expeditious time frame, adoption of the Proposed Order may be a meaningful step to reforming Huntsville's broken school discipline and school-based policing systems. We are eager to participate in any process of revising the Proposed Order, and volunteer our time and expertise as appropriate.

Thank you for your consideration.

Sincerely,

Brooke Menschel
Ebony Howard
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, AL 36104
(334) 956-8200
Brooke.Menschel@SPLCenter.org
Ebony.Howard@SPLCenter.org