# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SONNIE WELLINGTON HEREFORD, IV, et al., | } } } | |
| Plaintiffs, | } } | |
| v. | } } | Case No.:  5:63-cv-00109-MHH |
| UNITED STATES, | } } | |
| Intervenor Plaintiff, | } } | |
| v. | } } | |
| HUNTSVILLE BOARD OF EDUCATION, et al., | } } } | |
| Defendants. | } | |

## 2017 MEMORANDUM OPINION REGARDING STATUS OF CONSENT ORDER IMPLEMENTATION

On April 24, 2015, the Court entered a consent order in this public school desegregation case.  That order identifies the steps that the Huntsville Board of Education may take to eliminate from the Huntsville school district the vestiges of racial segregation so that the Board may ask the Court to conclude its supervision of the district.  (Doc. 450).  The Huntsville Board of Education operated under the consent order during the 2015-16 school year and the 2016-17 school year.  This

opinion concerns the district's progress toward the end of federal supervision over those two years.[1]

To obtain relief from federal supervision, the Huntsville Board of Education not only must fulfill its obligations under the consent order but also must demonstrate the Board's willingness to maintain the goals of the consent order after supervisions ends. The latter objective requires the Board to demonstrate "good faith." As the Court stated in its June 30, 2014 memorandum opinion in this matter,

> "To be entitled to the end of federal court supervision, a formerly dual school system must be able to prove that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable." *Duval Cnty. School*, 273 F.3d at 966 (citations omitted). "The good-faith component has two parts. A school district must show not only past good-faith compliance, but also a good-faith commitment to the future operation of the school system through 'specific policies, decisions, and courses of action that extend into the future.'" *Lee* [*v. Autauga Cnty. Bd. of Educ.*], 2004 WL 2359667, at *4 [(Oct. 19, 2004)] (quoting *Dowell v. Bd. of Educ. of the Oklahoma City Public Schools*, 8 F.3d 1501, 1513 (10th Cir.1993)) (citations omitted).

(Doc. 364, p. 94)

As the parties implement the consent order in this case, the Court is paying close attention to the second aspect of good faith – the Huntsville district's commitment to the future operation of the City of Huntsville school system

---

[1] This opinion highlights the Board's efforts with respect to some, but not all, of the *Green* factors.

through courses of action that extend into the future and indicate a willingness on the district's part to maintain the goals of the desegregation order after the Court dissolves the order. To release a public school district from federal supervision, a district court must be reasonably confident that a school district will not revert to prior unconstitutional practices. This is where the rubber meets the road.

The members of a school board and a district's superintendent bear primary responsibility for demonstrating that the school district will maintain the goals of a desegregation order after federal supervision ends. But in a system like Huntsville's where the public elects the members of the school board, and the members of the school board select the superintendent, ultimate responsibility for good faith rests with the electorate. Elected representatives do the will of their constituents. Absent political will, genuine, systemic change – as opposed to expedient, short-lived suspension of unconstitutional policies and practices – cannot be achieved. Therefore, in examining the district's progress in its implementation of the consent order, the Court is paying close attention to the public will and the extent to which the Huntsville community supports not only the letter but the spirit of the consent order.

The consent order provides monitoring tools designed to make transparent the district's work under the consent order, so that the United States, the public, and the Court may evaluate the district's progress under the consent order. One of

those tools is an annual report that contains copious information relating to each of the *Green* factors that the consent order addresses.  (Doc. 450, pp. 89-91).  The consent order also establishes a Desegregation Advisory Committee – DAC, for short.  The DAC—through community meetings, a dedicated webpage, and other means of communication—gathers information relating to the implementation of the consent order.  (Doc. 450, p. 88; Doc. 509, pp. 2-3, 6).  The DAC shares that information with the district's superintendent and the Court, and the DAC publishes an annual report.  (Doc. 450, p. 89).  The consent order authorizes the United States to make site visits at the district's schools and administrative offices.  (Doc. 450, p. 90).  To familiarize itself with schools in the district and to get a sense of school climate, the Court participates in site visits from time to time.  The Court also conducts public hearings at which members of the community have an opportunity to share with the parties and the Court observations about the implementation of the consent order.

On November 15, 2016, the Huntsville Board of Education provided to the United States and to the Court an annual report for the 2015-16 school year, the first full year of implementation of the consent order.  (Doc. 500 through Doc. 508).[2]  On September 5, 2017 and September 14, 2017, the Court visited a number of schools with counsel for the parties.  On September 6, 2017, the Court held a

_____

[2] The Board will file its annual report for the 2016-2017 academic year on November 15, 2017.

public status conference at which the Court received updates from Huntsville School Superintendent Dr. Matt Akin, Huntsville Director of Strategy and Innovation Christie Finley, and Huntsville Deputy Superintendent of Instruction Dr. Tammy Summerville. In advance of the hearing, the Court also received written comments from members of the community via email messages to the DAC, and members of the Huntsville community spoke at the September 6, 2017 hearing at the conclusion of the parties' presentations. (Doc. 537, pp. 192-237). The Court relies on these sources of information for purposes of this memorandum opinion.[3]

## 1. The Board's Efforts to Implement the Consent Order and to Fulfill its Reporting Obligations

During the 2015-16 school year, the Huntsville Board of Education developed procedures and supporting documents designed to promote uniform implementation of the Consent Order, "so that even if all new employees took over the implementation of the Consent Order, the transition would have only a minimal effect, if any, on implementation." (Doc. 500, p. 3). The Board developed implementation protocols for student assignment, equitable access to course

---

[3] For reasons discussed in greater detail below, the Court has not yet received the DAC report for the past academic year. Because we are well into the 2017-18 school year, the Court determined that it was best to issue an opinion regarding the district's progress without waiting for the publication of the DAC's report and Dr. Akin's response to the report.

offerings and programs, extracurricular activities, faculty, facilities, and student discipline.  (Doc. 500, p. 3; *see generally* Doc. 450).

The Board also submitted its 2015-16 Annual Report on time.  The report is more than 2,400 pages long.  (Docs. 501-08).  The Board filed a 45-page preface that provides an overview of the 2015-16 academic year.  (Doc. 500).[4]  In addition to these formal reports, the district gathers data throughout the school year to enable the district to monitor its progress under the consent order.  (Doc. 508). The Board reports that it has woven its monitoring efforts into "each school's Continuous Improvement process, so that those goals are embedded in the daily instructional process and expectations monitored by the principals."  (Doc. 508, p. 5).  The Board also routinely responds to requests for information from the United States.  (Doc. 537, pp. 48-53).

Gathering data and completing these reports is an arduous task that requires diligence and attention to detail.  The reports are imperative to all stakeholders' ability to assess the extent to which the district is progressing in its efforts to comply with the consent order.[5]  The Board's effort to create uniform procedures

---

[4] In that preface, the district stated:  "The first year of implementing any change is difficult, and the Consent Order required many changes."  (Doc. 500, p. 2).  The Court acknowledges this consideration and has taken it into account when evaluating the district's progress under the consent order.

[5] As Reverend Oscar Montgomery stated at the recent public hearing in this matter, "the first step in building trust is openness and transparency, the ability to really understand all of the

for the implementation of the consent order also was a considerable task and one that is important to the Board's compliance with the order. The Court recognizes the district's significant efforts in this regard and views the self-monitoring, in particular, as evidence of a good-faith commitment to the future identification of racial disparities within the district, so that those disparities may be examined and alleviated.

## 2. Facilities – Recent School Construction

For the 2016-17 school year, students at Sonnie Hereford Elementary School, McNair Junior High School, and Jemison High School attended brand new schools. Before the beginning of the 2017-18 school year, the Board completed construction of Grissom High School and Morris P-8. (Doc. 500, p. 32; Doc. 537, p. 138).[6] The district has completed renovations at Whitesburg P-8, Martin Luther King, Jr. Elementary School, and AAA P-8. (Doc. 500, p. 33; Doc. 507-3, p. 2; Doc. 537, pp. 138-139). The district also has complied with its obligation to install SMALLabs in schools that house grades seven and eight, thereby providing an innovative educational tool to all seventh and eighth grade students in the district.

---

underpinnings and all of the various processes that are taking place in order to achieve the desired end that we've been sharing here." (Doc. 537, p. 221).

[6] When the Court visited Morris P-8 in early September 2017, the district was in the process of furnishing the school, and all but the last few details of construction were complete. The construction project, originally slated for completion in 2017, was well-ahead of schedule. (Doc. 537, p. 138).

(Doc. 507-3, p. 12; Doc. 537, p. 138; *see generally* Doc. 450, pp. 71-72). The Court has visited the new schools; the facilities appear to be excellent.

The consent order states that this district must "provide equitable facilities so that no matter where a student attends school[,] the facility will provide the student with equal access to a quality education." (Doc. 450, p. 71). For the most part, the new school facilities are equitable. There are some exceptions. The new Grissom High School, a predominately white school, has tennis courts; the new Jemison High School, a predominantly black school, does not. (Doc. 507-9, p. 2). In addition, there have been maintenance issues relating to the athletic facilities at Jemison High School; there is no evidence that there are similar issues at Grissom. (Doc. 537, pp. 234-236). The Court reminds the Board to ensure that all facilities are equally well-maintained.

The consent order also requires the Board to request approval from the Court before "making any school renovations or additions that would alter the M-to-M transfer capacity of a school." (Doc. 450, p. 72). The Court reminds the Board of this obligation.

### 3. Student Assignment

#### a. Magnet Programs

Magnet programs enhance desegregation by drawing students from across the City of Huntsville to unique programs offered at only one location in the

district. To enhance the availability of magnet programs and equity in the selection of students for those programs, the district has adopted a uniform online application. (Doc. 537, p. 38). The district also has undertaken a significant effort to advertise its magnet programs. These efforts have produced a nearly 40% increase in magnet school enrollment. (Doc. 537, p. 41).

The district now boasts the only middle school magnet program for gifted students in the greater Huntsville area. (Doc. 537, p. 39). A number of magnet programs in the district seem to attract a large number of applicants, fostering the ability of these programs to serve as a desegregatory tool. (Doc. 501-4, p. 2). So popular are these programs that for the 2015-16 academic year, because of space restrictions, the district could not accommodate all of the applicants that it received for the AAA, ASFL, Columbia, New Century, and Jemison College Academy programs. (Doc. 501-4, p. 2).[7] The Court hopes that through the Board's marketing efforts, the Board will continue to generate interest in these and the other magnet programs within the district. It appears that the Board is working to fulfill its obligation to ensure that magnet programs are not duplicated at multiple schools within the district, so that the programs may serve their desegregatory purpose. (Doc. 500, pp. 11-12).

_____

[7] ASFL received the U.S. Department of Education Blue Ribbon designation in 2016. (Doc. 537, p. 41).

### b. M-to-M Transfers

M-to-M transfers enable a student to move from her zoned school where her race is in the majority to another school where her race is in the minority. During the 2015-16 school year, 348 students requested M-to-M transfers for the 2016-17 school year. (*See* Doc. 501-1, pp. 2-10). The Board granted 216 of those requests. (*See* Doc. 501-1, pp. 2-10).[8] The Board denied 132 of those requests. (*See* Doc. 501-1, pp. 2-10).[9] Challenger Elementary and Jones Valley Elementary had the highest number of M-to-M transfers at the elementary level. Approximately 20 students accepted M-to-M transfers to Challenger Elementary, and approximately 20 students accepted M-to-M transfers to Jones Valley Elementary. (*See* Doc. 501-1, pp. 2-10).[10] At the middle school level, approximately 15 students accepted M-to-M transfers to both Challenger Middle and Huntsville Junior High. (*See*

---

[8] Of the approved transfer requests, 160 students accepted the transfer, and 56 students declined the transfer. (*See* Doc. 501-1, pp. 2-10).

[9] The Board denied 130 M-to-M transfer requests because of space; the Board denied two M-to-M transfer requests because the Board determined in each instance that the student was not eligible for an M-to-M transfer. (*See* Doc. 501-1, pp. 2-10).

[10] Approximately 10 students accepted M-to-M transfers to both Chaffee Elementary and Mountain Gap P-8. A handful of students accepted M-to-M transfers at one of nine other elementary schools. (Doc. 501-1, pp. 2-10). During the 2015-16 school year, the Board did not approve M-to-M transfer applications for Blossomwood Elementary for the 2016-17 school year. (*See* Doc. 501-1, pp. 2-10). Consistent with the terms of the consent order, the district advertised Blossomwood as having limited or no availability for M-to-M transfers for the 2016-17 school year based upon the capacity calculation that the Court approved in the consent order. (Doc. 450, p. 12; Doc. 501-2, p. 36; Doc. 501-3, p. 13).

Doc. 501-1, pp. 2-10).[11]  For the district's high schools, four students accepted M-to-M transfers to Grissom, and two students accepted M-to-M transfers to Huntsville High.  (*See* Doc. 501-1, pp. 2-10).

Consistent with the terms of the consent order (*see* Doc. 450, p. 18), the district distributed one survey to M-to-M parents and another to M-to-M students to evaluate the M-to-M program.  The response rate for the parent survey was low.  Only 6.3% of eligible parents (or 51 of 813) responded to the survey.  (Doc. 501-1, p. 17).[12]  Because of the low response rate, the responses are not statistically significant.  (Doc. 500, p. 9).  Of the parents who responded, more than 75% (or three out of four) provided favorable responses to the following questions:

- The M2M transfer gives my student better academic opportunities;
- My student's school is more academically challenging than his/her zoned school;
- My student is able to excel academically because of the M2M transfer;
- My student feels welcome in his/her school;
- My student gets along with other students at his/her school;

---

[11] Approximately 10 students accepted M-to-M transfers to Hampton Cove Middle School. (Doc. 501-1, pp. 2-10).

[12] As previously stated, 160 students accepted M-to-M transfers during the 2015-16 school year to attend a new school during the 2016-17 school year.  *See* footnote 8, above.  The consent order asks the Board to provide for a given school year information about new transfer applications only.  The consent order does not require the Board to provide in its annual reports information about the total number of M-to-M students who attend each school in the district. (*See* Doc. 450, pp. 19-20).  Although the information does not appear in the Board's annual report, the Board has represented to the Court that 813 students attended various schools on M-to-M transfers during the 2015-16 school year.  The survey process that the Board used during the 2015-16 school year asked parents/guardians to complete a survey for each of their M-to-M children.  Because there were 813 M-to-M students, there were 813 possible surveys for parents to complete.

- The leadership at my student's school is supportive of his/her success;
- I am glad my student is on an M2M transfer; and
- I am satisfied with where my student was placed for the M2M transfer.

(Doc. 501-1, p. 17).

Parents were less satisfied with issues relating to transportation and the lottery process. For example, of the parents who responded to the survey, only 48% were satisfied with the transportation to and from his or her student's school, and only 44% were satisfied with the lottery process that the district uses to assign M-to-M transfers. (Doc. 501-1, p. 17).

The students' responses to the district's M-to-M survey largely mirror the parents' responses, but the response rate is significantly higher. Ninety-two percent of the students surveyed responded. (*Compare* Doc. 501-1, p. 16 *with* Doc. 501-1, p. 17; Doc. 500, p. 6). Of the students who responded to the survey, students indicated mid to high satisfaction with respect to the following questions:

- The M2M transfer gives me better academic opportunities;
- The M2M transfer gives me better extracurricular opportunities;
- The M2M transfer is convenient for me/my family;
- My school is more academically challenging than my zoned school;
- I am able to excel academically because of the M2M transfer;
- I feel welcome at my school;
- I get along with teachers at my school;
- I get along with other students at my school;
- The principal and staff at my school are supportive of my success;
- I am glad I am on an M2M transfer;
- I am satisfied with the application process to receive an M2M transfer; and

- I am satisfied with where I was placed for the M2M transfer.

(Doc. 501-1, p. 16).[13]

M-to-M students were more satisfied with bus transportation and the lottery process than their parents. Of the students who responded to the survey, 63% provided favorable responses when asked whether they were satisfied with the bus transportation to and from their school, and 61% provided favorable responses when asked whether they were satisfied with the lottery process for assigning M-to-M transfers. (Doc. 501-1, p. 16). According to the survey key, the answers to these two questions indicate low to mid student satisfaction. (*See* Doc. 501-1, p. 15).

### c. Good Faith

In its preface to the 2015-16 annual report, the district stated that there were aberrations in the report which the district attributed to a number of factors, including "[i]ssues driven by the interactions of newly blended student populations." (Doc. 500, p. 2). A few schools within the district have experienced more significant changes in student population than most of the schools in the district. The schools experiencing the most significant changes in student population include Blossomwood Elementary, Jones Valley Elementary, and

---

[13] Of the students who responded to the survey, 70%−75% of students provided favorable responses to these questions which, according to the key that the district used to interpret the student survey responses, indicates mid to high student satisfaction. (Doc. 501-1, p. 15).

Huntsville High School.[14]  Because of their proximity to predominantly African-American neighborhoods, these schools received more black students through rezoning.  (Doc. 446, p. 222; Doc. 450-1, pp. 2, 13; Doc. 450-3, p. 7; Doc. 537, pp. 65-68; Doc. 537, pp. 60-61; *Compare* Doc. 382, p. 6 *with* Doc. 463-6, p. 2 and Doc. 507-9, p. 2).   Additionally, many parents selected these schools as their first choice for M-to-M transfers.  (*See* Doc. 501-1, pp. 2-10).  It is reasonable to infer that parents selected these schools as their first choice for M-to-M transfers because a transfer necessarily requires additional travel, so that a relatively close transfer school is preferable to a distant school.  The combination of rezoned black students and black M-to-M transfer students at these schools has altered the racial composition of student populations at these schools.  In reaction to the initial shift in the racial composition of the student populations at these schools, some white parents withdrew their children from the schools, contributing to the overall shift in the racial composition of the student bodies in the schools.

These shifts in student populations have produced the most written feedback that the Court has received regarding the implementation of the consent order.  Of the thousands of families whose children attend public schools in the City of

---

[14] Based on information that the parties presented during the September 6, 2017 hearing, the Court anticipates that the Board's November 2017 report will indicate that the Board approved a high number of M-to-M transfers to Blossomwood for the 2017-18 school year.  (Doc. 537, p. 70).

Huntsville, the Court has received fewer than a dozen written submissions expressing concern over shifts in student populations, but the Court recognizes that the fairly significant white flight in the district suggests that the written submissions reflect a broader sentiment in the community.

By and large, the written submissions address three topics. First, the authors suggest that schools that have received many African-American students via rezoning and M-to-M transfers are not equipped to provide necessary services to new students because many of the students previously attended Title I schools, and Title I funds are not available at the receiving schools to support the students. Second, the authors posit that the new students introduce many behavioral issues to which other students should not be exposed, and the behavioral issues cause teachers to lose significant teaching time because the teachers must devote unreasonable amounts of time to discipline. Finally, there seems to be concern that if the district continues to approve M-to-M transfers to the schools at issue, the formerly predominantly white schools will become predominantly African-American, leading to additional white flight and causing the demographics in the neighborhoods surrounding the schools at issue to change. A number of parents have asked the Court to suspend M-to-M transfers to the schools at issue and direct transfer applicants to other schools in the district so that the schools at issue may adjust to their new student populations.

The Court discusses student discipline below, so the Court will not address the topic here. With respect to funding, representatives of the district have indicated to the Court that the district has sufficient resources to provide the support that students who previously attended Title I schools may need.[15] The suggestion that M-to-M transfers may cause the racial composition of the student body at a school to flip from predominantly white to predominantly black reflects a misunderstanding of the M-to-M transfer provision in the consent order. Under the consent order, the district may approve an application for an M-to-M transfer only if the applicant's race is in the minority at the school which the applicant hopes to attend. If the applicant's race is in the majority at the school to which the student applies, then the district must deny the transfer application. (Doc. 450, pp. 10-11; *see* Doc. 500, p. 5).

The Court cannot accommodate the request for a suspension of M-to-M transfers at the schools at issue. The legal standards that govern this issue dictate that the district's efforts to satisfy the *Green* factors following the entry of the 1970 desegregation order in this case (Doc. 299-1) already have taken much too long. In *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) (*Brown II*), the Supreme Court stated

---

[15] For examples of some of the types of support that were available at Huntsville High, Blossomwood Elementary, and Jones Valley Elementary during the 2015-16 school year, *see* Doc. 505-4, pp. 21-31, Doc. 505-4, pp. 64-70; Doc. 505-5, pp. 13-15, respectively. During the September 2017 site visit to Jones Valley, the Court observed a large group of volunteers at the school.

unequivocally that "racial discrimination in public education is unconstitutional," and the Supreme Court directed district courts to fashion equitable remedies that would provide admission to public schools "on a racially nondiscriminatory basis with all deliberate speed." *Id.* at 301.[16]

Thirteen years later in *Green v. County School Board of New Kent County, Virginia*, the Supreme Court explained that the mandate of the *Brown* decisions concerned much more than race-neutral public school admissions. The Supreme Court stated:

> It is of course true that for the time immediately after Brown II the concern was with making an initial break in a long-established pattern of excluding Negro children from schools attended by white children. The principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the 'white' schools. Under Brown II that immediate goal was only the first step, however. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about . . . .

391 U.S. at 435-36 (citation omitted). The Supreme Court held that a public school system must not only admit students on a non-racial basis but also must "abolish its dual, segregated system" altogether. *Id.* at 437. The Supreme Court found that the defendant school system had deliberately perpetuated an unconstitutional dual system by waiting ten years after the *Brown II* decision to

---

[16] In its landmark decision, *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) (*Brown I*), the United States Supreme Court announced that in the realm of public school education, separate is inherently unequal. 347 U.S. at 495. The Court mistakenly stated at the recent public hearing in this case that the United States Supreme Court issued *Brown I* in 1965. The Court apologizes for the error.

begin the work of desegregation, thereby "compound[ing] the harm of such a system."  391 U.S. at 438.  The Supreme Court held that such delays were "no longer tolerable."  *Id.* (citing *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 234 (1964)).

Finally, in October 1969, more than 15 years after *Brown I*, the United States Supreme Court issued a short opinion in which the Court insisted that school districts immediately act to eliminate the vestiges of racial segregation and held that it was error for lower courts to give districts additional time to comply with desegregation orders.  Citing its decision in *Green*, the Supreme Court stated:

> The question presented is one of paramount importance, involving as it does the denial of fundamental rights to many thousands of school children, who are presently attending Mississippi schools under segregated conditions contrary to the applicable decisions of this Court. Against this background the Court of Appeals should have denied all motions for additional time because continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.

*Alexander v. Holmes Cty. Bd. of Educ.*, 396 U.S. 19, 20 (1969) (citing *Green*, 391 U.S. at 438-39, and *Griffin*, 377 U.S. at 234).

The Supreme Court's call to swift action in 1969 cannot be answered with further delay in 2017.  From a practical standpoint, the Court appreciates that significant change within any system, including a public school system, can strain

a system temporarily as the system adjusts to the new norm. The jump start that the consent order has provided for elimination of racial inequality from the City of Huntsville school system has created some strain. But slowing the pace of change to accommodate the majority would exacerbate the injustice that African-American residents of Huntsville have suffered for decades.

As this Court previously has noted, time is a relative concept. For black children who waited until 1865 to be recognized as United States citizens (with the ratification of the 13th amendment) and then waited until 1970 to be admitted into white classrooms in the Huntsville City public schools, the waiting must end, and the goals of the 1970 desegregation order in this case must be realized. The district must implement the M-to-M transfer provisions of the consent order as written. If the district wishes to encourage an increase in transfer applications to schools other than the schools situated nearest to predominantly African-American communities, then the district will have to offer transportation opportunities that will give students easy access to more distant schools.[17]

---

[17] It is conceivable, for example, that the district could operate vans that would take black students to the southern-most schools in the district where the student bodies are predominantly white. Test scores indicate that African-American students at those schools are high achievers who sometimes outscore their Caucasian classmates (Doc. 501-5, p. 40), so the schools might be attractive to parents if the transportation obstacle could be resolved.

**4. Equitable Access to Course Offerings and Program**

In the memorandum opinion that prompted the parties to negotiate the consent order in this matter, the Court noted that many African-American students did not have access to the course offerings and programs that were available to white students in the district. (Doc. 364, pp. 51-55, 74-75, 77-79). For example, the predominantly black high schools in the district offered students far fewer AP course options than the predominantly white high schools in the district. (Doc. 364, pp. 51-53).[18] The Court attributed this discrepancy to two factors: the lack of information provided to African-American students about accelerated course work and the lack of preparation of African-American students for accelerated course work. (Doc. 364, pp. 75-78).

The district is attempting to address both of these factors. With respect to information, the Board hosts a district-wide event to introduce parents and students to the course offerings at various schools. (Doc. 537, p. 27). For the 2016-17 school year, more than 1,600 parents and students attended the event. (Doc. 537, p. 27). The event has expanded over the past three years and now includes college representatives and career academy representatives so that parents and students can

---

[18] Racial disparity in AP offerings remained after the 2015-16 school year. The district offered 26 AP or IB courses at Columbia High School; 28 AP courses at Grissom High School; 23 AP courses at Huntsville High School; 13 AP courses at Jemison High School; 15 AP courses at Lee High School; and 21 AP courses at New Century Technology High School. (Doc. 501-5, pp. 30-34). There has been an increase in the enrollment of African-American students in AP courses at Grissom High School and Huntsville High School, two of the predominantly Caucasian schools in the district. (Doc. 500, pp. 13-14).

learn about the range of opportunities available to all students throughout the district. (Doc. 537, p. 28). The program currently is geared toward middle and high school parents and students, but the district is thinking about including elementary students to help those students start imagining the possibilities that await them. (Doc. 537, p. 28).

As the following data shows, the district's efforts to expand the enrollment of African-American students in honors and AP courses produced some growth in enrollment from the 2015-16 school year to the 2016-17 school year:

**Middle School Honors Enrollment**

Middle School students taking at least one honors course

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2015-2016 | 42% | 71% | 49% | 56% |
| 2016-2017 | 47% | 74% | 53% | 60% |

(Doc. 461-1, p. 6; Doc. 508, p. 9).

**High School Honors Enrollment**

High School students taking at least one honors course

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2015-2016 | 28% | 46% | 38% | 38% |
| 2016-2017 | 29% | 48% | 37% | 38% |

(Doc. 461-1, p. 6; Doc. 508, p. 9).[19]

---

[19] These charts regarding honors enrollment and the following chart concerning AP enrollment demonstrate that the district's efforts have benefitted students of all races.

**AP Enrollment**

High School students taking at least one AP class

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2015-2016 | 18% | 40% | 26% | 29% |
| 2016-2017 | 19% | 42% | 27% | 30% |

(Doc. 461-1, p. 6; Doc. 508, p. 9).

**AP Performance**

Students who scored an 80% or higher in at least one AP course

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 59% | 79% | 75% | N/A |
| 2015-2016 | 61% | 79% | 72% | N/A |

(Doc. 461-1, p. 5; Doc. 508, p. 8)

Students who passed at least one AP exam

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 10% | 61% | 54% | N/A |
| 2015-2016 | 15% | 57% | 47% | N/A |

(Doc. 461-1, p. 5; Doc. 508, p. 8). The Court hopes that the number of African-American students who enroll in more rigorous courses will continue to increase and the achievement gap will narrow if the district consistently provides more information about and better preparation for honors and AP courses.

The district has recognized that one of the most significant barriers to equitable access to course offerings and programs is the racial achievement gap in

the district.  (Doc. 537, pp. 14-15, 35, 44).[20]  As the following data demonstrates, the district experienced minimal progress in closing the achievement gap during the 2015-16 school year:

## ACT 11th Grade Benchmark Rate[21]

Math

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 6% | 54% | 31% | 34% |
| 2015-2016 | 7 % | 54% | 34% | 33% |

(*See* Doc. 461-1, p. 4; Doc. 508, p. 7)

English

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 25% | 80% | 55% | 57% |
| 2015-2016 | 30% | 84% | 59% | 59% |

(*See* Doc. 461-1, p. 4; Doc. 508, p. 7)

---

[20] The district also has acknowledged that the district faces a literacy problem.  (Doc. 537, pp. 43-45).

[21] Eleventh grade students take the ACT exams.  The maximum score is 36.  A student who scores a 22 on the math portion and an 18 on the English portion benchmarks for those areas.  The expectation is that a student who benchmarks will have a 50% chance of making a B and a 75% change of making a C in a college freshman Math or English course.  (Doc. 461-1, p. 4; Doc. 508, p. 7).

## **ACT Aspire Proficiency (Grades 3-8)[22]**

Math

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 29% | 71% | 48% | 51% |
| 2015-2016 | 28% | 67% | 44% | N/A |

(*See* Doc. 461-1, p. 4; Doc. 508, p. 8)

English

| Year | Black | White | Other | District |
|------|-------|-------|-------|----------|
| 2014-2015 | 61% | 89% | 69% | 73% |
| 2015-2016 | 57% | 87% | 68% | N/A |

(*See* Doc. 461-1, pp. 4-5; Doc. 508, p. 8).

As the following data shows, a few schools in the district have successfully closed the achievement gap at some grade levels, and in some schools in the district, African-American students in some grades out-perform their Caucasian classmates. For example, on the English portion of the ACT Aspire test, black sixth grade students at AAA had a 93% proficiency rate while white sixth grade students had an 87% proficiency rate. (Doc. 501-5, p. 39). Black and white students in third, fourth, fifth, sixth, seventh, and eighth grades at the ASFL performed nearly identically on the English portion of the Aspire test. Black third

---

[22] ACT Aspire exams indicate whether a student is on track to be college ready and career ready and to benchmark on the ACT for the Math or English content area. A student who is proficient on the ACT Aspire exam is considered on track to benchmark on the ACT. (Doc. 461-1, p. 4; Doc. 508, pp. 7-8).

grade students had a 77% proficiency rate, and white third grade students had a 78% proficiency rate. Black fourth grade students had an 88% proficiency rate, and white fourth grade students had a 91% proficiency rate. Black fifth grade students had an 86% proficiency rate, and white fifth grade students had an 89% proficiency rate. Black and white sixth grade students had a 100% proficiency rate. Black seventh grade students had a 96% proficiency rate, and white seventh grade students had a 100% proficiency rate. Black eighth grade students had a 77% proficiency rate, and white eighth grade students had an 80% proficiency rate. (Doc. 501-5, p. 39).

Black fifth grade students at Goldsmith Schiffman Elementary School had a 100% proficiency rate on the English portion of the Aspire test while white fifth grade students had an 87% proficiency rate. (Doc. 501-5, p. 40). Black fourth grade students at Hampton Cove Elementary had a 100% proficiency rate on the English portion of the Aspire test while white fourth grade students had a 91% proficiency rate. (Doc. 501-5, p. 40).[23]

At McDonnell Elementary, black fifth grade students had a 69% proficiency rate while white fifth grade students had a 50% proficiency rate on the English portion of the ACT Aspire test. (Doc. 501-5, p. 40). At McNair Junior High,

_____

[23] During the 2015-16 school year, there were few African-American students at Goldsmith Schiffman Elementary School and Hampton Cove Elementary School. Thirty-six black students attended Goldsmith Schiffman, and 246 white students attended Goldsmith Schiffman. (Doc. 463-6, p. 2). Forty-one black students attended Hampton Cove Elementary, and 427 white students attended Hampton Cove Elementary. (Doc. 463-6, p. 2).

black seventh graders had a 64% proficiency rate while white seventh graders had a 40% proficiency rate. (Doc. 501-5, p. 40).

Black and white sixth grade students at Monte Sano Elementary both had a 100% proficiency rate on the English portion of the ACT Aspire test. (Doc. 501-5, p. 40). Black and white tenth grade students at New Century Technology High School both had a 93% proficiency rate on the English portion of the test. (Doc. 501-5, p. 41). At Rolling Hills Elementary School, black third grade students had a 65% proficiency rate on the English portion of the test while white third grade students had a 50% proficiency rate. (Doc. 501-5, p. 41).

On the Math portion of the ACT Aspire test, black third grade students at Challenger Elementary School had a 100% proficiency rate while white third grade students had a 75% proficiency rate. (Doc. 501-5, p. 43). Black fourth grade students at Chapman P8 had an 86% proficiency rate while white fourth grade students had a 60% proficiency rate. (Doc. 501-5, p. 43). At Hampton Cove Elementary School, black fifth grade students had a 100% proficiency rate on the Math portion of the test while white fifth grade students had an 88% proficiency rate. (Doc. 501-5, p. 44). At Morris Elementary, black third grade students had a 55% proficiency rate, and white third grade students had a 44% proficiency rate. (Doc. 501-5, p. 45).

These results are the exception, not the rule. The ACT Aspire test results show that generally speaking, black students in Huntsville city schools lag behind their white peers, and in many instances, to a significant degree. (*See generall*y Doc. 501-5, pp. 39-46). With the exception of the English proficiency rate for black and white students at New Century Technology High School which are equal, test scores from the district's tenth grade students during the 2015-2016 school year demonstrate that white students are statistically far better prepared to take college entrance exams. At Columbia High School, for the English portion of the ACT Aspire test, black tenth grade students had a 39% proficiency rate, and white tenth grade students had a 63% proficiency rate. (Doc. 501-5, p. 39). On the Math portion of the ACT Aspire test, black tenth grade students at Columbia had a 4% proficiency rate, and white tenth grade students had an 11% proficiency rate. (Doc. 501-5, p. 43).

At Grissom High School, for the English portion of the ACT Aspire test, black tenth grade students had a 46% proficiency rate, and white tenth grade students had an 80% proficiency rate. (Doc. 501-5, p. 40). On the Math portion of the ACT Aspire test, black tenth grade students at Grissom had a 9% proficiency rate, and white tenth grade students had a 34% proficiency rate. (Doc. 501-5, p. 44).

At Huntsville High School, for the English portion of the ACT Aspire test, black tenth grade students had a 30% proficiency rate, and white tenth grade students had an 87% proficiency rate.  (Doc. 501-5, p. 40).  On the Math portion of the ACT Aspire test, black tenth grade students at Huntsville High had a 4% proficiency rate, and white tenth grade students had a 42% proficiency rate.  (Doc. 501-5, p. 44).

At Johnson High School, for the English portion of the ACT Aspire test, black tenth grade students had an 18% proficiency rate, and white tenth grade students had a 0% proficiency rate.  (Doc. 501-5, p. 40).  On the Math portion of the ACT Aspire test, black tenth grade students at Johnson had a 1% proficiency rate, and white tenth grade students had a 0% proficiency rate.  (Doc. 501-5, p. 44).[24] [25]

At Lee High School, for the English portion of the ACT Aspire test, black tenth grade students had a 25% proficiency rate, and white tenth grade students had a 51% proficiency rate.  (Doc. 501-5, p. 40).  On the Math portion of the ACT Aspire test, black tenth grade students at Lee had a 2% proficiency rate, and white tenth grade students had a 7% proficiency rate.  (Doc. 501-5, p. 44).

---

[24] Three white tenth grade students at Johnson High took the ACT Aspire test during the 2015-2016 school year.

[25] At the end of the 2015-2016 school year, Johnson High School closed.  Students who were assigned to Johnson now attend Jemison High School.

At New Century, for the Math portion of the ACT Aspire test, black tenth grade students had a 31% proficiency rate, and white tenth grade students had a 50% proficiency rate. (Doc. 501-5, p. 45).

The district is working to close these achievement gaps and ensure that all students in the district have access to equitable academic programs which provide an opportunity for comparable achievement by all students regardless of race.

## 5. Extracurricular Activities

During the 2016-17 school year, the district recognized that many students had difficulty participating in clubs and other extracurricular activities because the activities met after the school day ended, and students who did not have access to transportation if they stayed after school or who had to get to a job after school could not be part of extracurricular offerings.[26] Therefore, for the 2017-18 school year, the district adopted the "power hour" from 11:30 to 12:30 each day. During that hour, clubs may meet, students may schedule advisory meetings with teachers, and students may attend tutoring sessions. (Doc. 537, pp. 29-30). Students have the opportunity to identify club offerings and provide feedback concerning extracurricular activities. (Doc. 537, p. 30).

---

[26] *See* Doc. 501-8, pp. 2-31 for a listing of the clubs that the schools in the district offered during the 2015-16 school year.

### 6. Student Discipline, Positive School Climate, and Effective Classroom Management

Just as success breeds success, negativity breeds negativity, and negativity can be fatal to the district's effort to implement the consent order. The Court already has mentioned some of the schools in the district that are wrestling with white flight. White flight harms school climate; it sends the unmistakable and indelible message that white parents would rather move or pay private school tuition than have their children attend a racially integrated school.

More caustic to efforts to build positive school climate are administrators and teachers who are reluctant to embrace the consent order. The Court hesitates to say anything critical of administrators or teachers, and the Court hopes, though it cannot tell from the record, that the issues that exist are limited in scope, but the Court would be remiss if it did not address this issue.

Before discussing the challenges that exist, it is important to acknowledge that for a host of reasons, some of which are unrelated to the consent order, instability in the district has frustrated dedicated teachers over the past few years. Teachers are critical to the success of the consent order, and teachers and administrators have had to adjust to many changes under the consent order while managing many other demands.

School discipline may be the area in which teachers and administrators have seen the greatest change. The district has had four different codes of conduct over

a period of four years. (Doc. 537, pp. 61, 140). The last of these is the behavioral learning guide, a "living document" that the district has worked to fine-tune and make more user-friendly over the past two years, implementing changes that teachers and parents have recommended. (Doc. 537, p. 29). Make no mistake -- teachers and administrators have every right to be frustrated and weary of this amount of change in a single area in a short period of time, and the Court recognizes that teachers and administrators have been implementing improvements for all students in a host of areas. It is a difficult task, and the Court enthusiastically thanks teachers and administrators who have embraced the work.

The Court's concern arises from a drumbeat of messages that suggest that some administrators have instructed some teachers not to follow the behavioral learning guide, and some teachers independently seem to reject the guide, preferring the district's prior disciplinary practices.[27] Again, the Court understands the natural inclination towards the familiar, and if the old code of conduct were not broke[n], the Court would gladly say "don't fix it." But the old system of discipline in the district was constitutionally flawed. Data revealed that the district's previous practices produced "a vast disparity" racially in student discipline. (Doc. 537, p. 141). In some high schools in the district, there was a

---

[27] In the introduction to its overview of the 2015-16 annual report, the district stated that the district had faced some hurdles in the implementation of the consent order, caused in part by "[c]onfusion and reluctance on the part of the faculty, staff, and administration concerning the boundaries set by the Consent Order." (Doc. 500, p. 2).

10:1 difference in office discipline referrals for black and white students for similar infractions. (Doc. 537, p. 141; *see also* Doc. 446, pp. 26-27, 29). Similar disparities existed in suspensions (both in-school and out-of-school) and expulsions. (Doc. 537, p. 142; *see also* Doc. 446, pp. 26, 29). As a consequence, black students were losing significantly more class time than white students because of the inequitable enforcement of the district's code of conduct.

Working with the Department of Justice and experts in the field of student discipline, the district developed the behavioral learning guide, not to prevent schools from disciplining black students who violate behavioral standards but to ensure equitable discipline for conduct violations for all students, regardless of race. For a host of reasons, perhaps most significantly the turnover in superintendents during the 2016-17 school year, the district's code of conduct has yet to be fully and faithfully implemented. Teachers have contacted the Court anonymously to report that they are discouraged from disciplining children at all. Parents echo these reports. Without further investigation, the Court cannot tell whether teachers merely perceive that they are being discouraged from disciplining children or whether leaders within the district have actively discouraged student

discipline, but either way, the result is the same. The damage to school climate is significant.[28]

Unease about student safety also harms school climate. The Court is aware of recent off-campus social media incidents involving students from Grissom High School, one involving a gun and one involving racial slurs. The Court shares the district's concerns about incidents of violence or threatened violence and conduct that may incite violence. The consent decree does not prevent the district from meting out proper discipline to address these behaviors. The consent decree requires just and equitable discipline, not abdication of the district's disciplinary role, and the consent decree promotes behavioral learning that equips students to make better decisions.

Bullying and threats of violence from students are not isolated to the Huntsville system, as evidenced by recent incidents in nearby school systems and nationwide statistics. According to the Centers for Disease Control, school violence is a nationwide public health problem, and the measures the CDC cites to prevent such violence -- school-based prevention programs focused upon developing emotional skills; parent-and-family based programs; and street-outreach programs -- notably do not focus upon discipline as a cause of, or panacea

---

[28] The Court also has received information which indicates that teachers may not be submitting data about discipline in the district. This makes the district's discipline data unreliable and undermines the district's ability to demonstrate to the Court in a meaningful way that the district is successfully addressing racial disparities in discipline.

for, school violence. *See* Centers for Disease Control and Prevention, *Understanding School Violence Fact Sheet 2016*, available at https://www.cdc.gov/violenceprevention/pdf/school_violence_fact_sheet-a.pdf (last visited November 14, 2017).[29]  A growing body of research indicates that racism also is a public health problem, and racism is more prevalent than student gun violence.  Dr. David Williams, *How Racism Makes Us Sick* (2016), available at https://www.ted.com/talks/david_r_williams_how_racism_makes_us_sick (last visited November 14, 2017).  Both of these issues must be addressed; one does not preclude the other.  To be sure, the district should appropriately discipline students who -- through violence, threats of violence, or conduct that incites racism -- destabilize school climate and cause students to fear for their safety.  But the district must impose consequences equitably, and discipline to the exclusion of preventive and rehabilitative measures leaves unresolved the cognitive and behavioral issues that produced the misconduct in the first place.

---

[29] For more information about national safety issues and local incidents, *see* Centers for Disease Control and Prevention, *Trends in the Prevalence of Behaviors that Contribute to Violence on School Property*, available at https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trends/2015_us_violenceschool_trend_yrbs.pdf (last visited November 14, 2017); *Everytown for Gun Safety Support Fund, Analysis of School Shootings: January 1, 2013—December 31, 2015*, available at https://everytownresearch.org/documents/2015/04/analysis-of-school-shootings.pdf (last visited November 14, 2017); Amber Lee Cole, WAFF, "Gun discovered near Madison middle school campus" (November 9, 2017), http://www.waff.com/story/36808617/gun-discovered-near-madison-middle-school-campus (last visited November 14, 2027); Chris Davis, WHNT, "Madison County's Superintendent responds to gun incidents at Hazel Green High" (October 26, 2017), http://whnt.com/2017/10/26/madison-countys-superintendent-responds-to-gun-incidents-at-hazel-green-high/ (last visited November 14, 2017).

The Court is not going to say more on this topic at this juncture. The Court has discussed student discipline with Dr. Akin, and Dr. Akin must have a fair opportunity to address the deficiencies that exist in the district. He did not have that opportunity during the 2016-17 school year. The Court hopes that in the 2017-18 school year, the district, in cooperation with the United States, will continue to tweak the district's code of conduct, train teachers and administrators in the proper use of the district's disciplinary tools, and enforce disciplinary standards in a racially-neutral manner. If the district implements with fidelity the various disciplinary initiatives that the district has developed and consistently and accurately tracks and monitors disciplinary actions throughout the district, then the district may begin meaningfully reducing racial disparities in student discipline, and the Board may begin the process of establishing a record of good faith in the area of equitable discipline.

## 7. DAC

The three superintendent turnovers during the 2016-17 school year impacted not only student discipline but also the work of the DAC. The DAC is designed to serve as an independent committee that collects and shares with the superintendent and the Court feedback about the implementation of the consent order from all of the stakeholders in the Huntsville community. This task was complicated by the turnover of superintendents during the 2016-17 school year.

The parties and the Court devoted the beginning of the 2016-17 school year to a revision of the consent order provisions regarding the DAC to expand student participation in the DAC and provide stronger tools to ensure the independence of the DAC. (Doc. 509).[30] The DAC created its own website and instituted new means of communication to facilitate feedback, so that stakeholders may communicate by attending DAC meetings, emailing the DAC, and providing written comments in drop-boxes located at the schools throughout the district. (Doc. 509, pp. 2-3; Doc. 537, pp. 178-179, 182-183; *see also* http://www.hsvdac.com/, last visited November 13, 2017). The DAC hopes that these alternative tools will enhance communication for the 2017-18 school year.

The Court and the parties encourage parents and students to apply to participate in the DAC. The DAC offers parents and students an opportunity to play an important and significant role in the implementation of the consent order.[31] The Court expresses its gratitude to everyone who has served on the DAC to date.

---

[30] The DAC could not begin its efforts in earnest until the revisions to the consent order provisions concerning the DAC were complete. Therefore, the DAC's timeline for reporting to the superintendent and to the Court was delayed for the 2016-17 school year.

[31] The members of the DAC are racially diverse, but currently there are no African-American male parents on the DAC. (Doc. 535, p. 1, n.1). The 2018-19 DAC applicant pool hopefully will give the parties and the Court the opportunity to select a black father to fill a vacancy on the DAC.

8.     **Good Faith**

Two years after the Court entered the consent order in this case, the good faith component of this school desegregation effort has come into clear focus. As the Court stated earlier, the City of Huntsville School Board and Dr. Akin are primarily responsible for demonstrating the district's good faith in implementing the consent order, but the prospect for lasting, transformative change lies in the hands of the community at large. As Dr. Akin put it, "for us to achieve our vision, all of our employees, all of our parents have to believe in the vision." (Doc. 537, p. 19).

The parties are working well together to facilitate the district's effort to comply with the consent order. Unlike ordinary adversarial litigation in which each party tries to defeat the other, the United States continues to look for ways to help the district succeed in its efforts to comply with the consent order and obtain relief from federal oversight. The attorneys for the district and for the United States are working hard to foster success.

Dr. Akin recognizes that the consent order is a vehicle for systemic change that will position the Huntsville district to become a leader in the public school arena. As Dr. Akin has stated, the consent order is aligned with the district's vision, and "[o]ur vision for our school system or part of it is to become a model school system for the country." (Doc. 537, p. 12; *see also* Doc. 537, p. 20). It

goes without saying that the district cannot be a model for the nation unless the district serves all of its students equitably without regard to race.

The district also cannot achieve its vision without support from the City of Huntsville Board of Education.  Dr. Akin acknowledged that there are divisions on the Huntsville Board.  (Doc. 537, p. 12).  Those divisions have the capacity to undermine the efforts that Dr. Akin and the attorneys are making to comply with the consent order.  Dr. Akin is working to rebuild trust in the district.  Trust and mutual concern for the different challenges that the various districts within the Huntsville system face will serve the Board well.  As Dr. Akin pointed out:

> Each of our board districts has different challenges, whether it's geographical challenges of west Huntsville or the extreme poverty that we face in north Huntsville.  I would be foolish to say that they all have the same solutions. We have to work together to look at individual solutions for individual students, for individual schools and for individual districts within the city.  But at the end of day, it's so important that we all work together as one system.

 (Doc. 537, p. 13).

That unity of purpose is essential to implementation of the consent order. As Dr. Akin and Reverend Montgomery both stated, the recipe for success is simple:  do what is right for all of the students in the Huntsville district, and satisfaction of the goals of the consent order will be a natural consequence of that effort.  Dr. Akin and the members of his team said it repeatedly:  "do what's right for all children in our city."  (Doc. 537, pp. 19, 29).  Reverend Montgomery stated

the principle this way: "paramount in our concerns would be doing what is right and what is best for all of the kids which, in my understanding, would ultimately allow unitary status to take care of itself." (Doc. 537, p. 222).

The obligation to do what is right for all of the students in the district rests with all of the citizens of the district. The role of teachers and administrators is clear, but there is a role for everyone. Parents must do their part to prepare their children for school, both academically and behaviorally. Parents must work with teachers and administrators to help instill in each student a love of learning and respect for teachers and fellow students. (Doc. 537, p. 225).

Parents need assistance too. Parents sometimes lack the resources necessary to provide all of the support that their children require. For example, because of limited access to transportation or because of constraints that a job (or jobs) may create, parents of M-to-M students may need a neighbor or a member of their church congregation to drive them to a school meeting or attend a school meeting on their behalf. While these parents are at work, they may need a member of their community to help their children with homework. Parents of M-to-M students (literally) have gone the extra mile to move their children to a school that is poised to help their children be successful; these parents may need help to bridge the gap between their neighborhood and their child's school. They undoubtedly are not alone; parents throughout the district may need support.

In Dr. Akin's words, "we can't move forward without talking to each other and without listening to each other and without believing in each other," and without working together.   (Doc. 537, pp. 13, 20).   A better appreciation of the challenges that exist throughout the district will better equip all stakeholders to do their part to build the district that Dr. Akin envisions.  The motto that Dr. Akin and Reverend Montgomery espoused can become the motto for the district:  for the good of all of the children, do what's right.  Put it on banners.  Preach it in the pulpit.  Say it to your neighbor.  Set the example:  do what's right.  If the district does that, the consent order will take care of itself.  It's 2017; for the good of all the children, it's time to do what's right.

November 14, 2017

MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE