FILED
2024 Feb-01  PM 04:48
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SONNIE WELLINGTON HEREFORD, IV, *et al.*, | ) | |
| | ) | |
| PLAINTIFFS, | ) | NO.: 5:63-cv-00109-MHH |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF-INTERVENOR, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HUNTSVILLE BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## JOINT STATUS REPORT TO THE COURT

Plaintiff-Intervenor the United States of America ("United States") and

Defendant Huntsville Board of Education ("Board" or "District") (collectively, the

"Parties"), by and through undersigned counsel, respectfully submit this status

report in accordance with this Court's September 15, 2023 order.  (Doc. 770).  This

report is submitted jointly by the Parties and provides a general discussion of the

status of the Board's implementation of the Consent Order.

## I. BACKGROUND[1]

This school desegregation case was filed against the Board on March 11, 1963.  On August 12, 1963, the Court entered an order restraining and enjoining the Board from discriminating against plaintiffs based on race or color in the assignment, transfer, or admission to public schools in the City of Huntsville, Alabama.  (Doc. 1, docket sheet, p. 2-3).  On April 12, 1965, the United States intervened in this case.  (*Id.* at 5).  In 2015, after months of Court-ordered mediation stemming from contested litigation on student assignment issues, the Parties jointly proposed the entry of a comprehensive consent order designed to facilitate the Board's attainment of unitary status.  The Court entered the joint proposed consent order ("Consent Order") on April 24, 2015, following an evidentiary hearing.  (Doc. 450).

Since that time, and as discussed in more detail below, the District has taken steps to implement the terms of the Consent Order.  The District also has supplied all required data and reports related to its implementation of the Consent Order in November of each year, has responded to each of the United States' requests for additional information, and has allowed the United States access to all requested records.

---

[1] More detailed recitations of this case's history are set forth in the Court's May 20, 2014 Order (Doc. 329) and June 30, 2014 Memorandum Opinion (Doc. 364) and are not repeated here.

Since the entry of the Consent Order, the United States has monitored the District's compliance with the Consent Order by, among other things, reviewing the District's annual reports to the Court; conducting in-person and virtual site visits to the District's schools, during which the United States has toured schools, observed classrooms, and interviewed school administrators, staff, and District personnel; engaging in regular communications with the District about its implementation of the Consent Order; propounding numerous requests for information to the District; reviewing the Desegregation Advisory Committee's ("DAC") annual reports and observing its public meetings; and seeking community input on the District's implementation of the Consent Order.  The United States also has solicited the assistance of experts, where necessary.  The Parties have worked together in good faith to address issues that have arisen under the Consent Order.

On April 5, 2023, the District filed an unopposed motion for partial unitary status as to faculty and staff.  (Doc. 758).  The United States filed a response to that unopposed motion on April 26, 2023.  (Doc. 763).  On August 25, 2023, the District filed a motion for approval of proposed facility additions to two District schools.  (Doc. 769).  In that motion, the District previewed that it plans to seek release from federal court supervision in the area of facilities in the near future. (*Id.* at 18).  On September 15, 2023, the Court considered these companion

motions and, "for the sake of efficient use of the parties' resources and to avoid successive hearings and the expense associated with them," ordered the Parties to "meet and confer about the status of the Board's implementation of the Consent Order and consider which *Green* factors the Board may have satisfied, or may be near satisfying, and provide the Court with a written status report by February 1, 2024."  (Doc. 770).

To comply with the Court's directive, and in furtherance of its regular compliance monitoring, the United States conducted a five-day site visit to the District in November 2023.  While on site, the United States visited 14 schools, met with school administrators, and interviewed a range of District personnel responsible for overseeing the District's implementation of the Consent Order, including the Superintendent, Gifted Services Coordinator, Magnet Programs Director, Deputy Superintendent of Curriculum and Instruction, District Curriculum Specialists for Elementary and Secondary Education, Human Resources Director, Talent Management Director, Talent Management Coordinator, Executive Director of Prevention and Supports, and Behavioral Learning Coordinator.  The site visit covered an array of issues related to the District's implementation of the Consent Order, including student discipline, magnet programming, advanced academic programming, and facility maintenance.

In January 2024, the Parties held a series of meetings (totaling 13 hours) to discuss the status of the District's implementation of Consent Order provisions related to each open *Green* factor.[2]  On January 8, 2024, the Parties focused on extracurricular activities (Section IV of the Consent Order) and faculty and staff (Section V); on January 9, 2024, the Parties focused on facilities (Section VI); on January 16, 2024, the Parties focused on student assignment (Section II); on January 25, 2024, the Parties focused on equitable access to course offerings and programs (Section III); and on January 26, 2024, the Parties focused on student discipline (Section VII).  After these meetings, the United States issued targeted follow-up requests for information and data covering each area, to which the District has or is in the process of responding.

## II. DISCUSSION

Based on extensive data and information provided by the District and the United States' comprehensive compliance monitoring since the Consent Order's entry, as well as the District's responses to concerns raised by the United States and the Parties' January 2024 meetings, the Parties agree that the District may have satisfied, or may be near to satisfying, the extracurricular activities and facilities *Green* factors.  (*See* Sections II.a & II.b, *infra*).  The parties previously outlined

---

[2] All *Green* factors, except transportation, are open in this case.  (*See* Doc. Nos. 671 and 675).

their positions regarding the faculty and staff *Green* factors, *see* Doc. Nos. 759 and 763, and provide further updates below.  (*See* Section II.c, *infra.*)

The Parties agree that student assignment, equitable access to course offerings and programs, and student discipline are not appropriate for a release from judicial supervision at this time.  As to student assignment, the Parties recognize that the District has taken a number of steps since 2015 to implement the Consent Order's student assignment provisions, including the Majority-to-Minority ("M-to-M") transfer provisions (Section II.D of the Consent Order) and magnet schools/programs provisions (Section II.E).  The United States closely monitors student assignment through its review of District data, information, and feedback from the DAC and community.  The District has recently notified the United States that it plans to propose substantial modifications to its magnet schools and programs in conjunction with its launching of a 10-year capital plan.  While the District has provided the United States an overview of the 10-year capital plan orally, the United States has requested further information on this and other topics and is awaiting a formal proposal from the District to evaluate.  The Parties plan to devote significant time this spring to discussing these proposals and will update the Court accordingly.

As to equitable access to course offerings and programs, the District consistently satisfies several of the Consent Order's requirements. For example,

the District consistently satisfies requirements related to Advanced Placement ("AP") and honors course availability at secondary schools and for conducting outreach to parents/guardians of students participating in such courses for the first time (though attendance fluctuates).  However, significant proficiency gaps exist between Black and white students in English and math generally, and Black students remain underrepresented in AP, honors, and gifted programs.  While the District has seen an increase in Black student participation in AP courses since the 2021-22 school year, the participation and achievement gaps between Black and white students in advanced and honors courses remain significant.  For the District's gifted program, the percentage of Black students who have been identified as gifted has steadily increased since the 2020-21 school year and is currently at the highest percentage since 2015-16, with a gap of 7% between Black and white students in gifted this school year.  As with student assignment, the United States closely monitors equitable access to course offerings and programs, and the District continues to take steps to increase access to gifted, enrichment, and advanced programming for Black students who have been historically underrepresented in the District's programs.

As to discipline, the District has acknowledged an increase in student discipline incidents since the 2021-22 school year as students returned to in-person learning after the COVID-19 pandemic.  (Doc. 779, p. 30-31).  Moreover, since the

Consent Order's entry, the District's annual report data and information consistently show significant disparities between Black and white students who receive exclusionary discipline, including for in-school and out-of-school suspensions.  (*Id.* at 32).  Unfortunately, those disparities are as great or greater than they were at the time this Court entered the Consent Order.  Consistent with Section VII.A of the Consent Order, the District has retained a discipline expert to assist in its efforts to ensure non-discrimination in student discipline and create positive school climates.  The Parties agree, however, that there is work to be done to address ongoing racial disparities in the District's administration of discipline District-wide and at particular schools.

Below the Parties summarize the status of the District's implementation of the Consent Order's provisions related to extracurricular activities, facilities, and faculty and staff, and explain why the District may have satisfied, or may be near to satisfying, those *Green* factors.

### a.  Extracurricular Activities

The Parties believe that the District may have satisfied, or may be near to satisfying, the extracurricular activities *Green* factor.  The Consent Order requires that each high school, middle school/junior high school, and elementary school in the District "provide students with an equal opportunity to participate in a range of extracurricular activities."  (*See* Doc. 450, §§ IV.A, IV.B, IV.C).  The United

States' review of data from the District's annual reports indicates that, with few exceptions, the District has maintained the required extracurricular activities at each school level.[3]  This includes fourteen clubs at each high school, six clubs at each middle school/junior high school, and one club at each elementary school.  In addition, as required by Section IV.E of the Consent Order, the District has set participation targets for each extracurricular activity that align with each school's demographics plus or minus 15 percentage points.  (Doc. 779, p. 24).  The District also has worked to publicize academic clubs and extracurricular activities, in accordance with Section IV.F.  (*Id.* at 25).

The purpose of this section of the Consent Order is to ensure that students have meaningful access to extracurricular activities and that the District removes any barriers that create disparate access to extracurricular activities on the basis of race.  While the information provided by the District is largely promising, the United States' review has revealed some outstanding questions.  The United States has requested additional data and information from the District about these issues.  If that information confirms the District's efforts to ensure meaningful access and remove barriers affecting Black students, the Parties believe that the District will

---

[3] Participation in and access to extracurricular activities was also limited during the 2019-20 (spring semester) and 2020-21 school years, during the height of the COVID-19 pandemic.  (*See* Doc. 723, p. 26-29).

be well-positioned to seek release from federal court supervision in the area of extracurricular activities in the near future.

### b. Facilities

The Parties agree that the District may have satisfied, or may be near to satisfying, the facilities *Green* factor.  Under the terms of the Consent Order, the District must "provide equitable facilities so that no matter where a student attends school the facility will provide the student with equal access to a quality education."  (Doc. 450, § VI.A).  In addition, the Consent Order memorializes the following agreement between the Board and the United States:

> The Parties agree that upon good-faith compliance with this section, including completion of the District's Construction Plan, Renovation Plan, Playground Plan, and SMALLab Plan, and the commencement of work on the Morris Pre-K-8 site, as follows, **the District will have met its desegregation obligations regarding facilities so that the District or the parties jointly may move the Court to declare the District unitary with respect to facilities . . . .**

*Id.* (emphasis added).

As the Board reported in its November 15, 2017 Consent Order Report Cover Notice, as of August 2017, the Board had completed all construction and renovation obligations outlined in the facilities section of the Consent Order. (Doc. 542, p. 33); (*see also* Doc. 450, § VI.A.1-3) (describing the requirements of the "District's Construction Plan," "District's Renovation Plan," and plan to construct a new Morris P-8).  This included the timely construction of Whitesburg

P-8, Morris P-8, Hereford Elementary School, McNair Junior High School,

Jemison High School, and Grissom High School, and the timely renovation of

Martin Luther King, Jr. Elementary School and the Academy of Academics and

Arts P-8.  (Doc 569-3, p. 2).

In addition to imposing certain construction and renovation obligations, the

Consent Order also requires the Board to implement the "District's Playground

Plan" to modernize its elementary school playground equipment and "District's

SMALLab Plan" to ensure that all schools with grades seven and eight have

SMALLabs of comparable quality.  (Doc. 450, § VI.A.4-5).  In each of the Board's

annual reports, the Board updated the Court and the United States on the

implementation of the District's Playground Plan.  (*See* Docs. 463-1, p. 21; 507-3,

p. 4-10; 569-3, p. 4; 637-3, p. 3; 667-55, p. 3; 698-7, p. 2; 723-7, p. 2; 744-6, p. 2;

779-5, p. 2).  During its November 2023 site visit, the United States visited some

elementary school playgrounds and confirmed that they had been renovated or

newly constructed since the Consent Order's entry, including the playgrounds at

Highlands Elementary, Rolling Hills Elementary, Blossomwood Elementary, and

Jones Valley Elementary. Additionally, in each annual report, the Board has

updated the Court and the United States on the construction of SMALLabs and the

gradual transition away from those spaces in all facilities.  (*See, e.g.*, Docs. 569-3,

p.5; 744, p. 45).

11

The Board believes it also has consistently met its other facilities obligations. For example, during the construction of the facilities identified above, the Board developed a set of District-wide standards for construction and renovation, and the Board's position is that it has adhered to those standards throughout the entirety of the Consent Order's implementation, as required by Section VI.B.1.  The Board also believes it has ensured that the District's teaching technology, security measures, and environmental remediation procedures were equitable during the implementation of the Consent Order, as required by Section VI.B.2.

Regarding portables, the Consent Order requires the District to "[e]liminate all portables in use during the 2014-15 school year by the 2017-18 school year, and, in the future, use portables in the District only as necessary as an interim solution." (Doc. 450, § VI.B.3).  The Board met the requirement to ensure that all classroom portables were discontinued by the first day of 2017-18.  (Doc. 569-3, p. 3).  The Board was able to continue without classroom portables until the 2021-22 school year.  That year, the Board installed portables at Whitesburg Elementary School, Goldsmith-Schiffman Elementary School, Hampton Cove Elementary and Middle Schools, Morris Elementary and Middle Schools, and Grissom High School to address growing student populations at those schools.  (*See* Doc. 723-7, p. 3).  The Board has represented that it intends for these portables to be interim

measures and that it has started taking steps to implement future construction plans to alleviate the need for these portables.  (*See* Doc. 769) (explaining that the requested construction for Hampton Cove Middle School and Goldsmith-Schiffman Elementary School will help to address the growing student population and eliminate the need for portables at Goldsmith-Schiffman Elementary School).  As explained in its August 25, 2023 motion, the Board is close to finalizing a 10-year facility plan, and the Board expects that this plan will help limit the need for continued use of portables.  (Doc. 769, p. 18).  The United States will continue to monitor the District's use of portables, including by closely reviewing the District's forthcoming facilities plan to ensure that it adequately addresses this issue.

The final obligation of the Consent Order as to facilities, other than reporting, is that the Board must seek Court approval before performing any construction, school closure, or renovation that would impact the M-to-M capacity of any of the Board's facilities.  (Doc. 450, § VI.B.4).  Most recently, the Board sought permission to add on to the Hampton Cove Middle School and Goldsmith-Schiffman Elementary School facilities.  (*See* Doc. 769).  As the Consent Order requires, the Board gave the United States notice of the proposal and received

Court approval before taking the proposed actions for these two schools.  (*See* Doc. 770, p. 5).[4]

Despite having completed the majority of its obligations in VI.A in 2017, the Board has waited to move for a release of supervision in order to demonstrate to the Court its sustained good faith in the area of facilities.  This good faith has included addressing additional facilities needs that were not expressly mentioned in the Consent Order including, but not limited to:

- The completion of six new tennis courts at Jemison High School in June of 2019 (Doc. 667, p. 47);

- Comprehensive renovations for Highlands Elementary School during the 2021-2022 school year (including a roof replacement; HVAC replacement; interior and exterior paint; cafeteria renovation; landscaping; and new ceilings, lighting, flooring, restroom fixtures, and water fountains throughout) after an issue with the roof and HVAC replacement planned for the summer of 2021 resulted in the displacement of Highlands Elementary students; and

---

[4] The Board acknowledges that, during the 2016-17 school year, it failed to seek Court approval of renovations at Weatherly Elementary School that affected transfer capacity.  Upon learning of the changes made at Weatherly, the Board immediately informed the United States, the Parties reached a joint resolution on the issue, and the Board notified the Court of the steps taken to correct the Board's oversight.  (*See generally* Doc. 529).  The Board also notes that no M-to-M transfer requests were denied.

- The recent construction of additional athletics facilities at Jemison and Columbia High schools.

Given all of the above, the parties agree that the Board is close to demonstrating compliance with its Consent Order obligations in the area of facilities. As noted above, the District intends to embark on a 10-year facility plan in the near future, and the United States is awaiting a formal proposal from the District to evaluate. Once received, the United States will closely review that plan to ensure that it provides for equitable facilities throughout the District. The Parties agree that if that 10-year plan satisfies the United States' review, the District will be well-positioned to seek release from federal court supervision in the area of facilities in the near future.[5]

### c. Faculty and Staff

#### i. Joint Update

On April 5, 2023, the Board filed an Unopposed Motion for Partial Unitary Status as to Faculty and Staff. (Doc. 758). In that motion, the Board asked the Court to terminate federal supervision in the areas of faculty and staff. (*Id.*). In response, the United States provided an overview of its findings based on its

---

[5] The Board does not believe that the Court's consideration of its new 10-year capital plan is required by law in order for the Court to release the Board from federal judicial supervision. Instead, the Board mentions its 10-year capital plan as proof of the Board's ongoing and future good faith efforts to operate a unitary system and address facility needs even after the Court's release of supervision. The Board will endeavor to have its 10-year capital plan finalized and a motion for release from federal court supervision completed by this summer.

monitoring of the Board's compliance with the Consent Order's faculty and staff provisions.  (*See* Doc. 763).  The United States concluded that "the District has met its desegregation obligations with respect to faculty and staff and does not oppose the District's motion for a declaration of partial unitary status in this area."  (*Id.* at 12).  Thereafter, the Court entered an Order that recognized the Board's progress and good faith effort in this *Green* factor area.  (*See* Doc. 770).  While the Court did not grant or deny the Board's motion, the Court concluded that "[t]he Board's efforts to date in the area of faculty and staff and its commitment to avoid a reversion to prior *de jure* practices warrants a relaxing of supervision in this area until the Court releases the Board from federal supervision of faculty and staff."  (*Id.* at 4).  To that end, the Court suspended the Board's reporting obligations as to faculty and staff.  (*Id.*).

After the Court's Order, the Parties each undertook a preliminary review of recent data to evaluate whether there were any shifts in data that warranted a reconsideration of the Parties' positions in this area.  While the Board was not required to file data under the faculty section of the Consent Order in its most recent annual report, the Board generated the reports that it traditionally files and provided them to the United States at the United States' request.  The data revealed that, for the 2022-23 school year, the Board had 14 Black central office administrators (48%), 13 white central office administrators (45%), and 2 (7%)

16

central office administrators of other races.  Additionally, the Board's school principals in the 2022-23 school year were 57% Black and 39% white.  The Board's assistant principals during the same school year were 60% Black and 38% white.  Notably, the percentage of Black teachers in the District grew from 27% in 2021-22 to 31% in 2022-23.

The Parties agree that the above-referenced data do not reveal any shifts that warrant a reconsideration of the Parties' positions.[6]  The Board's position remains that it has fully and satisfactorily complied with the Consent Order in the areas of faculty and staff, that retention of judicial control in faculty and staff is not necessary to achieve compliance with the whole of the Consent Order, and that it has demonstrated a good-faith commitment to the whole of the Consent Order. (*See* Doc. 759).  The United States continues to not oppose the Board's Motion. (*See* Doc. 763).

The Board further updates the Court about its position below.  The United States' substantive position has not changed, and it defers to the Court as to the best course of action moving forward on this *Green* factor.

---

[6] The United States' review is still ongoing.  If the United States' review of other data and information from the District related to faculty and staff reveals any concerns, the United States reserves the right to raise such concerns with the District and reconsider its position.

## ii. Huntsville City Board of Education Update

The Court noted in its Order that before it could grant a motion for partial withdrawal of court supervision, "a district court should consider whether retention of supervision in one area is necessary to ensure compliance with other facets of a consent order."  (Doc. 770, p. 5 (citing *Freeman v. Pitts*, 503 U.S. 467, 491 (1992))). In its Brief in Support of its Motion, the Board stated that the Consent Order contained important faculty related provisions in the equitable access to course offerings and programs ("equitable access") section of the Consent Order. (Doc. 759, p. 17-18).  The Board concluded that, because the Court would continue to have jurisdiction over this area, the retention of supervision in faculty and staff was unnecessary to ensure compliance with the whole of the Consent Order.  (*Id.* at 18).  In its Brief, the Board did not expand upon these statements, but will do so here.

The Consent Order's equitable access section contains non-racial provisions that address the general assignment and distribution of certified personnel.  Even if the Court releases the Board from federal supervision for the faculty and staff *Green* factors, the equitable access provisions will continue to provide the Court oversight of certain personnel assignment decisions made by the Board.  For example, the Consent Order requires the Board to "manage hiring and assignment of teachers, including initial placement and voluntary and involuntary transfers, to

18

ensure comparability of teacher experience across schools." (Doc. 450, § III.B.3). The same section, for secondary teachers, requires the Board to "implement a process to review the credentials of secondary teachers in departments to ensure comparability of departments between schools" when considering factors such as "professional degrees, certifications, subject matter expertise, years of experience, performance reviews, qualifications of AP teachers, training, and other indicia of quality and effectiveness." (*Id.* at § III.B.1). If this review reveals lack of comparability, the Board must "take appropriate measures that will ensure the departments are comparable as soon as possible but not later than two years from the date of the determination." (*Id.* at § III.B.1.b).[7] This section also contains a provision regarding the review of the effectiveness of probationary teachers. (*Id.* at § III.B.2).[8]

The Court's continued supervision of the Board's personnel is not solely limited to equitable access. The student assignment section also provides the Court continued supervision over personnel qualifications at certain specific schools. For

---

[7] The equitable access factor will allow the Court to have continued awareness of the comparability of faculty at Board schools through the Board's annual report. For example, the equitable access section will continue to require the Board to provide the Court "a report for each school that includes the employee number of each teacher, his or her race, professional degrees, certifications, years of experience (3 years or less and more than 3 years) and course or courses taught." (Doc. 450, § III.M.1.d).

[8] The equitable access section contains other important provisions that mandate certified pre-kindergarten teachers (*Id.* at § III.C.2), trained and qualified gifted teachers and staff (*Id.* at § II.D.8), and comparability of school guidance counselors (*Id.* at § II.K.2).

the Lee High School Creative and Performing Arts magnet, the Consent Order requires the Board to "review all magnet courses to determine whether magnet courses have qualified teachers" and, based on this review, "develop a plan" to "hire or assign qualified teachers for any magnet courses identified as not having a qualified magnet teacher." (*Id.* at , § II.E.7.e). A similar provision exists for New Century Technology High School. (*Id.* at § II.E.7.f.3). For the Academy of Academics and Arts, the student assignment section provides protection to ensure the Board "recruits arts-minded teachers to teach at AAA from within the District and from outside the District." (*Id.* at § II.E.7.b.2).

There are many sections outside the faculty section of the Consent Order that will continue to address professional development for the Board's personnel. For example, the student assignment section will continue to mandate professional development strategies to support the implementation of any magnet curriculum. (Doc. 450, § II.E.10). The equitable access section will continue to mandate professional development for new teachers and refresher professional development tied to culturally responsive strategies. (*Id.* at § III.A.2). The discipline section of the Consent Order will continue to mandate professional development tied to the Behavioral Learning Guide and the Board's positive school climate program. (*Id.* at § VII.B.11).

The Board maintains its position that a release of federal supervision of the faculty and staff *Green* factors is an important milestone for the Board and the Huntsville community, at large.  It is a signal to the community that its Board of Education and the Board's faculty, staff, and administrators are committed to achieving unitary status and have worked in good faith to do so for these factors. Importantly, for the Court, the Board asserts that while a release from federal judicial supervision for the faculty and staff *Green* factors will limit the Court's authority to remedy future issues, the Court will not be left without recourse.  As explained above the Court will continue to have authority to address: potential disparities that arise related to teacher experience across all schools; disparities in teacher qualifications at the secondary level; and qualification concerns at certain magnet schools.  The Court will also have continued oversight over many professional development requirements for Board personnel.  Taken together, the Board asserts that the Court can both grant its unopposed motion and achieve its goal of limited future supervision of personnel using the other facets of the Consent Order described herein.

RESPECTFULLY SUBMITTED this 1st February 2024.


/s/ Christopher M. Pape
Christopher M. Pape
Zachary Roberson
McKala Troxler
Attorneys for Defendants

**OF COUNSEL**
BISHOP COLVIN, LLC
2101 Clinton Avenue W., Suite 402
Huntsville, AL 35805
Phone: 205.251.2881

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS, Chief
Educational Opportunities Section

*Brigid Benincasa*
KELLY GARDNER
ANDREA HAMILTON WATSON
BRIGID BENINCASA
JESSICA POLANSKY

U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section

950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-4092

*Attorneys for Plaintiff-Intervenor*


## CERTIFICATE OF SERVICE

I certify that I have filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid.

/s/ Christopher M. Pape
Christopher M. Pape