FILED
2026 Apr-13  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **SONNIE WELLINGTON HEREFORD, IV**, *et al.,* | ) )  ) |
| **Plaintiffs,** | ) ) |
| **and** | ) ) |
| **UNITED STATES OF AMERICA,** | ) ) |
| **Plaintiff-Intervenor,** | )  **Case No.: 5:63-cv-00109-MHH** ) |
| **v.** | ) ) |
| **HUNTSVILLE BOARD OF EDUCATION,** *et al.,* | ) ) ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

The City of Huntsville Board of Education has operated under federal supervision since 1970.  (Doc. 67; *see* Doc. 364, pp. 8–23).  The Court has supervised the school district's work in several areas pursuant to *Brown v. Bd. of Edu.*, 347 U.S. 483 (1954), and *Green v. County School Bd. of New Kent Cnty., Va.,* 391 U.S. 430 (1968).  The Board has asked the Court to release it from supervision as to three *Green* factors:  faculty and staff, facilities, and extracurricular activities. (Doc. 827; *see also* Docs. 758, 759, 782).  This opinion addresses the Board's motion.

As the Court stated in its April 2015 memorandum opinion in this case, in 1963, "Huntsville's public schools were racially segregated by law.  Negro children [were] sent to Negro schools only and [those] schools [were] staffed solely by Negro personnel. Conversely, white children [were] sent only to schools containing white children," and those schools were "staffed solely by white personnel."  (Doc. 449, p. 2) (quoting March 11, 1963, Affidavit in Support of Motion for Preliminary Injunction, ¶ 5).  In 1970, the Court ordered the Board to file with the United States Office of Education a desegregation plan for the school district.  (Doc. 67, pp. 1–2).[1] The desegregation plan was to "announce and implement" policies addressing faculty and staff; majority to minority transfers; equity in school construction and site selection; interdistrict transfers; equity in services, facilities, activities, and programs, including athletics and other extracurricular activities; and equity in transportation.  (Doc. 67, pp. 3–8).  For decades, in fits and starts, the Board implemented the desegregation plan.  (Doc. 364, pp. 8–23).

In April 2015, 45 years after the Court ordered the Board to implement a plan for desegregation of the school district, the United States Department of Justice and the Board presented to the Court a proposed consent order to update that Board's desegregation obligations and position the Board to finally "eliminate the vestiges

---

[1] In 1970, the Office of Education was part of the United States Department of Health, Education, and Welfare.  (Doc. 67, p. 1).

2

of the unconstitutional *de jure* system." *Freeman v. Pitts*, 503 U.S. 467, 485 (1992); (*see* Doc. 388-1). The consent order covers several topics including faculty, facilities, and extracurricular activities. (Doc. 450, pp. 62–73). The Court approved the consent order, (Doc. 450), and the Board has worked diligently to implement its obligations under the order.

To evaluate the Board's motion for release from supervision in the areas of faculty, facilities, and extracurricular activities, the Court uses the criteria the United States Supreme Court has established for public school desegregation cases. Public school systems that were racially segregated by law must abolish "'the system of segregation and its effects'" so that racial discrimination in public education is eliminated "root and branch." *Green*, 391 U.S. at 438, 440. "The *Green* factors are a measure of the racial identifiability of schools in a system that is not in compliance" with *Brown*. *Freeman*, 503 U.S. at 486. When a public school district eliminates the vestiges of the prior unconstitutional *de jure* system "to the extent practicable" and demonstrates its good faith commitment to the future operation of the public school system through "specific policies, decisions, and courses of action that extend into the future," a federal court must "restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 249-50 (1991). In its

3

discretion, a district court may "order an incremental or partial withdrawal of its supervision and control" over a public school district. *Freeman*, 503 U.S. at 489.

### Faculty and Staff

The 1970 desegregation order obligated the Huntsville Board of Education to assign all "principals, teachers, teacher-aides, and other staff who work directly with children at a school" so that no public school in the district was racially identifiable. (Doc. 67, p. 3). The Board was to assign staff so that the ratio of Black to white teachers and other school staff at each school was "substantially the same as each such ratio [was] to the teachers and other staff, respectively, in the entire school system." (Doc. 67, p. 3). The 2015 consent order updated the Board's responsibilities concerning the recruitment, hiring, promotion, demotion, termination, and assignment of faculty and staff. (Doc. 450, pp. 65–66, §§ V.A–B). The consent order requires the Board to keep records regarding faculty and staff and establishes new annual reporting obligations for the Board. (Doc. 450, pp. 67–70, §§ V.C–D).[2]

The record demonstrates that the Board has, to the extent practicable, eliminated the vestiges of *de jure* segregation with respect to faculty and staff. When the Court implemented the 2015 consent order, 30 % of the district's principals were

---

[2] The district has complied with its reporting requirements under the 2015 consent order.

Black, and 40 % of the staff members in the district's schools were Black.  (Doc. 828-1, p. 5) (citing Doc. 542, p. 28; Doc. 565-7, p. 2).  In 2024, 56 % of the district's principals were Black, and 53 % of the staff members in the district's school were Black.  (Doc. 828-1, p. 5).[3]  When the Court implemented the 2015 consent order, 27 % of the district's teachers were Black, (Doc. 828-1, p. 5) (citing Doc. 542, p. 28), and in 2024, 33 % of the teachers in the district's schools were Black.  (Doc. 828-1, p. 5).  Overall faculty retention increased from 80% in 2016–2017 to 88% in 2023–2024, with some fluctuations over the years.  (Doc. 828-1, p. 4, ¶ 6).[4]  The increase in teacher retention is indicative of the Board's good faith, demonstrating the Board's effort to retain Black and white teachers.

On this record, the Board has demonstrated its good faith commitment to hiring principals, faculty, and staff in a manner that prevents the schools in the district from being racially identifiable, and the Board appears to be committed to retaining its Black principals, faculty, and staff.  Accordingly, the Board has satisfied

---

[3] In 2023, the Court suspended the Board's reporting obligations as to faculty and staff, (Doc. 770, p. 4, ¶ 5), but the Court required the Board to preserve the records needed for reporting under Section V.D. of the Consent Order, so that updated information would remain available to the Court and the United States should future proceedings in this matter require it, (Doc. 770, p. 4, n.2).

[4] The district struggled with teacher retention in the 2020-21 and 2021-22 school years during the Covid pandemic.  (*See* Doc. 828-1, p. 4, ¶ 6).  The number of Black teachers in the district was largely consistent over those years, and the number has increased in the past two academic years. (Doc. 828-1, pp. 5, 7, ¶ 7).

the faculty and staff *Green* factor.  The Court releases the Board from federal supervision of faculty and staff.

## Extracurricular Activities

The 1970 desegregation order stated that no student could be segregated from or discriminated against "on account of race or color in any . . . extracurricular activity . . . that may be conducted or sponsored by or affiliated with the school in which [the student] is enrolled."  (Doc. 67, p. 7).  Under the 2015 consent order, public high schools in the district have had to offer a variety of extracurricular activities, including honor societies, math teams, ROTC, student leadership organizations, and other clubs.  (Doc. 450, p. 62, § IV.A).  Middle and junior high schools have had to offer activities such as National Junior Honor Society, a math team, and at least one student leadership organization.  (Doc. 450, p. 62, § IV.B).  Elementary schools have had to offer at least one math club.  (Doc. 450, pp. 62–63, §§ IV.C–D).  The Board has had to ensure that students and families have received information about extracurricular opportunities.  (Doc. 450, p. 63, §§ IV.E–F).  Each year, the Board has had to provide to the United States copies of school yearbooks and submit a report containing, by school, details regarding the extracurricular activities offered, student participation rates, and measures used to inform students about available activities.  (Doc. 450, pp. 63–64, §§ IV.G–H).

In their February 2024 Joint Status Report, the parties stated that, with minor exceptions, the Board has complied with its desegregation obligations concerning extracurricular activities. (Doc. 782, pp. 8–9). The Board has promoted its extracurricular clubs and teams through a variety of channels, such as morning announcements at schools, paper handouts, newsletters emailed to parents, text notifications, and flyers posted throughout schools. (Doc. 828-1, pp. 7–8, ¶ 9).

The Board has consistently provided the United States with copies of yearbooks, as required under the consent order. (Doc. 828-1, p. 8, ¶ 10). In its annual reports, the Board has provided comprehensive data regarding its extracurricular offerings and participation rates. (*See, e.g.*, Doc. 500, pp. 21–23; Doc. 505-8; Doc. 505-9; Doc. 506-1; Doc. 667, pp. 32–35; Doc. 667-38; Doc. 667-39; Doc. 667-40; Doc. 744, pp. 27–30; Doc. 744-4; Doc. 816, pp. 34–36; Doc. 816-8).[5]

Having reviewed the information that Superintendent Sutton provided in support of the Board's motion, the Court is satisfied that the Board has made significant efforts to eliminate barriers and ensure that students may join the clubs and academic teams available at their schools, and the Board has attempted to provide clubs and academic teams equitably across schools in the district. (Doc.

---

[5] Because the Court suspended the Board's reporting obligations, (Doc. 841), the Board's 2025 annual report does not include a complete extracurricular report.

828-1, pp. 10–14, ¶¶ 14-20). The Board has demonstrated its commitment to continue to organize and make available to all students in each public school extracurricular programs without regard to race.

Therefore, the Court releases the Board from federal supervision with respect to the extracurricular activities *Green* factor.

**Facilities**

The 1970 desegregation order prohibited the Board discriminating against any student "on account of race or color in any . . . facility . . . with[in] the school in which he [was] enrolled." (Doc. 67, p. 7). In addition, "[a]ll school use or school-sponsored use of . . . facilities . . . [were] to be open to persons without regard to race or color." (Doc. 67, p. 7). Under the 2015 consent order, the Board has had to ensure that school facilities are equitable. (Doc. 450, p. 71, § VI.A). The consent order mandated the construction of new facilities for Jemison High School, McNair Junior High School, Grissom High School, Whitesburg Pre-K through 8th Grade School, Sonnie Hereford Elementary School, and Morris Pre-K through 8th Grade School. (Doc. 450, p. 71, § VI.A.1, 3). In addition, the Board had to complete renovations at Martin Luther King, Jr. Elementary School and the Academy for Academics and Arts. (Doc. 450, p. 71, § VI.A.2). The Board had to fully implement its Playground Plan and ensure that each school serving grades seven and eight was equipped with a SMALLab. (Doc. 450, p. 71, §§ VI.A.4–5).

Under the consent order, when the Board renovates or replaces existing school facilities, it must "adhere to District-wide standards, such that following renovations or construction, the school or renovated section of the school meets the same standards of quality as applied to newer schools." (Doc. 450, p. 72, § VI.B.1).  The Board also must "[m]aintain standards for ensuring that as improvements are made to teaching technology, school security systems (e.g., door alarms), and environmental materials remediation, all schools are treated comparably."  (Doc. 450, p. 72, § VI.B.2).  Additionally, the Board had to "[e]liminate all portables in use during the 2014-15 school year by the 2017-2018 school year, and, in the future, use portables in the District only as necessary as an interim solution."  (Doc. 450, p. 72, § VI.B.3).

The Board has satisfied its construction and renovation obligations under the consent order.   (Doc. 541, pp. 7-8; Doc. 782, pp. 10-11).   The Board has implemented its elementary school playground equipment modernization project. (Doc. 828-2, p. 5, ¶ 5).  The Board complied with its obligation to install SMALLabs in schools that house grades seven and eight, (Doc. 541, pp. 7-8), and received permission to discontinue the SMALLab rooms in favor of expanded classroom space, (Doc. 744, p. 45).  The Board consistently informed the United States and the Court about the phase out of the SMALLabs.  (*See* Doc. 782, p. 11).  The Board has complied with its obligations regarding portable classroom space, though portables

9

still seem to be in use, and the Board has consistently filed its annual facilities reports. (*See* Doc. 840-1, p. 27; Doc. 457, pp. 31 – 34; Doc. 463-1; Doc. 500, pp. 32–34; Doc. 507-1; Doc. 542, pp. 33–35; Doc. 569-3; Doc. 598, pp. 38–40; Doc. 637-3; Doc. 667, pp. 46–49; Doc. 667-55; Doc. 698, pp. 38–41; Doc. 698-7; Doc. 723, pp. 38–41; Doc. 723-7; Doc. 744, pp. 41–45; Doc. 744-7; Doc. 779, pp. 26 - 28; Doc. 779-5; Doc. 816, pp. 37–39; Doc. 816-5).[6]

With respect to its demonstration of good faith, the Board prepared and submitted a ten-year capital plan for Court approval that sought to address critical facility needs in an equitable and fiscally responsible way while supporting desegregation efforts. (*See* Doc. 797). The Court approved the Board's motion to proceed with the capital plan. (Doc. 803).

In the Desegregation Advisory Committee's 2024–2025 Annual Report, the DAC expressed concerns regarding the motion to release the Board from judicial supervision of facilities due to "significant anticipated changes within the capital plan." (Doc. 840-1, p. 17). The DAC suggested that the Board provide regular updates as capital improvement plan projects begin or reach completion. (Doc. 840-1, p. 27). The DAC believes that such communication will foster community engagement and public understanding. (Doc. 840-1, p. 27).

---

[6] Because the Court suspended the Board's reporting obligations, (Doc. 841), the Board's 2025 annual report does not include a complete facilities report.

In his response to the 2024–2025 DAC report, the Superintendent provided information about steps the district is taking to reduce the use of portable classrooms. (Doc. 840-2, pp. 7–8), and the Superintendent stated that the Board will provide updates on implementation of the Capital Plan at Board meetings, (Doc. 840-2, p. 8).

The record demonstrates that the Huntsville Board of Education has complied in good faith with the facilities requirements in the 2015 consent order. Through correspondence with counsel for the parties, during the 2025 fall semester, the Court attempted to schedule a conversation with the DAC regarding the capital plan; the Court has not located a response from counsel.[7] Given the ongoing implementation of the ten-year capital plan and the concerns articulated by the DAC regarding release from supervision of facilities during that implementation, the Court will offer one more opportunity for a conversation with the DAC or the DAC Chair before the Court rules on the *Green* facilities factor.

In sum, the Court releases the Board from supervision of faculty and staff and extracurricular activities and defers ruling on the Board's request for release from supervision of facilities.

---

[7] The Court sent a message on October 2, 2025 offering a meeting in October 2025 and a message on October 27, 2025 offering a meeting on November 19, 2025.

11

Given the Court's release of the Board from supervision of faculty and staff,

Doc. 758 is moot.  The Clerk of Court shall please TERM Docs. 758 and 827.

**DONE** and **ORDERED** this April 13, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE